UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

------------------------------------------------------------

**In Re: RFC and RESCAP Liquidating Trust Litigation**


File No. 13-cv-3451 (SRN/HB)

**ResCap Liquidating Trust,**

**Plaintiff,**

**v.**

**Primary Residential Mortgage, Inc.**

**Defendant.**


File No. 16-cv-4070 (SRN/HB)


Via Zoom for Government


December 18, 2020

9:00 a.m.

------------------------------------------------------------

BEFORE:

The Hon. **SUSAN RICHARD NELSON,** United States District

Judge

1  Official Court Reporter:      Carla R. Bebault, RMR, CRR
                                 U.S. Courthouse, Suite 146
2                                316 North Robert Street
                                 St. Paul, Minnesota 55101
3
   **A P P E A R A N C E S**
4  **For Plaintiffs via Zoom**

5  **Isaac Nesser, Esq.**
   **Heather K. Christenson, Esq.**
6  **QUINN EMANUEL URQUHART & SULLIVAN**
   51 Madison Avenue
7  22nd Floor
   New York, New York 10010-1603
8
   **Donald G. Heeman, Esq.**
9  **Jessica J. Nelson, Esq.**
   **Laurie Quinn, Esq.**
10 **SPENCER FANE**
   150 South Fifth Street
11 Suite 1900
   Minneapolis, MN 55402
12
   **For Defendants via Zoom:**
13
   **Matthew V. Johnson, Esq.**
14 **Matthew B. Nicholson, Esq.**
   **WILLIAMS & CONNOLLY LLP**
15 725 12th Street NW
   Washington, DC 20005
16
   **Elizabeth V. Kniffen, Esq.**
17 **ZELLE HOFFMAN VOELBEL & MASON, LLP**
   500 Washington Avenue South, Suite 4000
18 Minneapolis, MN 55415

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**VIA ZOOM FOR GOVERNMENT**

THE COURT:  We are here this morning in the matter of ResCap Liquidating Trust versus Primary Residential Mortgage, Inc.  This is civil file number 16-4070.  Let's begin with appearances and we'll start with the Trust, please.

MR. NESSER:  Good morning.  It's Isaac Nesser at Quinn Emanuel for the plaintiffs.  Nice to see you virtually.

THE COURT:  Good morning.  Mr. Heeman.

MR. HEEMAN:  Sorry.  Good morning, Your Honor. Don Heeman from Spencer Fane on behalf of the plaintiff.

THE COURT:  Very good.

MS. NELSON:  Good morning, Your Honor.  Jessica Nelson from Spencer Fane on behalf of plaintiff.

MS. QUINN:  Good morning, Your Honor.  Laurie Quinn from Spencer Fane on behalf of plaintiff.

THE COURT:  Very good.

MS. CHRISTENSON:  I apologize, Your Honor.

THE COURT:  I'm sorry.  Ms. Christenson.

MS. CHRISTENSON:  Good morning, Your Honor. Heather Christenson, Quinn Emanuel, on behalf of the Trust.

THE COURT:  Good morning.

```
1              All right.  Let's turn to the defendant PRMI,
2       please.
3              MR. JOHNSON:  Good morning, Your Honor.  Matt
4       Johnson, Williams & Connolly, for PRMI.
5              THE COURT:  You know, Mr. Johnson, I'm having a
6       little bit difficulty hearing you, so if you're going to
7       argue today, I don't know if you can enhance that audio or
8       not.
9              MR. JOHNSON:  Sure.  Mr. Nicholson will be
10      handling the argument so I will be on mute.
11             THE COURT:  Well, whatever you just did worked.
12             MR. JOHNSON:  Okay.
13             THE COURT:  Mr. Nicholson.
14             MR. NICHOLSON:  Good morning, Your Honor.  Matt
15      Nicholson from Williams & Connolly for PRMI.
16             THE COURT:  Good morning.
17             MS. KNIFFEN:  Good morning, Your Honor.  Elizabeth
18      Kniffen from Zelle for PRMI.
19             THE COURT:  Good morning.  All right.  We are here
20      this morning to consider the Trust's motion for attorney's
21      fees, costs and pre-judgment interest.  How will we proceed
22      with this motion?  Who will be heard?
23             MR. NESSER:  Your Honor, it's Isaac Nesser.  I
24      will be kicking things off, but Heather and I,
25      Ms. Christenson and I, will be splitting some of the
```

1   argument this morning.

2         THE COURT:  Very good.  You may proceed,

3   Mr. Nesser.

4         MR. NESSER:  Thank you, Your Honor.  This is my

5   first Zoom hearing so hopefully I will be -- hopefully I

6   will do okay.

7         THE COURT:  I think it's probably my thousandth

8   Zoom hearing.

9         MR. NESSER:  I'm sure that's true.  Old hat for

10   you.  Still learning as we go.

11         Your Honor, at trial we talked a lot about what we

12   on the Trust side believed was a practical, common sense

13   approach to determining PRMI's fair share of liability.  We

14   talked a lot about the way that real people in the real

15   world make decisions.  And what we heard from PRMI, as we

16   said, were hyper-technical kind of arguments that really

17   don't reflect real world risk assessments, and it seems as

18   if we're right back where we were at that point in time.

19         Your Honor, the Trust managed this case, as it has

20   the entire litigation campaign, carefully and responsibly as

21   any litigant would.  The Trust has a responsibility and has

22   a fiduciary duty to its unit holders to manage the case

23   efficiently.  The Trust has recovered $1.3 billion

24   approximately in settlements, prevailed in the *HLC* trial,

25   prevailed in this trial.  We reduced the number of

1   timekeepers and hours and the fees here substantially

2   relative to what we had in *HLC*, and we did that even though

3   the Trust had an obligation to protect the record in *HLC*,

4   which was on appeal, pending on appeal, even while the trial

5   in this case was proceeding; and that was the $70 million --

6   $70 million judgment that was still up in the air and still

7   in play as the trial in this case was proceeding.

8           And, Your Honor, we did all that in the context of

9   claims that are extraordinarily complex and difficult and

10  expensive to litigate necessarily and against a defendant

11  that didn't make things easy all the time.

12          And as against all of that, Your Honor, PRMI makes

13  a string of arguments that from our perspective are just

14  divorced from reality and the real world of this litigation.

15  They say that we didn't meet our burden on the motion

16  because we filed redacted invoices, even though the Court

17  has already rejected that argument and rejected that

18  argument in *HLC*, and we believe it rejected that argument

19  again here in the order a few weeks ago.

20          And then PRMI says, well, there's nothing unusual

21  or exceptional or extraordinary about this case.  I mean,

22  Your Honor, it's difficult to understand even if they were

23  in the same courtroom with us for the last several years.

24  There was nothing ordinary about this case.  And PRMI's

25  argument really boils down to the same contention that the

1   counsel made in *HLC*, which the Court rejected in the fee

2   order in *HLC*, that this is just an ordinary, standard, two-

3   party contract dispute.  They don't say that in those words

4   anymore because Your Honor rejected it, but that's the sum

5   and substance of their position.

6           Your Honor, that kind of Monday morning

7   quarterbacking maybe would have been less objectionable if

8   PRMI had prevailed in the case.  They didn't.  And perhaps

9   it would have been more understandable if PRMI could

10  credibly claim surprise by the nature and size of our fee

11  request here, but they can't because over and over again we

12  stood up in open court and sounded the alarm bells as loudly

13  as we can.  We said PRMI was forcing the parties to conduct

14  the litigation in a manner that was out of all proportion to

15  the size of the case, and we explicitly said that if they

16  made that choice, they ought not complain down the road if

17  they were asked to make good on their agreement in the

18  contract to pay the Trust's fees.

19          And so, Your Honor, that's by way of introduction

20  how we see things.  Ms. Christenson and I were among the

21  very first lawyers to begin work on these cases at Quinn

22  Emanuel and so it's fitting in the sense that we're now

23  almost seven years later and it's down to the two of us and,

24  of course, our friends at Spencer Fane.  And so the way in

25  which we plan to split today's argument is that

1    Ms. Christenson will explain why a case like this would have

2    been extraordinarily expensive to litigate even in the best

3    of circumstances, and then talk about the efficiencies that

4    we were able to achieve nonetheless.

5            And then I'll just address some of the specific

6    drivers of our increased fees, including issues of

7    proportionality.  We had planned to rest on our papers with

8    respect to the issue of pre-judgment interest unless the

9    Court has any particular questions about that issue.

10           With that, I'll turn it over to Ms. Christenson

11   with the Court's permission.

12           THE COURT:  Thank you, Mr. Nesser.

13   Ms. Christenson.

14           MS. CHRISTENSON:  Good morning, Your Honor.  This

15   is Heather Christenson.  As we proceed, I will begin by

16   addressing the expenses in this case.  (Indiscernible) and

17   the other ResCap cases require a type of litigation that

18   this Court has recognized by its very nature is expensive.

19   (Indiscernible) was a culmination --

20           THE COURT REPORTER:  I'm sorry, Ms. Christenson,

21   you're cutting in and out.  Can you maybe get closer to your

22   microphone?

23           THE COURT:  It seems to work when you're closer,

24   so I think it's rocking that's the problem.

25           MS. CHRISTENSON:  Is this better?

1          THE COURT:  That's fine.

2          MS. CHRISTENSON:  My apologies for that.

3          This trial was a culmination of four years of

4    litigation, a culmination of hard-fought issues, some of

5    which were litigated multiple times.  I want to touch on two

6    points regarding the inherent expense of this case.  The

7    first point is that if --

8          THE COURT:  You are cutting in and out.  Let me

9    ask you this, and this happens all the time.  You don't

10   happen to have a headset, do you?  That seems to work much

11   better generally.

12         MS. CHRISTENSON:  I do not have a headset,

13   unfortunately.

14         THE COURT:  Okay.  Then I think the key is to just

15   try to be as still as possible and we'll just see if we can

16   make it work.

17         MS. CHRISTENSON:  The first point is that this

18   case was expensive because of the amount of work we had to

19   do.  I'll begin with re-underwriting.  In its brief, PRMI

20   questions how we could have spent so much on our

21   re-underwriting when we only spent $220,000 on work

22   conducted by Mr. Butler and his vendor Opus.  But that

23   massively understates the reality of the re-underwriting

24   work that is required in a case like this.

25         And I'm in a position to talk about that work

1   because I have been working on re-underwriting in these

2   cases for the past six years.  And as we stated in the Alden

3   declaration referenced in our brief, and we also stated in

4   my declaration, re-underwriting is a multi-level process.

5           First, we have to find and review all versions of

6   all loan files for each of the loans, which sometimes

7   amounts to hundreds of pages, and we provide those to the

8   experts and vendors.

9           Next, we have to find all relevant information on

10  each loan, whether it be in a bid tape or in one of the

11  thousands of rows of a database extract, or in an e-mail

12  somewhere in the document production.  And that's because we

13  and the expert had to be aware of anything PRMI could point

14  to to argue that a breach was purportedly waived or that RFC

15  purportedly knew about a breach.

16          Next, we had to find all relevant program-specific

17  guidelines and contract representations for the vendors and

18  experts to assess the loans against.

19          Next, we sent out subpoenas and reviewed and

20  collected the responses to provide to the expert and vendor.

21          Next, we retained appraisal, AVM and MLS experts

22  that conducted analyses that fed directly into the

23  re-underwriting report.  Here, those experts cost

24  approximately $335,000; and that amount excludes the work we

25  had to do to get those folks the loan-specific information

1    they needed for their analysis.

2         After all that expert work, working with the

3    vendors, Mr. Butler could identify the material breaches.

4    At that point we had to cross-check and confirm all of the

5    data points and all of the document citations supporting

6    each breach.  We did the same when Mr. Butler provided

7    breach-level responses to Ms. Keith's breach-level opinion.

8         Moving on to the securitization representations,

9    we spent a third of this trial addressing complicated

10   causation issues regarding the securitization

11   representations in this case.  We did not have to devote as

12   much time to that issue at the *HLC* trial.  We had the burden

13   of proof at trial on whether PRMI's breaches constituted or

14   could be construed to constitute breaches of so-called

15   pool-wide reps, and also had to demonstrate that those were

16   still breaches despite the so-called fraud disclaimer.  And

17   that issue was addressed here much more extensively than any

18   other case.

19        Next, the bankruptcy issues.  We needed experts

20   and lawyers in this case with a very particularized

21   bankruptcy expertise to address complicated issues regarding

22   a bankruptcy case that Judge Glenn said was one of the most

23   complicated he had ever seen.  And in doing so, we had to

24   respond to a lot of arguments to prove that the settlements

25   in the bankruptcy were reasonable at trial.

1        The damages issues.  We had to present and defend

2    a very complicated allocation model in this case; and as set

3    forth in our papers, we needed to quantify the absolute

4    worst-case scenario impact of PRMI's criticisms to our

5    monoline allocation model and our trust allocation model.

6        And because we had to do all of that complicated

7    and time-intensive work for this case, it's not helpful to

8    focus on and dissect specific filings and specific issues as

9    PRMI does.  When PRMI attempts to argue that the fees in

10    this case cannot possibly be justified by a specific issue

11    or a specific filing standing alone, PRMI loses the forest

12    for the trees.  That way of looking at things is not how

13    real litigants operate.  Real litigants look at the big

14    picture and real plaintiffs, like this plaintiff, had to

15    weave together complicated issues so that they could

16    establish each element of required proof.  And for those

17    reasons we think a more appropriate way of assessing

18    reasonableness of fees is to look at all of the issues

19    together and look at all four years of litigation in the

20    aggregate.

21        Point number two.  This case wasn't any less

22    complicated than *HLC* and for that reason perhaps the only

23    comparable case to this one is *HLC*.  The *Flagstar* case PRMI

24    cites in its brief is not a good comparison.  That case

25    lasted one-and-a-half years from complaint to trial.  It

1    only had 107 docket entries from complaint to pretrial;

2    whereas, for this fee and interest motion alone there have

3    been over 90 docket entries.

4         That case involved only two trusts.  This case

5    involved over 500.  That damages expert had to calculate how

6    defective loans impacted cash flows to the two trusts; but

7    in doing so, he calculated that by dividing the original

8    loan balance of defective charged-off loans by the total

9    original loan balance of all charged-off loans.  And so he

10   did not perform the same analysis as Dr. Snow did in this

11   case.  Dr. Snow had to allocate billions of dollars of

12   bankruptcy settlements to PRMI while also taking into

13   account all of the losses and all of the breach rates of

14   hundreds of defendants and other originators.

15        I stated earlier that *HLC* is the most comparable

16   case to this one.  Where we could take advantages from *HLC*

17   we did, but there were also places where there were no

18   efficiencies to be gained from *HLC*.  To take re-underwriting

19   as an example, it's true that the vendors and experts had a

20   protocol for reviewing loan files and identifying

21   re-underwriting breaches.  But it's not as though we could

22   have copied and pasted the HLC breaches into a PRMI report

23   and called it a day.  We had to perform all of the tasks

24   that I described earlier for the first time in this case for

25   these 157 loans.  For securitization representations, we had

1    to look at different trust documents, taking into account

2    the trusts that PRMI loans were securitized in and had to

3    analyze those representations.

4         And as we all recall in *HLC*, a lot of the

5    breaching loans were securitized into trusts that had a

6    compliance with guideline representation, and we know that

7    that was not the case in this trial.  We also had different

8    fact witnesses here.  It's not as though we could take a

9    cross outline from *HLC* and use it for Mr. Zitting, and the

10   same is true for all new PRMI witnesses who appeared at

11   trial or were deposed.

12        And the fact that the extrapolated damages in *HLC*

13   were higher than here does not mean that we had to do less

14   work in this case.  That fact is merely a consequence of the

15   efficiencies realized by sampling because, again, in *HLC* we

16   had to analyze 150 plus specific HLC loans, just as in this

17   case we had to analyze 150 plus PRMI specific loans.

18        Turning to efficiencies.  As we have said before,

19   whenever possible ResCap used knowledge gained from Wave One

20   and also attempted to use Wave One rulings.  As a

21   consequence of those efforts to streamline, we gained

22   efficiencies.

23        Your Honor, I have provided the Court with three

24   table demonstratives.  Those tables, Your Honor, I think are

25   helpful to demonstrate the efficiencies that ResCap achieved

1   in this case as compared to *HLC*.  The information in those

2   tables is based on information on page 2 of Exhibit 54 to

3   the supplemental declaration of Jill Horner, which is docket

4   number 105 in this case.

5          And these tables reflect the number of

6   timekeepers' hours and fees that relate to the *HLC* action

7   for the five months leading up to and including trial, which

8   was the period from July 2018 to November 2018.  That is

9   compared against the number of timekeeper hours and fees in

10  this action for the six months leading up to, including, and

11  after trial, which is the period from November 2019 to April

12  2020.  And I should also say that the data in these charts

13  relate to the data that underlie the fee requests that were

14  submitted in each of those cases.

15         So turning to the first table which reflects

16  "timekeepers" at the top, as Court can see, in *HLC* that

17  number was 137 individuals.  In PRMI it was 37 individuals.

18  That means there were 100 fewer timekeepers in PRMI, which

19  amounts to 73 percent fewer timekeepers.

20         This table demonstrates or reflects hours at the

21  top of the graph, and there the number of hours in *HLC* is

22  40,698.4.  The number of hours in PRMI is 11,681.5.  That

23  means there were 29,016.9 fewer hours here, which is a

24  difference of 71 percent fewer hours.

25         The final table reflects fees at the top portion.

1    There, in *HLC*, fees amounted to $13,851,133. Here, fees

2    amounted to $4,636,890. That means there were $9,214,243

3    fewer in fees here, which is a difference of 67 percent

4    fewer fees.

5        One note on the timekeepers. Our trial team in

6    this case was different from the *HLC* trial team, not only

7    because we used less individuals but also because we used

8    relatively cheaper attorneys that had been involved in these

9    cases from the start. Spencer Fane, who has a relatively

10    lower billing rate, served as the co-counsel, including

11    because of their deep familiarity with these cases and with

12    RFC's prior business.

13        We also promoted more junior attorneys with

14    relatively lower hourly rates to leadership positions; and

15    so I, as an associate, was able to lead all of

16    re-underwriting. I worked on the reports. I first chaired

17    the depositions, and I was able to examine my first trial

18    witness and handle the objections during Mr. Butler's

19    cross-examination that was conducted by a partner for PRMI's

20    counsel, and that was different than the role I served in

21    *HLC*.

22        And the same applied to my colleague Mr. Miller

23    who is also an associate at my firm. He led the charge on

24    arguments raised by PRMI's experts, Mr. Burnaman and

25    Professor Schwarcz, and he was able to first chair their

1    depositions and take their cross-examinations at trial, and

2    that was different from his role in *HLC*.

3         And once again, we tried wherever possible to cut

4    costs and streamline.  Where we could, we did; but there

5    were also certain instances where we were unable to do so.

6    And with the Court's permission, I will hand it back to

7    Mr. Nesser who will address some of those instances.

8         THE COURT:  Thank you, Ms. Christenson.

9         MS. CHRISTENSON:  Thank you, Your Honor.

10        MR. NESSER:  Your Honor, picking up where

11   Ms. Christenson left off, I wanted to say that it wasn't

12   only associates who were kind of put in leadership

13   positions.  My role here and Mr. Alden's role and

14   Mr. Scheck's role were also significantly larger in this

15   case than they were in the prior case, and that wasn't by

16   accident.  That was a deliberate decision that was made to

17   keep things -- to keep the team tighter and to keep the team

18   cheaper.  And so those were the kinds of steps that we took

19   wherever we could to make things work more efficiently.

20        But, Your Honor, I wanted to address the issue of

21   proportionality because we hear a lot about that in PRMI's

22   brief and I'm sure we'll hear a lot about it today.  And,

23   Your Honor, it didn't and it doesn't escape our attention

24   that our motion is asking for a lot of money.  It also

25   doesn't escape our attention that the amount of fees we're

1    requesting exceeds the size of the damages award and we're

2    sensitive to that.  We didn't seek an award of that nature

3    lightly, but it's the right award.  It's the right award

4    under the contract.  It's the right award as a matter of

5    law, and it's fair.  It's the fair real world fair award.

6           As to the contract, Your Honor, PRMI freely

7    entered into a contract in which it agreed to pay the

8    Trust's fees; and the Court held in *HLC* that when assessing

9    the fee request, I think it's appropriate to be mindful of

10   the fact that there was no reasonableness requirement

11   negotiated in the indemnification clause.  Your Honor in *HLC*

12   held that it's nonetheless appropriate to conduct a

13   reasonableness analysis and we're not suggesting that the

14   Court ought not do that here.  But the Court in *HLC*

15   indicated that that's an appropriate factor to keep in mind

16   for contextual purposes and we believe that that continues

17   to be appropriate.

18           As to the law, Your Honor, PRMI repeatedly argues

19   or suggests that we're somehow required to show exceptional

20   circumstances or significant benefits beyond the case.  But,

21   Your Honor, that's just not the law.  The Court held in *HLC*

22   that the amount of an attorney's fee award must be

23   determined on the facts of each case and is within the

24   District Court's discretion.  The Court also held that the

25   overall amount is not dispositive and that a court may find

1  a fee in excess of damages to be reasonable.  And so as a

2  legal matter, there's just nothing to the argument.

3       But I did want to address the issue of fairness

4  because PRMI's argument that our fee request somehow comes

5  as a bulk out of the blue because this case somehow wasn't

6  exceptional or extraordinary, that's just wrong.  This case

7  was extraordinary.  It's extraordinary, Your Honor, to have

8  issues of structured finance and bankruptcy and

9  re-underwriting and statistics and the appraisals and AVMs

10  and all of the rest.  It's extraordinary to have some of the

11  most difficult legal issues that any of us, I believe, has

12  encountered.  And, Your Honor, that's part of the reason why

13  we needed 13 trial days in a $5 million case.

14       But more than that, Your Honor, it's extraordinary

15  for a plaintiff to have to state on the record that they are

16  being forced to litigate issues that cost more to litigate

17  than the issues are worth in the first instance.  And we

18  talk about it in the brief and we talked about it a lot as

19  the case was proceeding, but the biggest example of this was

20  the Countrywide loan.  We had one loan in the sample.  I

21  don't think it was meaningfully disputed that that loan was

22  some -- was worth somewhere on the order of $30,000 in the

23  scheme of the case.  And yet that loan was litigated and the

24  breaches in that loan were litigated as if it was a $5

25  million issue.

1          And we raised the issue over and over again.  Why

2    are we having depositions and expert reports and trial

3    depositions and trial testimony on a $30,000 issue?  And we

4    never got an answer to that.  There's no answer to that in

5    the briefs either.  We don't know why PRMI chose to litigate

6    that way.  That was its prerogative.  Mr. Remele suggested

7    in his deposition that perhaps there was some extraneous

8    business interests that PRMI had that for some reason they

9    wanted to get rulings on those issues.  I don't know.  We

10   don't know.  But that was a decision that they made and they

11   now have to live with the consequences of that.

12         The same was true with the monoline allocation.

13   It was a $114,000 issue.  I'm not suggesting that's a small

14   amount of loan, but relative to the amount at stake and

15   relative to the legal fees that were expended in dealing

16   with that issue, it was just not proportional.

17         Your Honor, we had -- and I should say that was a

18   big issue in *HLC*.  It was worth a lot of money in *HLC*.  It

19   wasn't worth a lot of money here.  And so -- but

20   nonetheless, we got an expert report from Dr. McCrary.  We

21   had to depose Dr. McCrary.  We had to put in rebuttal

22   reports.  We had to deal with it at *Daubert*.  We had to deal

23   with it at summary judgment.  We had to deal with it at

24   trial.  I remember vividly.  I don't know whether the Court

25   does.  When Dr. Snow was on the stand he was cross-examined

by Mr. Johnson for 40 minutes on this issue; and what he
said in redirect was, Yeah, that 40 minutes was all incurred
by everybody in the courtroom over an issue that was worth
$114,000.

Again, we don't know why PRMI chose to litigate
that way, but it did.  And when you litigate issues of that
size knowing and being informed and being told on the record
that litigating issues of that size is going to generate
fees in excess of the damages at issue, you can't then
complain that the fees exceed the damages at issue.

We had the same issue on Assetwise.  I won't go
into it but that was worth somewhere in the order of
$400,000 and was litigated perhaps as if it was worth ten
times that much.

Your Honor, all of that is extraordinary.  It's
extraordinary as well to have a party engage in duplicative
litigation.  There are too many examples to list.  We listed
them in the brief.  But, I mean, how many times did the
Court need to address *UnitedHealth*.  How many times did the
Court need to address the same issues over and over and over
again in the context of expert discovery and *Dauberts*, in
limine, summary judgment, at trial.

We had the Ally issue.  We had this issue of the
supposedly -- there were supposedly two trusts settlements,
and it was like whack-a-mole.  I can't remember whose

1    expression that was, but it costs money to deal with that;

2    and I expect PRMI will argue, Well, why should it cost so

3    much money?  It's the same issue duplicatively.

4            But, Your Honor, the Court was there.  We were

5    there.  It's not as if you can say, Well, it's the same

6    issue.  Because PRMI, to their lawyers' credit, consistently

7    argued, Well, this is distinguishable.  It's distinguishable

8    for this reason or that reason, and now it's different, and

9    it's not the same posture as it was before.  So you have to

10   address -- the parties and ResCap had to address all of that

11   and it's expensive.

12           And so an issue that would seem to be

13   unexceptional then gets litigated five times.  And so,

14   again, you can't then come back and complain that your fees

15   are multiples of what PRMI believes they should have been

16   when that was a consequence of the litigation strategy.

17           Your Honor, it's extraordinary for a party to

18   waive a jury trial and then come back two years later and

19   say, Well, we're okay with a bench trial; just not in front

20   of this Court.  That's not ordinary.

21           And, Your Honor, in their surreply brief what they

22   say on that issue is, Well, that was only a 19-page brief

23   and it was argued at a regularly-scheduled hearing.  Come

24   on.  That's not the issue.  I mean, really?  The point is

25   ordinary litigants don't behave that way.  That's

1    extraordinary.  And that's the way they behaved, Your Honor,

2    on every single motion on every single issue in this case

3    and it's the way they continue to litigate this case.  The

4    fee motion that we're dealing with now is emblematic of

5    that.  Ordinary.  Ordinary, Your Honor, is opening brief, an

6    opposition brief and a reply.  This motion could have

7    existed of just those filings.

8        Ordinary doesn't require an expert to opine on

9    issues that the Court already addressed.  Ordinary doesn't

10   require anything of what we dealt with here.  Here's what

11   extraordinary looks like, Your Honor.  We filed our opening

12   brief.  We got a long letter plus a lengthy expert

13   declaration.  The Court had to issue two orders addressing

14   those and conduct an in camera review, all of that on the

15   issues of redactions that the Court had already dealt with

16   in *HLC*.

17       Then we got a 43-page opposition brief, plus a

18   long expert report.  The expert report didn't even address

19   the issue of reasonableness.  It just again essentially

20   litigated the question of whether our redactions permitted

21   an assessment of reasonableness.

22       And then we filed a reply in response to which we

23   got a 4-page, single-spaced letter in which they move to

24   strike three of our declarations, a 10-page surreply, a

25   19-page surrebuttal report from Mr. Remele, a 25-page

1    surrebuttal declaration from Mr. Smallwood.  Four filings,

2    60 pages on a surreply.

3            Your Honor, Ms. Christenson noted earlier that in

4    *Flagstar* there were 90 some odd docket entries up until

5    trial.  Here we had 90 some docket entries on this motion

6    alone.  That's not ordinary, and we don't think it was

7    appropriate to have litigated this motion that way.  We

8    understand PRMI disagrees with that, but what's not

9    debatable is that that's just not an ordinary way to

10   proceed.  That's exceptional by any measure.

11           And, Your Honor, this is all in the context where

12   the Supreme Court of the United States has said that the

13   Court's job is merely to do rough justice and that an

14   attorney's fee application shouldn't spawn a second major

15   litigation.  And, Your Honor, I haven't had a chance to

16   study in detail the slides that Mr. Nicholson circulated

17   shortly before argument, but I looked at them very quickly

18   and the first words that came to my mind were the Supreme

19   Court's admonition that the Court is not to engage in a

20   green-eyeshade exercise.  I mean, that is what they are.

21   Tiny small font.  Pages and pages of close analysis of

22   individual entries.  That's not what this is supposed to be

23   about.

24           Your Honor, the last kind of module that I wanted

25   to talk through is specifically to talk about this word

1    "proportionality" because we hear so much about it, so let's

2    talk about it.  Your Honor, if you would please -- if the

3    Court would please look at the hand-up or the exhibit that

4    we circulated in advance of the argument, what this is is

5    we've gathered here 16 different instances in which we said

6    on the record in open court, Hey, PRMI, if we proceed this

7    way, we're going to have to spend money in attorney's fees

8    in an amount that is not proportional to the size and needs

9    of the case.  That was the word that we used,

10   "proportional," because we saw this coming.

11           Your Honor, in April 2018, as is recorded in the

12   hand-up, Ms. Nelson sounded the alarm about wasteful,

13   duplicative depositions.  In July 2018 we said the

14   deposition requests were "disproportionate."  We raised the

15   issue again in January 2019 and in February of 2019.  We

16   said again, "It's disproportionate."

17           And we raise it again in May of 2019.  Your Honor,

18   that was just a few months after we had argued the

19   attorney's fees application in the *HLC* case.  And what we

20   said there explicitly, it's on the hand-up I think on the

21   second page, was that -- that if we were going to proceed in

22   the way that PRMI wanted to proceed, which is to say

23   submitting loan-by-loan expert reports on issues where the

24   Trust has sole discretion, if we were going to proceed that

25   way, that we didn't want to hear when it came time to an

1    attorney's fee application precisely the kind of arguments

2    that we're now hearing.

3          And Your Honor issued an order saying that's

4    correct.  We should not have loan-by-loan expert rebuttal

5    reports on issues where the Trust has sole discretion.

6    PRMI, respectfully, did not abide by that order and we'll

7    come to it in a moment.  As shown in the hand-up, though, we

8    raised this issue of proportionality twice in June, again in

9    August.

10          And I remember that letter, Your Honor.  What we

11    said was we -- and this is on the issue of these rebuttal

12    reports.  After Your Honor issued an order saying you

13    shouldn't have loan-by-loan analyses of loans where the

14    Trust has sole discretion because of the issues of

15    proportionality that we had raised, we got a report that did

16    exactly that except it somehow attempted to find a loophole

17    or an exception to the Court's order and said, Well, no,

18    this isn't a sole discretion issue.  This goes to our good

19    faith and fair dealing defense, which then of course got

20    rejected by the Court on summary judgment.

21          But that was, I think, again, emblematic of what

22    happened.  We had a ruling and then we had every possible

23    creative, clever argument to try to evade those rulings;

24    which again, is the prerogative of PRMI and its counsel, but

25    there are consequences of litigating in that fashion.  And

1 the purpose of our letter in August was to make a record of

2 that for this precise situation.

3       We raised the issue again in September.  What we

4 said was, "We wanted to make a record now for purposes of

5 any forthcoming fee application as to PRMI's unapologetic

6 insistence on processes that will require the Trust to waste

7 time and money litigating settled issues."

8       Again on September 17, again in December,

9 repeatedly in January.  In January we framed the issue in

10 terms of, "the size of the case, the dollar amount of the

11 trusts claimed in the aggregate, the relative significance

12 of the various disputed issues, and proportionality."  Those

13 were the words we used.

14       We also invoked the issues of attorney's fees.  I

15 remember asking whether PRMI would stipulate that it was

16 reasonable to spend $50,000 in attorney's fees on a $30,000

17 issue.  We got no response then.  We have no response now.

18       We raised the issue again in February.

19       And so, Your Honor, when we hear criticism about

20 whether our fees were proportional to the dollar amounts at

21 issue in the case, we don't have a lot of sympathy for that

22 argument because we've spent the last year and a half

23 talking about proportionality of fees relative to the size

24 of the case.  We didn't want to proceed this way but I don't

25 know what more we could have done.  PRMI was on notice of a

1      contract.  They were on notice of the *HLC* fee award.  They

2      were on notice that our fees were increasing.  They knew

3      that the Trust was open to a settlement here, just as it

4      settled dozens and dozens of other cases before the Court,

5      but they elected to take a risk and proceed to trial.  That

6      was their right.  But they weren't successful at trial and

7      the Trust now should not be left holding the bag for the

8      consequences of those decisions.

9                  That's all I have, Your Honor.

10                 THE COURT:  Thank you, Mr. Nesser.

11                 All right.  Mr. Nicholson.

12                 MR. NICHOLSON:  Thank you, Your Honor.  With the

13     Court's indulgence, I'll just set up the podium real quick.

14                 (Pause in proceedings.)

15                 MR. NICHOLSON:  Good morning, Your Honor.  Matt

16     Nicholson for -- from Williams & Connolly for PRMI.

17                 I'd like to begin by addressing plaintiff's motion

18     for attorney's fees and costs and then I may, if there's any

19     time remaining, address their motion for pre-judgment

20     interest.

21                 In its motion plaintiff is seeking $13.84 million

22     in fees and costs in a case where it sought and obtained

23     just $5.4 million in damages.  Mr. Nesser talks a lot about

24     the real world and what's ordinary, but the reality is it's

25     not ordinary and it's not normal in the real world for

1     parties to incur such massive costs in pursuit of damages of

2     $5.4 million absent a fee-shifting provision.

3            And so what's going on here, Your Honor, is that

4     the plaintiff in this case, because it had an expectation

5     that its fees could be shifted, decided to litigate, over-

6     litigate this case from the very beginning; and I'll

7     demonstrate that today, and that is really the reason why

8     plaintiff's fees are so high.

9            Mr. Nesser talks a lot about defenses.  He doesn't

10    once talk about the hours that plaintiff spent responding to

11    any of those defenses.  He doesn't once explain any math by

12    which he can reasonably explain how hours could have added

13    up to 28,700 in this case.

14           And Ms. Christenson for her part spent the day

15    talking about issues which, at best, account for only a

16    fraction of plaintiff's massive fees.  Plaintiff -- she

17    talks about issues that largely had been addressed in prior

18    cases, and she talks about re-underwriting issues that

19    should have accounted for only a fraction of $13.84 million,

20    and in fact by their own estimate does, so that doesn't get

21    them anywhere close.

22           But, Your Honor, I want to just give a brief

23    summary of our affirmative points about why the motion

24    should be denied or substantially reduced and then I'll

25    circle back and address these in a little bit more detail.

1    But the first is that plaintiff cannot show that

2    it was reasonable to spend such massive fees in light of the

3    nature or difficulty of this action.  Mr. Nesser says the

4    action was extraordinary.  It was in many respects, but

5    plaintiff was not approaching this case on a white slate

6    having litigated dozens and dozens of cases having

7    presenting similar issues in Wave One.  And as far as the

8    amount of new litigation activity goes, this case was far

9    from extraordinary; rather, it involved about a relatively

10   standard amount of standard litigation activities like

11   depositions, trial days, hearing days, et cetera.

12       And as to proportionality, there can be no

13   question that plaintiff's request for $13.84 million is

14   grossly disproportional to the amount involved.  Contrary to

15   Mr. Nesser's contention, plaintiff does have to show some

16   exceptional circumstance to get such a large fee and cost

17   award.  Courts in contract cases will rarely grant fees that

18   even exceed the amount of damages involved.  Here, they are

19   going above that by several million dollars.  Clearly, they

20   have to show some exceptional circumstances like a larger

21   benefit, and plaintiff can't point to any such thing.

22       Third, plaintiff hasn't even adequately documented

23   its hours in this case.  Instead they provided zero invoices

24   for its law firms for the vast majority of the case, and

25   redacted its invoices to the point of being indecipherable

1    for the other periods. And insofar as they did produce

2    information, it only underscores that 28,700 hours were

3    excessive and unreasonable.

4          Plaintiff, as I said, did not at one point in this

5    case, in this argument, identify the hours it spent on any

6    particular activity. Ms. Christenson says, Oh, well, that

7    wouldn't be helpful. Well, Your Honor, that's exactly how

8    courts approach these questions. They ask how many hours

9    are reasonable to spend on document discovery? How many

10    hours are reasonable to spend on depositions? How many

11    hours are reasonable to spend on summary judgment, et

12    cetera. Plaintiff cannot give any numbers for those

13    different periods of the case, and it doesn't and it can not

14    because there is no reasonable way to show the math in this

15    case that adds up to 28,700. We've given plaintiff time and

16    time again to come forward with that math and they haven't

17    done it.

18          And that's not being a green-eyeshade accountant,

19    Your Honor. That's just asking for what's done in every

20    single case involving fee petitions. Parties come forward

21    with documentation of their hours and how much they spent on

22    particular activities. Plaintiff hasn't done that because

23    it can't do the math.

24          And so what is the plaintiff left with? Well,

25    it's left with trying to shift the blame to PRMI for

1   engaging in wildly disproportionate spending; but again,

2   they can't identify the hours they spent on any of these

3   expenses that they complain about.

4          And, Your Honor, after they submitted their reply

5   I went back and looked at their records to see what was the

6   point in this case in which their spending on fees and costs

7   surpassed the amount at issue of $5.4 million.  And it turns

8   out, Your Honor, that by July 2019 plaintiff had spent $5.66

9   million on this case.  That was before PRMI even submitted

10  an expert report.  That was before PRMI litigated any of

11  these issues that plaintiff complains about.

12         And that shows that plaintiff never made any

13  serious effort, Your Honor, to calibrate its spending to the

14  amount involved.  Instead, it over-lawyered this case from

15  the beginning; and the facts, which I'm going to go through

16  today, not as a green-eyeshade accountant but just at a high

17  level, show that this was the case.

18         Now, one more preliminary point and that is that

19  Mr. Nesser complains about the way that we litigated this

20  fee petition.  Well, to begin with, this fee petition is

21  multiples of the size of damages award that they sought and

22  obtained, so it's hardly unreasonable for PRMI to ask that

23  plaintiff do basic things like explain how many hours it

24  spent on particular activities.  But setting that aside, the

25  reason that this issue is litigated the way it was is

1    because of plaintiff's own litigation choices.

2            What did it do?  It filed an initial fee motion

3    that was extremely short with a perfunctory brief providing

4    little explanation of the hours.  It attached a cursory

5    declaration for Ms. Christenson which addressed only

6    high-level events that didn't come close to justifying its

7    hours; and it attached volumes of exhibits with no

8    explanation and with key information redacted or missing

9    entirely.

10           So how did we respond to that?  Well, we sought

11   basic discovery that typically is granted in any case, and

12   we retained an expert to look through this.  And what did we

13   find?  We found that plaintiff could not remotely justify

14   its massive hours at each stage of the case.  And so how did

15   plaintiff respond?  Well, it sought to use its reply brief

16   as a do-over.  So it's a little bit hard to swallow

17   Mr. Nesser's complaints about litigation within litigation

18   when plaintiffs told us for the first time on November 2nd

19   that it was going to submit an expert reply for the first

20   time along with its reply brief.

21           And it turned out that after doing so, and blowing

22   up the schedule in this case and having to delay this

23   hearing by over a month, plaintiff finally came forward with

24   that expert report and what did it say?  Well, it didn't say

25   much, Your Honor.  It never opines that plaintiff's fees are

1    reasonable.  That expert reviewed all of plaintiff's fee

2    submissions and not once could he opine that the fees were

3    reasonable, not for a single period of the case.  There's

4    perhaps no more damning indictment of plaintiff's motion

5    than the fact that its own hand-picked expert cannot opine

6    that its fees are reasonable.

7         And what else did it do?  It submitted a new

8    do-over supplemental declaration for Ms. Christenson which

9    identified a bunch of events that she blamed us for not

10   addressing in our motion, but of course those were events

11   Ms. Christenson did not even deem important enough to put in

12   her initial declaration.  And the events she pointed to, as

13   we set forth in the Smallwood declaration, were largely just

14   routine litigation events, like 3-page letters, 2-page

15   stipulations, joint agendas, routine meet and confers, that

16   can't remotely justify the massive expenditures and hours in

17   this action.

18        So, Your Honor, with that introduction, I want to

19   make a few brief remarks about the legal standard because

20   Mr. Nesser brought it up.  Mr. Nesser points to the fact

21   that the contract and the fee provision that they rely on

22   doesn't use the word "reasonable" but, as we explain in our

23   brief and this Court recognized in the *HLC* case, as a matter

24   of public policy courts read reasonable requirements into

25   contracts and the Court should do so again here.  Plaintiff

1    doesn't seriously contend otherwise.

2          And to the extent plaintiff is contending that

3    this is somehow a relaxed reasonableness standard or maybe a

4    reasonableness minus standard, there's simply no merit to

5    that contention.  Courts in Minnesota apply a reasonable

6    standard and it applies with equal, if not greater, force in

7    the contract context.

8          I refer the Court to cases like *Best Buy* or

9    *ISystems* where courts in a contract case context apply the

10    reasonableness test with just as much or more rigor than in

11    noncontract cases.

12          And, Your Honor, that takes me to a point about

13    how the standard works.  Under this standard, the lodestar

14    standard, it's plaintiff's burden to both document the

15    appropriateness of its hours and to prove that they are

16    reasonable.  It's not our burden to come forward based on

17    information that we only have a partial fixture or two and

18    to show that it's unreasonable.  So we've looked at their

19    submissions.  We've done even more, gone beyond that and

20    done an expert analysis, and we've shown that they can't

21    demonstrate that these fees are reasonable.

22          And one more point, Your Honor, about the legal

23    standard and that is what I brought up at the beginning, and

24    that is that a plaintiff in a contract case can't simply

25    choose to run up massive bills and pursue a Rolls Royce

1    prosecution and then expect to be able to shift the full

2    amount of the bill to the defendant.  The plaintiff is free

3    to choose to do that and to pay its own way, but when it

4    comes to fee shifting, it can only shift the amount that is

5    reasonable.

6              And that gets to the core problem of this case.

7    Plaintiff complains a lot about defenses and PRMI's

8    decisions, but the reality is it chose from day one to

9    litigate this case in a Rolls Royce fashion.  That wasn't

10   our fault.  That wasn't our decision.  That was plaintiff's

11   decision.  They chose from the very outset of this case to

12   litigate aggressively, and I'll discuss this in more detail

13   later, but before the stay was even lifted in this case they

14   billed 5,810 hours.  Before the fact discovery and opening

15   expert reports were done they billed 11,996 hours.  And

16   through expert discovery and opening summary judgment and

17   *Daubert* briefs they billed 16,170 hours.  That's not a

18   plaintiff responding to defenses.  That's a plaintiff that

19   chose to aggressively litigate this case in a Rolls Royce

20   fashion from day one.

21             Now, with respect to the first *Hensley* factor,

22   plaintiff hasn't come close to showing the nature or

23   difficulty of this action somehow justifies its massive,

24   massive fee requests.  Although Mr. Nesser is correct that

25   this case involves complex, quote, unquote, extraordinary

1    issues, plaintiff's firm didn't approach these issues -- its

2    firms didn't approach these issues on a blank slate.  To the

3    contrary, they had already litigated these issues, many of

4    them, similar issues in scores of Wave One cases.  As part

5    of those prior cases, they developed the legal theories and

6    the expert methodologies that they later recycled in this

7    case.

8         To take just a few examples, they developed a

9    sampling and damages methodology, an analysis of the

10   reasonableness of the settlement, an automated valuation

11   model, protocols for re-underwriting, and re-underwriting

12   results for a global sample, all of which they repurposed

13   here, which makes it even more shocking that they somehow

14   managed to bill 28,700 hours and counting.

15        Now in terms of litigation events, the case was

16   hardly extraordinary.  Mr. Nesser talks about all these

17   issues about the number of depositions and whatnot; but if

18   you look at the actual facts, you'll see that this case did

19   not involve an extraordinary number of those events.  For

20   example, there were 14 fact or 30(b)(6) depositions.  That's

21   less than the default rule of 10 per side and it's hardly

22   unusual in a commercial contract case.  There were seven

23   expert depositions, four of which were half days; several of

24   which involved were that had previously testified in the *HLC*

25   case and Wave One generally.

1    There were 15 case management conferences, and

2    twelve of those were brief hearings following much longer

3    Wave One conferences.  There were four motions hearings.

4    That's hardly unusual.  Two of those were telephonic.

5    And the dispositive briefs in this case were all

6    within standard limits and incorporated in prior briefing.

7    There was one pretrial conference.  There was a bench trial

8    of 13 nonconsecutive days.  Mr. Nesser acts like that is

9    somehow extraordinary in a commercial case, but even their

10    own expert admitted that that's not an extraordinary length

11    for a bench trial.  And on top of that, one of the 13 days

12    was 42 minutes with no witnesses.  So none of this somehow

13    justifies their exorbitant request for $13.84 million in

14    fees and costs.

15    So faced with these facts, Ms. Christenson tries

16    to seize on what she calls the case-specific issues.  And,

17    Your Honor, of course there were case specific issues in

18    this case.  There are case-specific issues in every case.

19    So the fact that there are case-specific issues doesn't make

20    this case somehow different or extraordinary.  What makes it

21    extraordinary, to use Mr. Nesser's word, is that plaintiff

22    had already litigated some of the issues in Wave One and

23    just recycled its work product on those issues here.

24    For example, in their summary judgment brief, they

25    move for summary judgment on 19 issues for which they

1    incorporated prior briefing.  The Court then granted summary

2    judgment to them on virtually every one of those issues.

3    That's not normal in a contract case for a party to be able

4    to do that.  They resolved massive chunks of this case by

5    just filing a brief with basically just staccato sentences

6    saying grant summary judgment on this, grant summary

7    judgment on that.  And insofar as there were case-specific

8    issues, those issues I think can reasonably account for only

9    a fraction of their massive fees.

10          Now to take an example of that, Ms. Christenson

11   talks about trust-level representations.  But trust-level

12   representations were an issue in Wave One.  In fact, by

13   plaintiff's own admission, that constituted 100 pages of

14   testimony in the *HLC* trial.  And yes, it was a bigger issue

15   here.  Of course it was.  But the fact of the matter is that

16   these were not new issues to plaintiff.  It had litigated

17   them before.  And in fact in their summary judgment

18   opposition in this case they said that First Wave defendants

19   have made "the same arguments about different trust

20   representations."

21          And then furthermore, PRMI's two main experts on

22   this topic, Professor Schwartz and Mr. Burnaman, had

23   submitted virtually identical reports on trust-level

24   representations in Wave One, and plaintiff's main expert on

25   this issue, Mr. Hawthorne, also submitted a report that was

virtually identical to Wave One.  So plaintiffs can hardly claim that it was somehow addressing this issue for the first time.

Now, Ms. Christenson also pointed to loan specific re-underwriting and, Your Honor, again, that was a case-specific issue, but plaintiff didn't approach it on a blank slate.  Why?  Because plaintiffs had already re-underwritten its global sample in Wave One.  It simply used its results here.

Plaintiffs also had developed the re-underwriting protocols in Wave One that it later repurposed here, and re-underwrote loans using this protocol just as it had done in dozens of other cases.

Moreover, the amount of loan re-underwriting in this case was far from extraordinary.  To take -- to focus on the PRMI sample, there were 150 loans.  Plaintiff chose to add seven later.  Mr. Butler alleged breaches on only 75; five of which he later dropped.  And because of the Court's ruling, PRMI was only allowed to challenge loan-level breaches on 28 loans in its initial expert report and only 12 loans at trial.

And how long did it take for Mr. Butler to testify about those 12 loans at trial in the vaunted loan-level trial presentation?  Well, by plaintiff's own estimate it was 50 pages, which is 2 percent of the transcript.  Again,

1    there's nothing unusual about this, nothing shocking about

2    this, that would justify spending so much.

3            You know, we cite in our brief the example of the

4    *Flagstar* case, a case where the plaintiff's expert

5    re-underwrote 800 loans, alleged breaches on 606.  The

6    defendant's expert challenged breaches on 123.  There was a

7    12-day trial.  Two experts testified about the details of

8    over 20 loans.  The plaintiff in that case claimed

9    attorney's fees of only $3.69 million as compared to the

10   over $10.39 million in this case.

11           Now, plaintiff now tries to brush that case aside

12   despite the fact that it was by plaintiff's own telling in

13   the *HLC* case the landmark decision involving a lot of issues

14   of first impression, it was incredibly important, and

15   involved a lot more re-underwriting than this case.

16   Plaintiff also says, Well, damages were different in that

17   case.  That case was a loan-level damages case and in our

18   case we had to allocate the settlements.  Well, sure, that's

19   correct.  But Dr. Snow had developed all of his damages

20   models in Wave One that he used.

21           The only distinction between the damages models in

22   Wave One and in this case was that Dr. Snow later offered

23   two alternative monoline calculations that he said shouldn't

24   even be used.  That's hardly, you know, a major driver of

25   fees and it's inexplicable to me why counsel would have

1    spent huge amounts of hours working on that issue for

2    plaintiff's side.  And the issue took up only 2 percent of

3    trial.  So, you know, this simply -- these issues that

4    Ms. Christenson points to simply can't explain their massive

5    fees.

6           So a few more points on this.  On the issue of

7    re-underwriting, they spent only $235,000 for Mr. Butler and

8    his support firm Opus to do all of the PRMI underwriting

9    work in this case, including the initial re-underwriting,

10   the preparing of the expert reports, testifying at

11   deposition and testifying at trial.

12          Now, plaintiff says they had to support

13   Mr. Butler, but it's hard to imagine why that would justify

14   expending many multiples of $235,000 given that Mr. Butler

15   presumably was doing his own work.  The same is true of

16   their AVM and appraisal experts.  Those billed just $281,374

17   for PRMI sample work for the entire case, which is just 2

18   percent of plaintiff's total requests.  Those experts also

19   largely recycled their reports from the initial Wave One and

20   they didn't even testify at deposition or trial so it's hard

21   to see how plaintiff can reasonably say it spent an enormous

22   amount of time supporting those experts.

23          And, you know, again, it's notable Ms. Christenson

24   provides no specifics.  How much time did you spend

25   supporting Mr. Butler?  How much time did you spend

1     supporting Mr. Lee?  Supporting Mr. Kilpatrick?  No answers

2     are given because plaintiff knows that the math just simply

3     doesn't reasonably add up.

4           Ms. Christenson also pointed to an estimate by

5     Mr. Alden in a declaration that it cost $8,000 to

6     re-underwrite each loan.  Well, Your Honor, first of all,

7     that declaration is not supported by a single invoice.  It

8     doesn't have any case-specific information in this case.  It

9     was something they submitted during expert discovery in

10     connection with Dr. Snow's report.

11           If you look at the actual spending in this case,

12     they spent only 516,000 on all expert reports, all expert

13     work related to the PRMI sample, including Mr. Butler's

14     deposition and trial.  So it's hard to see how they can go

15     from 516 to what is their estimate of $1.2 million.  But

16     even if you credited this assessment of $1.2 million on

17     re-underwriting, that's still a fraction of $13.84 million,

18     which is their request, so clearly this doesn't get them

19     anywhere near all the way.

20           Ms. Christenson on this issue also pointed to

21     contract matching and guideline matching.  She pointed to

22     bid tapes.  She pointed to database extracts.  She pointed

23     to all kinds of things.  But we asked plaintiff's own expert

24     about this.  You reviewed plaintiff's submissions.  In any

25     submission, did they identify the number of hours they spent

1    reviewing loan files?  No.  Can you opine that the amount of

2    hours they spent reviewing loan files was reasonable?  No.

3           And so it's a bit rich for plaintiff to accuse us

4    of not having accounted for the hours they spent on these

5    tasks, given that they didn't even produce documentation

6    showing those hours and their own expert couldn't even offer

7    such an opinion.

8           As far as contract matching goes, plaintiff had

9    done that exercise in dozens of prior cases.  It's a

10   document review exercise in essence, and it can be done by

11   lower-billing attorneys; so it's hard to see how that

12   justifies a massive chunk of $13.84 million.

13          And as to guideline matching, Ms. Christenson acts

14   like that was the responsibility of counsel which came as a

15   bit of a shock to me because I went back and read

16   Mr. Butler's report which says he did the guideline

17   matching, not counsel; and he did so by matching guidelines

18   to Client Guides simply by lining up the commitment date to

19   the date of the Client Guide.  It's hard to see how that

20   would, reviewing Mr. Butler's findings on that mechanical

21   exercise, would justify some of the enormous amount of fees.

22          So, Your Honor, all these arguments about the

23   difficulty of the action, they at most account for a small

24   fraction for what plaintiff is seeking here.  They don't

25   come close to justifying $13.84 million.

1        And that takes me to the next of the *Hensley*

2   factors and that's proportionality.

3        Now, there certainly is no mechanical rule that

4   you can't go above a certain percentage of the recovery in a

5   case.  There's no one-size-fits-all approach to that.  But

6   what there is is a principle that the Minnesota Supreme

7   Court has repeatedly recognized in cases like *Green* and *Asp*

8   that courts must consider the amount in issue in deciding

9   reasonableness.  And there's a good reason for that and that

10  is that attorneys are supposed to exercise billing

11  judgments.  They are supposed to take into account the

12  amount at issue in deciding how much to spend.  As the

13  Eighth Circuit puts it:  Attorneys should not be permitted

14  to run up bills that are greatly disproportionate to the

15  ultimate benefits they may obtain.

16        And that principle applies with particular force

17  in contract cases.  Courts will rarely find reasonable an

18  award that exceeds the amount involved.  The plaintiff has

19  to point to some exceptional circumstance like the existence

20  of some larger benefit.  Mr. Nesser says he's not aware of

21  any such requirement set forth in cases like the *Krear* case

22  which we cite from the Second Circuit, and it's totally

23  consistent with the cases that their own expert cites.

24        Of those cases, all but one involve fee awards

25  that were less than the amount at issue; and the one

1    remaining one involved larger benefits because the plaintiff

2    could point to prospective savings over the term of the

3    lease.

4         Now in this case, plaintiff's fees were wildly

5    disproportional and there was no larger benefit to justify

6    that.  They spent $13.84 million despite knowing from early

7    phases of the case that the amount of damages was about 5.4.

8    And I take it from Mr. Nesser's presentation that they don't

9    actually dispute that they knew that this case involved a

10   lower amount of damages, nor could they really dispute that

11   because they developed their damages methodology in Wave One

12   and even before re-underwriting the PRMI loans they could

13   have estimated what the damages were simply by inputting

14   estimated PRMI re-trades around the global averages.

15   Dr. Snow testified his damages model can be used, can be

16   easily used with any input that you want.  Despite all that,

17   plaintiff billed $13.84 million in pursuit of 5.4, which is

18   facially unreasonable.

19        And I think on this point, you know, it's telling

20   that despite filing multiple briefs in this case, despite

21   filing an expert report that cites a bunch of cases,

22   plaintiff still hasn't cited a single contract case from

23   Minnesota or any jurisdiction that has awarded fees and

24   costs exceeding the amount at issue by millions of dollars,

25   and we're not aware of any such case either.  This would be

1     the first.  So that's what would render this case

2     extraordinary to use Mr. Nesser's term.

3              And as to benefits beyond the case, you know,

4     Mr. Nesser and plaintiff are grasping at straws.  They point

5     to the fact that, Well, the *HLC* appeal was pending before

6     the Eighth Circuit; but they omit that the *HLC* appeal as of

7     July 2019 had been stayed due to HLC's bankruptcy.  There

8     had been no decision to go forward with that appeal and the

9     appeal ultimately was dismissed.

10             And more broadly, the idea that on appeal in some

11    other case, which they already prevailed at the trial level,

12    somehow justifies massive spending in this case has no

13    support and it really makes no sense.  They say they were

14    worried about adverse precedent.  It's hard to see how that

15    matters.

16             First of all, a decision by this Court at trial

17    wouldn't be precedent in any binding sense on the Eighth

18    Circuit so it's hard to see why that was a concern.  And

19    furthermore, they had already prevailed on the same common

20    issues from *HLC* at summary judgment where they moved for

21    summary judgment on 19 issues from Wave One.  So they

22    already prevailed on those issues.  It's hard to see why

23    they were concerned about adverse precedent.  But in any

24    event, these sorts of amorphous concerns hardly justify

25    spending $13.84 million in pursuit of 5.4.

1    And, Your Honor, you know, plaintiff also points

2    to the pre-judgment interest so I just want to address that

3    briefly.  We don't think they are entitled to pre-judgment

4    interest; but even if they were, we don't think it should be

5    included in the proportionality analysis because it merely

6    reflects the time value of money.  But even if you did,

7    their combined recovery of 5.4 million in damages plus their

8    claim of 2 million pre-judgment interest only gets them to

9    7.4, which is still millions below their request for 13.84.

10    So by any conceivable measure, the amount of

11    spending here was wildly disproportional, and they don't

12    cite any case coming close to justifying such a

13    disproportional award.

14    And on the topic of *HLC*, now plaintiff spent a lot

15    of time today saying, Well, we billed a lot less here than

16    we did in *HLC*.  That's true, Your Honor, but the comparison

17    is completely inapposite.  In the *HLC* case not only did this

18    Court award fees and costs that were less than the damages,

19    the Court also -- the *HLC* case also involved an amount at

20    issue many times larger than the amount at issue here.  At

21    summary judgment plaintiff in *HLC* was seeking $61 million,

22    which is 11 times the amount at issue here.  By the time of

23    trial, it was seeking $40.6 million in *HLC*, which is still

24    about seven and a half times more than the amount it's

25    seeking here.

1           And plaintiff also ignores a myriad of extensions

2     between the two cases including that *HLC* was the first case

3     to go to trial; that plaintiff could draw upon that prior

4     experience here.  And that the Court in *HLC* cited a bunch of

5     facts that distinguish this case from *HLC*, including that

6     there were 150 depositions, I believe 30 to 40 case

7     management conferences, which unlike here actually lasted a

8     long time.  Many issues of first impression.  And a lot of

9     the witnesses at *HLC* were testifying for the first time;

10    whereas here, several of the witnesses had already testified

11    at *HLC*.  So the comparison to *HLC* simply fails.

12           Mr. Nesser also talks about, you know, how they

13    recovered $1 billion in all of their cases and he implies

14    that that somehow means that the strategy here was

15    reasonable.  But the question here is not whether the Trust

16    has been successful in other cases, Your Honor.  It's

17    whether it was reasonable in this case to spend $13.84

18    million going after $5.4 million in damages, and the answer

19    to that is clearly no.

20           And to the extent they are suggesting that they

21    had some finely-crafted litigation strategy in light of the

22    amount at issue, that's clearly belied by the facts.  As I

23    noted at the outset, they blew past the amount at issue by

24    July 2019, before we raised or before we litigated any of

25    these defenses that they complain so vociferously about and

1    before we had served a single expert report.

2            Now, turning to the time required, now plaintiff I

3    don't think has come close to showing that it was reasonable

4    to bill over 28,700 hours on this matter.  Now to begin

5    with, you know, plaintiff hasn't even documented these hours

6    as required by *Hensley*.  As the petitioner, the plaintiff

7    should come forward with documentation of the hours in the

8    form of billing records showing the amount spent and work

9    performed.  Without these records you can't assess whether

10   the hours spent on a particular task are reasonable and the

11   opposing party can't lodge particularized objections to

12   particular entries.

13           Now in this case what did plaintiff do?  Well, in

14   its initial motion it sought attorney's fees for the period

15   from December 2014 to July 2020.  But it didn't produce any

16   law firm invoices for the months from December 2014 to

17   October 2019, or May 2020 to July 2020.  So for at least 62

18   out of 68 months, that is the period for which they are

19   seeking fees, there are no law firm invoices produced.

20           What did plaintiff produce?  Well, let's take a

21   look.  So for Quinn Emanuel, plaintiff produced what are

22   called workbooks.  I would like to show the Court one and if

23   you will bear with me for a minute I will try to share my

24   screen.  Is the Court able to see that?

25           THE COURT:  Yes.  And I also have the printouts

1    that you sent to our e-mail address.

2            MR. NICHOLSON:  That's fantastic.  Thank you, Your

3    Honor.

4            So, what did it produce?  Here's an exemplar of a

5    workbook.  You see the names.  You see the amount of hours.

6    You see the amount charged, the rate.  But what you don't

7    see is any description of the work performed.  And without

8    that, it's impossible to tell if these hours that are being

9    spent are reasonable.  You know, in fact we asked

10   plaintiff's sponsored expert about this issue.  We asked

11   him, So look at Mr. Miller's entry for 9.3 hours on 7-1-19.

12   Can you tell us what he was doing that day?  No, I can't.

13   Can you tell us whether his hours were reasonable?  No.  Can

14   you tell us whether other timekeepers were working on

15   duplicative tasks?  No.  He couldn't do any of that.

16           So, Your Honor, I don't think that given

17   plaintiff's own expert can't even tell what its attorneys

18   were doing, you know, surely plaintiff hasn't documented its

19   hours in an adequate way.  Again, this isn't being a

20   green-eyeshade accountant.  This is a complete absence of

21   information about what these people were doing on particular

22   days.

23           Now, let's talk about Spencer Fane.  What did

24   plaintiff produce for Spencer Fane, and actually also

25   Carpenter Lipps.  Well, it just produced these tables that

1   show the total amount of dollars billed per month.  The

2   tables don't show how many hours were spent.  The tables

3   don't show what activities were performed.  The tables don't

4   show how many timekeepers performed them.  The tables don't

5   show whether the timekeepers were doing the same work.  And

6   again we asked plaintiff's expert about this and he couldn't

7   provide any of that information or opine whether the fees

8   here were reasonable.

9          So what's to be done?  Plaintiff obviously hasn't

10  produced adequate documentation to show the appropriateness

11  of its hours and the case law shows that there are two

12  potential remedies.  One is to deny the motion without

13  prejudice and require them to come forward now with those

14  documents.  The other is to reduce the fee request.

15         And, Your Honor, we're aware that the Court has

16  previously said that they don't have to provide additional

17  invoices in discovery.  So to the extent that the Court

18  stands by that ruling, we think the only appropriate remedy

19  is to reduce the request; and these amounts without invoices

20  account for $5.15 million in fees, so we think that should

21  be removed from the petition.

22         Now if we turn to the period from November of 2019

23  to April 2020, what did plaintiff produce there?  Well, it

24  produced invoices for its law firms but, as Your Honor

25  knows, it heavily redacted them.  Now, we're aware that the

1    Court has said that those redactions were proper in terms of

2    privilege and work product, but there's a separate question,

3    Your Honor, whether they can carry their burden of proof

4    based on those redactions.  When a party decides to redact,

5    that's its prerogative as long as it does so for privilege

6    and work product.  But that comes with a cost and that is

7    that it may not be able to prove the full amount sought that

8    is reasonable.  It can recover from redacted invoices only

9    to the extent that the redacted invoices still have the

10   information necessary to ascertain what the activities were

11   and whether the hours were reasonable; and here the

12   redactions clearly don't permit that.

13        Mr. Remele has explained that at length; and

14   again, we asked plaintiff's own expert if he could decipher

15   the invoices that were redacted and he could not.  He could

16   not tell what timekeepers were doing.  He couldn't tell

17   whether other timekeepers were performing the similar tasks.

18   He couldn't determine whether the hours were reasonable.

19        So, you know, Your Honor, we think that since

20   plaintiff has decided to go this route having redactions, it

21   should not be able to recover for those amounts which amount

22   to $4.9 million.

23        And, Your Honor, just as a side note, the way that

24   plaintiff chose to proceed here was its prerogative, but

25   it's not the way that other parties have proceeded in this

1    district when it comes to redactions.  You know, during the

2    deposition Mr. Cambronne talked at length about the *Best Buy*

3    case where the Robins Kaplan firm had sought to recover a

4    substantial amount of fees in a contract action.  And it

5    attached to its motion fee records with virtually no

6    redactions, despite the fact that there was an appeal

7    pending in that case.  That's the typical way that parties

8    go forward.  They don't do what was done here which is to

9    veil things in secrecy.

10    And as to secrecy, Your Honor, it's no answer for

11    plaintiff to say that the Court should now review the

12    unredacted or unproduced invoices in camera.  Your Honor,

13    fee proceedings are not supposed to be ex parte proceedings

14    and the due process clause requires that opposing counsel

15    have access to invoices that the Court relies on when

16    awarding fees.

17    Indeed, the Ninth Circuit has held that it would

18    be an abuse of discretion to consider unproduced invoices in

19    camera.  The Ninth Circuit did that in a case involving an

20    award of just $2.3 million, so we think the ruling applies

21    with even greater force here where plaintiff is seeking

22    upwards of 10 million in fees, not to mention costs.

23    And on top of that, plaintiff's approach here is

24    fundamentally unfair.  Plaintiff hasn't provided

25    documentation of the hours its attorneys spent on tasks.  It

1    hasn't even summarized at a higher level how many total

2    hours its attorneys spent on a particular task.  Yet it's

3    expecting the Court to go back behind closed doors, review

4    its invoices, determine the amount of time spent on

5    particular tasks, and then determine whether those hours

6    were reasonable.  That not only would impose a heavy burden

7    on the Court, but it would entirely deprive PRMI of an

8    opportunity to weigh in on the process.

9         For example, the Court might look at a particular

10   entry on a particular day or even a series of days and think

11   that the entry seems reasonable in isolation.  But PRMI

12   should have the opportunity to show that numerous

13   timekeepers were billing for duplicative tasks, which as

14   I'll show here is a very, very serious concern.  Under

15   plaintiff's approach, Your Honor, however, we're completely

16   deprived of that opportunity.

17        Now, you know, we think that because plaintiff

18   hasn't produced adequate documentation, it shouldn't be

19   allowed to recover for its fees.  However, if the Court goes

20   on to consider the limited information produced, it only

21   underscores that the hours that plaintiff's firms billed

22   were grossly in excess.

23        Now, let's take a look at slide 3 just for a

24   moment.  Your Honor, this shows the amount of hours billed

25   by plaintiff's firms according to plaintiff.  These are

1      hours that we cannot verify based on the information

2      produced.  But if we take them at face value, they show a

3      massive amount of billing.  15,685 hours by lead counsel

4      Quinn.  12,614 hours by legal counsel who moved from

5      Felhaber to Spencer Fane, and 469 hours by a third firm

6      Carpenter Lipps.  On their face these are massive hours,

7      particularly in a case involving just $5.4 million in

8      damages where plaintiff had already litigated similar cases

9      in the past.

10             THE COURT REPORTER:  Mr. Nicholson, can I please

11     ask you to slow down.

12             MR. NICHOLSON:  Sure.  Sorry.

13             And, Your Honor, these hours raise very serious

14     questions about duplicativeness.  On its own, lead counsel

15     in this case billed nearly 16,000 hours, yet legal counsel

16     still managed to bill an additional 12,614 hours in a

17     supporting role.  And plaintiff has provided no persuasive

18     explanation for that massive amount of hours.  And

19     Ms. Christenson points to the fact that local counsel had a,

20     quote, longstanding relationship with RFC, but at most that

21     explains why they were hired, why they were retained in this

22     case.  It doesn't explain why they went on to bill 12,600

23     hours.

24             You know, they also point to things like

25     depositions and Ms. Christenson's declaration.  But local

1  counsel took only one deposition, which was during trial,

2  and defended zero.  While they attended six, there's been no

3  showing that that was even necessary; that they performed

4  any work that was non-duplicative of work by lead counsel.

5          They also talk about case management conferences.

6  Well, as I talked about earlier, 12 of those were very short

7  hearings after Wave One conferences.  We went back and

8  looked at the transcripts for those.  It turns out that

9  although Ms. Christenson said local counsel made a bunch of

10  arguments, local counsel made the presentation at only two

11  of the 12, and those took only 16 pages total.  And at the

12  three conferences after the stay was lifted, local counsel

13  didn't make any presentations at all.

14          Now, you know, the same trend continues with

15  summary judgment, *Daubert*, pretrial.  They didn't make any

16  arguments at any of those hearings.  Now, at trial, local

17  counsel cross-examined just one witness, accounting for less

18  than 2 percent of the trial record.  Local counsel also

19  handled admission of deposition testimony and some exhibits,

20  but most of those were uncontested issues and local

21  counsel's presentations accounted for less than 25 pages.

22          So it's hard to see how these supporting tasks

23  could justify billing 12,600 hours, which is what you would

24  expect from a lead counsel, not a local counsel in a

25  supporting role.

1          And, you know, ultimately what plaintiff is

2     arguing in Ms. Christenson's declaration is that local

3     counsel assisted lead counsel on all these different

4     activities.  But, Your Honor, that underscores the problem

5     here.  Plaintiff is free to have, like I said, a Rolls Royce

6     prosecution where it hires two firms to basically litigate

7     full time.  It has one firm, quote, unquote, assisting the

8     other.  But it can't shift those fees to PRMI after the

9     fact.  That's simply not reasonable.

10          Now, plaintiff also hasn't offered any explanation

11    for Carpenter Lipps, who I didn't hear much about during

12    their presentation today.  Carpenter Lipps's hours are less

13    than the other two firms to be sure, but they are still

14    unreasonable.  Plaintiff certainly hasn't shown otherwise.

15          Carpenter Lipps billed 469 hours despite the fact

16    that its only appearances in this case were to defend two

17    depositions and to listen to a third deposition by phone.

18    They never argued a motion, never examined a witness, never

19    recorded an appearance at trial or in court generally.  As

20    far as we can tell from the invoices, which are redacted,

21    Carpenter Lipps spent most of its time, or at least a large

22    chunk of it, simply reading filings that were already on the

23    docket or conferring amongst each other about those already

24    filed documents.

25          And more broadly, they spent time travelling back

and forth from Cleveland to St. Paul to attend all the

hearings in this case, including summary judgment, *Daubert*,

pretrial, and every single day of trial.

Now, Your Honor, again, plaintiff was free to do

that.  They were free to pay Carpenter Lipps to do that, but

it doesn't mean that they can shift those fees to us.

Plaintiff says, Well, Carpenter Lipps had institutional

knowledge about RFC; but surely Quinn Emanuel, who had been

representing the ResCap Liquidating Trust for years, had

sufficient knowledge; and if they needed to ask Mr. Lipps a

question, he was only a phone call away.  He didn't need to

sit through every single day of trial, much less every

hearing, and bill at about $414 an hour, I believe, or $410,

something in that range.

They also say that Carpenter Lipps attended trial

because it had background of fact witnesses.  But, Your

Honor, Carpenter Lipps didn't even attend the depositions of

two fact witnesses that testified at trial, so it's hard to

see how that justifies them attending trial for those

witnesses.  And on top of that, even if they had the

background of a few fact witnesses, at most a few days of

trial.  That doesn't explain why they attended every single

day.

And so what is plaintiff left with?  Well, the

only remaining explanation for Carpenter Lipps's hours is

1    that Jeff Lipps was listed as a trial witness.  Well, Your

2    Honor, by January, early January, the parties were also

3    discussing a stipulation.  Although it wasn't formally

4    entered until February before the trial, I don't think there

5    was any serious view that Mr. Lipps would need to testify at

6    trial.

7            So I went back and I looked at his billing records

8    and it turns out that in the week before trial, Mr. Lipps

9    billed less than 3 hours for the case.  It was 2.8 or 2.9.

10   That's before billing dozens of hours for attending the

11   trial.  So clearly, I can't tell what he was doing, but

12   clearly he wasn't concerned about having to give some major

13   blockbuster testimony at the trial, which again he never

14   did.  So for all these reasons the Court should drastically

15   reduce Carpenter Lipps's hours.  At most, it should be

16   covered for defending two depositions, which is a small

17   fraction of 469 hours.

18           Now, Your Honor, we didn't stop in this case at

19   analyzing plaintiff's hours over the entirety of the action.

20   We actually dug in and tried to figure out what plaintiff

21   didn't do, which was to show how many hours they billed over

22   particular periods.  And on that score, you know, we were

23   significantly limited by how little information they

24   produced to us.  But our expert, Mr. Remele, did work with

25   the support firm to try to make estimates of those hours.

And what those estimates show, to provide some context, the way they did it was by using those workbooks that I showed you earlier which have hours with no explanations, and they also used those tables that we looked at earlier and divided, say, the Spencer Fane billings by their average rates in the case. And what they found, Mr. Remele and his support firm, was that plaintiff relentlessly billed massive hours over each period of the case.

And, Your Honor, I would refer you to slide 4 which we have provided, and I can bring it up if you would like, but if you're able to just look at it, it may be easier.

THE COURT: I have it in front of me.

MR. NICHOLSON: Okay. Great. So from this chart you can see this pattern. Plaintiff's firms billed over 5,800 hours before the stay was lifted. Almost 12,000 hours due to fact discovery and opening expert reports, and over 16,000 hours through experts.

And the chart also, Your Honor, highlights the problem of duplicativeness. You see that for basically every one of these periods, you've got local counsel billing nearly as many, if not more, hours than Quinn Emanuel was billing. And, Your Honor, even if you credit some of the explanations that plaintiff has provided for these local

1    counsel hours, this is still not reasonable.  Clearly Quinn

2    was taking the laboring oar in this case.  Any fair-minded

3    observer who came to trial would know that who dealt with

4    this case, and yet their billings are -- by their lead

5    counsel are almost as large in terms of hours.  So, you

6    know, Your Honor, they basically had two firms bill full

7    time throughout this case which is not something that they

8    can shift.

9         And so if you look at the actual particular

10   periods here, you know, this highlights the lack of

11   reasonableness, how they haven't (indiscernible due to audio

12   distortion) reasonableness.  And on this score, I mentioned

13   this at the outset but it bears repeating, we asked their

14   expert, You've looked at this.  Do you dispute any of the

15   hours that are here?  No.  Can you opine that the hours are

16   reasonable for any of these periods?  No.  He hasn't offered

17   any of those opinions.  I think that's telling, Your Honor,

18   that their own expert can't do that.

19        And as for Ms. Christenson in her declaration, you

20   know, she does go through this period to her credit, but

21   what she does is she just collects routine case files like

22   stipulations (indiscernible due to audio distortion) and the

23   like, but even considered cumulatively can't possibly

24   explain this massive billing.

25        So let's start with the first period.  December

1    1st, 2014 through December 31st, 2016.  This is when the

2    pre-complaint period through filing of the complaint.  They

3    billed 105 hours during this period.  But while these hours

4    seem small in comparison to the massive hours billed during

5    other periods, I think it shows several trends that continue

6    throughout the litigation.

7         One is that plaintiff was recycling prior work

8    product.  The complaint they filed here largely tracked the

9    complaints they filed in dozens of other actions.

10   Ms. Christenson says in her declaration, Well, it was a

11   carbon copy.  That's not the question, Your Honor.  That's

12   not the point.  The point is they weren't working from a

13   blank slate.  They were simply inserting allegations into an

14   existing template so it's unclear why it took so many hours.

15        They also point to pre-complaint negotiations and

16   time spent entering tolling agreements.  But, you know, this

17   illustrates the problem with their approach.  They haven't

18   produced time records showing how much they spent on any of

19   this.  Also they, you know, from early on you see that they

20   have three firms billing substantial hours in the case which

21   is something that repeats throughout.

22        Now, Your Honor, if you look at the second period

23   of the case, that's January 1st, 2017 through July 31st,

24   2018, this is the period when the parties engaged in written

25   and document discovery.  Now during this period, plaintiffs

1   somehow billed 4,784 hours.  Now this was a period where

2   there were very few disputes other than routine ones that

3   are raised in any commercial case; and none of these

4   defenses that Mr. Nesser harps on were at issue in this part

5   of the case or litigated in any substantial fashion, yet

6   they billed almost 5,000 hours, and they haven't come close

7   to showing that that's reasonable.

8              Now, in their initial motion what did they point

9   to?  Well, they pointed to the fact that they had produced

10  300,000 documents during this period.  Well, the problem

11  with that argument, as we pointed out, is that they also had

12  a document discovery firm which billed 36,000 hours across

13  Wave Two, including almost 9,000 hours that plaintiff

14  attributes to this case, and that's separate and apart from

15  their massive attorney fees.

16             So given that that third-party firm billed, by

17  their estimate, 9,000 hours in this case, they can hardly

18  point to document production to explain why their law firm

19  billed another 4,784 hours.

20             So faced with the failure of that explanation,

21  they offered a number of new explanations on reply; but most

22  of them consist to pointing to two to five-page letters on

23  discovery issues, pointing to the fact that they had to

24  produce a loan list, which they produced in dozens of prior

25  cases.  Pointing to the fact that the parties had a dispute

1    about PRMI's answer, ignoring the fact that the parties

2    entered a stipulation applying the Court's Wave One ruling.

3    And pointing to those case management conferences which, as

4    I explained earlier, were very, very short and followed

5    regularly scheduled Wave One conferences.  So none of this

6    explains these massive hours.

7            And as to Ms. Christenson, Ms. Christenson also

8    points to her arguments about contract indemnification and

9    guideline matching, but I've already addressed those, why

10   those don't explain this either.

11           Now, the next period is a particularly curious one

12   and that's from August 1st, 2018 through January 31, 2019.

13   This is a period where all discovery was stayed in this

14   case.  Despite that, plaintiff's firm inexplicably billed

15   another 921 hours.  Now, their explanation for this on reply

16   is that they engaged in lengthy negotiations regarding

17   post-stayed discovery, but it's hard to fathom how they

18   spent, you know, hundreds of hours on those negotiations

19   when this only resulted in them filing a 3-page letter with

20   the Court.

21           They also say that they began preparing for

22   depositions and expert discovery.  The depositions didn't

23   begin until March 21st, 2019; expert reports weren't served

24   until May 30th, 2019, and plaintiff billed massive hours in

25   those periods as well so it can't explain why it was

1    reasonable to bill 921 hours during this stay.

2              Now the next period, Your Honor, is February 1st,

3    2019 to May 31, 2019.  The parties engaged in fact

4    depositions and issued expert reports.  And during this

5    period plaintiff billed an astounding 6,186 hours amounting

6    to 364 hours per week over a 17-week period.  Now, plaintiff

7    has, Mr. Nesser in particular, has tried to blame PRMI for

8    taking depositions, but during this period there weren't

9    that many depositions.  Plaintiff took only three fact

10   depositions and PRMI took only eight, which is less than the

11   default rule of ten per side.  Well less.

12             And to put it into comparison, in the *Best Buy*

13   case that I referenced earlier the parties took 65 total

14   depositions.  In Wave One I believe there were over 150

15   total depositions.

16             Now, plaintiff asserts these depositions were time

17   intensive in terms of preparation, but it nowhere identifies

18   why it took 6,186 hours during this period.  Many of the

19   deponents on the PRMI side were persons who held positions

20   in sales or underwriting.  They were similar to persons that

21   plaintiff had deposed in dozens of other cases.  And of the

22   deponents named defendants, several testified, you know, in

23   other cases and had been prepared to testify before.  So

24   again, hard to see why this was such a time-intensive

25   exercise.

1        Furthermore, plaintiff, as we pointed out in the

2   Clouser declaration, routinely overstaffed these depositions

3   sending two or three attorneys when only one was necessary.

4        The hours during this period also raise serious

5   questions about duplicativeness.  Local counsel billed 2,628

6   hours despite not taking a single fact deposition during

7   this period.  Its only deposition was later.

8        And with respect to the opening expert reports,

9   these were reports that were largely recycled from Wave One.

10  For example, Mr. Hawthorne's report was virtually identical

11  with only a few minor changes.  And plaintiff, you know,

12  doesn't really contest this.  Instead, they point out that

13  some of the exhibits to the expert reports contain PRMI's

14  specific information as if that's some eureka moment that

15  proves that their hours were reasonable.

16       But, Your Honor, it's normal in a commercial

17  contract case to have exhibits that refer to the defendant.

18  What's remarkable in this case is that they were recycling

19  the reports themselves and all the protocols, all the

20  methodologies that had been used during Wave One.

21       And on top of that, you know, putting together

22  these exhibits was likely expert centric work.  Plaintiff

23  says, Oh, their attorneys had to check these exhibits.

24  Plaintiff nowhere identifies how many hours they spent doing

25  all of this, which underscores another problem of their

position.  They just point to a bunch of these activities,
none of which are all that remarkable, and never tell you
how many hours they spent on a single one, just hoping that
somehow if you squint and look at the case as a whole you'll
come up with 2,700.

Now, the next period is June 1st, 2019, to October
31, 2019 when the parties engaged in expert discovery and
filed opening dispositive briefs.  Now, during this period
plaintiff billed another 4,174 hours, amounting to 190 hours
per week.  You don't have to be a green-eyeshade accountant
to know that that's a lot.

And again, plaintiff hasn't shown these massive
hours to be reasonable.  During this period, the parties
took just two additional fact 30(b)(6) depositions.  As to
expert discovery, plaintiffs spent most of the period just
waiting for us to serve rebuttal reports in August, and then
plaintiff served three short reply reports, two of which
incorporated work from Wave One.

The parties then took or defended seven expert
depositions, four of which were half days.  And as to
dispositive motions, all of them were within standard limits
and plaintiff incorporated prior briefing on 19 of 24 issues
in the summary judgment brief.

So it's hard to see why these events required
4,174 hours.  That's more, over just this 22-week period,

1    Your Honor, that's more than courts have deemed reasonable

2    in entire commercial cases in this district.  And while

3    plaintiff may say these cases are distinguishable, these are

4    the amounts approved in the entire case.  The *Windsor Craft*

5    case which did not involve prior litigation involving

6    similar issues, 3,900 hours.  *Best Buy*, a case involving 56

7    fact depositions, 2,500 hours accrued.  So we are leaps and

8    bounds above those amounts, even in this little 22-week

9    period.

10           Now, turning to the periods with redacted

11   invoices, that's November 1st, 2019 to April 30th, over this

12   period of six months plaintiff's firms billed another 11,681

13   hours amounting to 64 hours per day for 6 months.  That's a

14   staggering amount, again, in a case of this size.

15           Now, in comparison to the hours billed by PRMI's

16   counsel underscores this point.  Over the same period PRMI's

17   counsel billed 6,146 hours.  So in other words, plaintiff's

18   firms billed nearly twice as many hours as PRMI's firms did.

19   And one of the primary reasons for that is that plaintiff

20   drastically overstaffed this case with timekeepers.

21           So this isn't about responding to defenses.  This

22   is about overstaffing, Your Honor, and over-litigating.

23   Setting aside the fact that they had 58 timekeepers that

24   they excluded from their bills after the fact, which is

25   dramatic and just shows that they really weren't making any

1    serious effort to calibrate the number of timekeepers to the

2    size of the case, they are still seeking fees for 37

3    timekeepers, 12 partners, three counsel, seven associates,

4    15 staff, over the same period PRMI employed 23 total

5    timekeepers without any deductions.  And many of these

6    billed, you know, only a handful of hours, so we could have

7    deducted it to make the comparison more apples to apples.

8         We had just five partners, three associates and 15

9    staff.  There's no plausible need for plaintiff to employ 12

10   partners, three counsel and seven associates on a case of

11   this size.  To illustrate this point, I think it's important

12   to look at a chart from Mr. Remele's report.  That's slide

13   5, Your Honor.  I'm going to bring that one up briefly.

14        This chart, Your Honor, is broken into two panels.

15   The top panel shows the major timekeepers, the primary

16   timekeepers in this case.  These are the attorneys that are

17   trying the case, as well as one paralegal per side.  You'll

18   recognize the names in this top panel.  Mr. Nesser,

19   Mr. Johnson, Mr. Alden, Mr. Smallwood, et cetera.  These are

20   the people who were actively involved in trying the case and

21   taking depositions by examining witnesses, by presenting

22   arguments, et cetera.

23        You'll see that in the top panel plaintiff's main

24   timekeepers outbill defendant's timekeepers by 5,955 hours

25   to 4,827.  That's a pretty sizeable discrepancy.  But the

1  even more notable thing about this, when you look at the

2  bottom panel, and that shows how many secondary timekeepers

3  plaintiff had billing on this case.  As you see, they had a

4  legion of timekeepers billing at a very high clip.  This is

5  just over six months, Your Honor.

6  These secondary timekeepers billed 5,726 hours as

7  compared to 1,322 hours.  So, Your Honor, this belies

8  plaintiff's argument about how they efficiently staffed this

9  case, how they relied on junior associates, et cetera, et

10  cetera.  Yes, they did some of that.  But -- as we did, but

11  what this shows is that they were also employing legions of

12  other timekeepers who are billing behind the scenes doing we

13  don't even know what because a lot of the records are so

14  redacted you can't possibly decipher them.

15  So I think this encapsulates why plaintiff billed

16  so much, Your Honor.  It wasn't defenses.  It was over-

17  litigation, it was overstaffing.  They decided to litigate

18  this case in a Rolls Royce way, and they can only shift fees

19  for what's reasonable.  Okay?  It's certainly not reasonable

20  to do this, what you're seeing here, in a case involving a

21  damages claim of $5.4 million.

22  And by the way, there's no explanation provided in

23  any of their filing for what these folks were doing, why

24  their work was necessary or (indiscernible due to audio

25  distortion).

1          Now, if we look, Your Honor, at particular subsets

2     of this six-month period we'll see that there are even more

3     questions about reasonableness.  Consider the period from

4     November 1st, 2019, to December 11th, 2019.  Sorry.

5     November 1st.  This is when the parties filed their summary

6     judgment and *Daubert* oppositions and replies to the

7     court-held hearings.  During this period of less than six

8     weeks, plaintiff's firms billed 1,671 hours amounting to 278

9     hours per week.  Plaintiff again hasn't come close to

10    demonstrating that this was reasonable.  All the briefs here

11    were within standard limits.  Plaintiff incorporated a lot

12    of prior briefing.  For example, a summary judgment brief on

13    opposition to summary judgment, excuse me, largely just

14    recounted issues that they had already briefed in their

15    cross-motion for summary judgment.

16         And on top of that, plaintiff's invoices, to the

17    extent we can decipher them, show that they drastically

18    overstaffed the summary judgment and *Daubert* hearings.  For

19    summary judgment, ten timekeepers billed for attending the

20    hearing but only three presented argument.  For *Daubert*, ten

21    timekeepers billed for attending the hearing but only four

22    attended the argument.

23         Your Honor, PRMI didn't force plaintiff to do

24    this.  This was plaintiff's own choice to litigate in a

25    Rolls Royce fashion.  Plaintiff's only defense to this is to

1       say, Well, there could have been issues that needed to be

2       researched in realtime or people needed to provide advice

3       on.  Your Honor, that's just another example of them over-

4       litigating this case, trying to be as aggressive as

5       possible.  It might have been reasonable to have a few extra

6       timekeepers in support.  Having ten to defend a brief, more

7       than necessary to field a baseball team, hardly seems

8       reasonable or necessary.

9              And again, in comparison to PRMI's time over this

10      period underscores a point.  Plaintiff's firm billed 1,671

11      hours as compared to only 881 by PRMI's firms.  And for this

12      period plaintiff can't possibly say that the two sides are

13      engaged in different work.  In fact, the two sides were

14      briefing and arguing flip sides of the exact same issues.

15             And, Your Honor, a daily comparison I think

16      further highlights this point and gives belie to plaintiff's

17      argument about PRMI forcing it to do things.  Your Honor,

18      this slide shows a daily summary of hours billed.  And what

19      you see here is that plaintiff and PRMI billed radically

20      different hours on days that they were performing the same

21      tasks, plaintiff billing almost twice at much, sometimes

22      almost more than twice as much, than PRMI did.

23             So consider a few examples.  November 12th is the

24      day that both sides file summary judgment and *Daubert*

25      oppositions.  Plaintiff billed 115 hours as compared to 54

1    by PRMI.  And you can see here, by the way, that the color

2    breakdown that plaintiff has two firms essentially billing

3    full time on these issues which largely explains why their

4    hours are so massive.

5            Consider November 26th.  Both sides file summary

6    judgment and *Daubert* replies.  Plaintiff bills 88 hours as

7    compared to only 27 by PRMI.

8            Consider the day of the summary judgment hearing.

9    Plaintiff billed 120 hours as compared to 35 by PRMI.

10   Again, Your Honor, did we force them to bill 120 hours for

11   that hearing where we billed 35?  Hardly.

12           Consider December 11th, the day of the *Daubert*

13   hearing.  They billed 103 hours as compared to 35 by PRMI.

14   So day after day, week after week, they are billing

15   massively more hours despite doing similar activity.

16           And, Your Honor, I'm aware that the Court didn't

17   consider the comparison in *HLC* between hours of the two

18   sides to be all that instructive, but we've done a different

19   analysis here, Your Honor, by focusing on particular days

20   when the parties are doing particular -- doing the same

21   types of tasks.  And we've also looked at particular periods

22   as opposed to just a six-month period as a whole, and it

23   shows that despite similar tasks, plaintiffs just massively

24   overstaffed and over-litigated this case.

25           And while I'm here, you'll notice that these bars

1    up here at the top of plaintiff's hours are Carpenter Lipps,

2    who just parachutes in to attend hearings and bill pretty

3    significant hours for that, despite not making arguments and

4    not even entering appearances.

5          Now, if we look back at slide 4, which I'll just

6    refer the Court to, the next period is the pretrial period

7    of December 12th, 2019 to February 9th, 2019.

8          THE COURT:  Mr. Nicholson, let me just interrupt

9    you a moment.  Can you estimate how much longer your

10   presentation is?

11         MR. NICHOLSON:  Your Honor, I think I'll just go

12   another 10 or 15 minutes.

13         THE COURT:  All right.  I am cognizant of the fact

14   that we haven't given the court reporter a break.  You have

15   been speaking for I believe over an hour, and we're looking

16   at almost two hours into the hearing.  So we're going to

17   take a ten-minute break.  While we're on the break everybody

18   should mute their audio and turn off their video.

19         Ten minutes from now is two minutes past the hour,

20   so at two minutes past the hour I will put my video back on

21   and that's your sign to put your video back on.

22         All right.  Court is adjourned for ten minutes.

23         (Recess taken from 10:52 to 11:03 a.m.)

24         THE COURT:  All right.  I think everybody is back

25   with us again.  You may continue but you're on mute, sir, so

1    please take yourself off.  Very good.

2         MR. NICHOLSON:  Your Honor, if I could refer you

3    again to slide 4, which is our summary of the hours billed

4    over particular periods, and I wanted to pick up with the

5    pretrial period from December 12th, 2019, to February 9th.

6         Now, over this period, we'll see that the trend

7    continues.  Plaintiff's firms bill 4,426 hours over an 8.5

8    week period, which amounts to about 520 hours per week.

9    Again, plaintiff hasn't come close to showing that these

10   massive hours are reasonable.  And as we talked about, they

11   had tried a similar case in the past, the *HLC* case, so they

12   should have been able to capitalize on a lot of their prior

13   work product, and I think they did, yet they still billed

14   massive hours.

15        Furthermore, the amount of pretrial briefing

16   during this period was far from unusual.  If anything, it

17   was relatively light for a commercial contract case.

18   Plaintiff filed three motions in limine, each of which was

19   less than ten pages.  PRMI filed none.  The parties filed

20   short trial briefs, each less than five pages, and the

21   plaintiff filed three letters of eight, four, and one page.

22   Additionally, the Court held just one pretrial conference.

23   None of this is so extraordinary so as to justify billing

24   4,400 hours or more, which is more than many firms bill in

25   an entire commercial case.

1        Now, a comparison to PRMI's hours again

2   underscores that this is unreasonable.  Plaintiff's firms

3   bill 4,426 hours over this 8.5 week period as compared to

4   2,210 hours by PRMI's firms.  Again, plaintiff's firms

5   billed twice as many hours.  So we see the effect of their

6   overstaffing yet again because they have two firms billing

7   basically full time, not to mention a third firm showing up

8   for hearings.  They are out-billing us by a factor of two.

9        So, Your Honor, they haven't shown that this was

10  somehow warranted here.  Again, it's not because of PRMI's

11  defenses.  It's because of their drastic overstaffing.

12       So now consider the period of the bench trial from

13  February 10th, 2020 to March 13th, 2020.  Now, this is a

14  five-week period and plaintiff's firms again billed a

15  massive amount: 4,117 hours amounting to 823 hours per week.

16  Again, they haven't demonstrated that this is reasonable.

17       The bench trial was not extraordinary in length.

18  This occurred over the course of 12 nonconsecutive days.  In

19  total it was about 95 hours including all breaks.  There

20  were a total of 12 live witnesses called, five by

21  plaintiffs, seven by PRMI.  Several witnesses had testified

22  previously in the *HLC* case about similar issues, including

23  Bangerter, Hawthorne, Snow, Burnaman and McCrary.

24       Furthermore, the invoices confirm that plaintiff

25  drastically overstaffed the trial itself.  On average, they

1    had 12.3 timekeepers bill for attending some portion of each

2    trial day, but only 2.6 timekeepers on average actually

3    examined a witness or made some sort of substantive

4    presentation.

5            Furthermore, Carpenter Lipps billed 125 hours

6    during this eight-week period, mainly for attending the

7    trial itself despite never participating in the trial or

8    even entering an appearance.

9            And yet again, a comparison underscores these

10   points.  During the trial period plaintiff's firms billed

11   4,117 hours as compared to 2,296 by PRMI's firms.  And we

12   should again look at a daily comparison.

13           If you look at days on which the two sides are

14   performing similar tasks, you see that plaintiff regularly

15   bills twice as many hours.  Consider February 10th.  This is

16   the first day of the trial when both sides presented opening

17   statements and both sides questioned Mrs. Farley.

18   Plaintiff's firms billed 241 hours on this day alone, as

19   compared to 119.6 by PRMI's firms.

20           Or consider March 12th when both sides questioned

21   Mr. Crawford and Dr. McCrary.  Plaintiff's firms billed

22   261.9 hours as compared to 100 hours by PRMI's firms.

23           Next consider March 13th, the day both sides again

24   questioned Dr. McCrary and also both sides presented closing

25   arguments.  Plaintiff billed 170 hours as compared to 68.7

1    by PRMI's firms.  Again, these figures, these day-by-day

2    accounts, belie the notion that plaintiffs somehow

3    efficiently staffed this case or that plaintiff was

4    responding to defenses.  Instead, it's overstaffing.  It's

5    these giant spikes in hours that are due to overstaffing

6    that are driving its hours.

7         Finally, with respect to the after periods of the

8    case, consider the period from March 14th to April 30th when

9    the parties submitted post-trial briefs.  Plaintiff's firms

10   billed 1,467 hours during this period, including 911 hours

11   by Quinn Emanuel and 548 by local counsel.  Now, while

12   post-trial briefing was surely a considerable task, I don't

13   think plaintiffs have come close to showing what warranted

14   billing almost 1,500 hours in a case that involved damages

15   of $5.4 million.  Plaintiff's only real defense to this is

16   that the brief couldn't be drafted by a, quote, select

17   handful of attorneys and that it somehow required 23

18   timekeepers.

19        Well, Your Honor, PRMI's counsel drafted a

20   post-trial brief of comparable length using mainly the four

21   Williams & Connolly attorneys who drafted and tried the

22   case, and we did so in 762 hours or about half of the hours

23   that plaintiff's firms did.  So this again illustrates the

24   problem here is that plaintiff is overstaffing in basically

25   having two firms working full time on these issues.

1          Now, I expect that on reply Mr. Nesser will get up

2     and say that this whole presentation I have done is just

3     being a green-eyeshade accountant.  Well, Your Honor, I

4     don't think you have to be a green-eyeshade accountant to

5     know that these numbers present serious problem.  Plus, the

6     analysis we're doing here is simply a standard type of

7     analysis that courts do.  They look at how many hours are

8     billed over particular periods of the case.  And I refer the

9     Court to Judge Montgomery's opinion in the *Windsor Craft*

10    case looking at how many hours are billed to trial, summary

11    judgment, et cetera.  And we've done that work here because

12    plaintiff didn't do it.

13         So plaintiff can hardly take offense or fault us

14    for doing the work that they should have done, and

15    especially they can't do that when they are seeking from us

16    $13.84 million.  It's probably too much to ask for them to

17    tell us how much time they spent on major litigation

18    activities in the case.

19         Now, just really briefly, there are two other

20    periods here that don't have invoices.  There's the period

21    from May 1st, 2020 to July 31st, 2020 when plaintiff's firms

22    billed an estimated 376 hours.  And the only explanation for

23    these hours, which were after the post-trial briefing and

24    before the Court had issued its decision, that the plaintiff

25    started working on its fee motion.  But, Your Honor, we

1    submit that the Court should deny all fees for this period

2    because plaintiff should not be entitled to recover for fees

3    spent litigating or preparing a fee petition.

4         We recognize the Court held otherwise in the *HLC*

5    case, but we think the correct view of the law, as stated by

6    the Second Circuit in the *Krear* case, and that there's no

7    Minnesota authority squarely on point.  And in that case the

8    Court held that a general contract provision about fee

9    shifting wasn't sufficient to allow fees on fees.  Instead,

10   in light of the rule that indemnity clauses are narrowly

11   construed, there has to be a separate provision specifically

12   authorizing fees on fees.

13        And here, even assuming there was a fee-shifting

14   provision, which clearly there's no specific provision

15   authorizing fees on fees.  In any event, plaintiff hasn't

16   produced any invoices for this period so it hasn't shown

17   what its attorneys were doing for 376 hours or why that was

18   reasonable.

19        Now, the last period is August 1st, 2020 to

20   October 31st, 2020.  Plaintiff in its reply brief asserted

21   for the first time that it was entitled to an additional

22   $298,000 in fees and costs for this period.  The Court

23   should deny that request.

24        First of all, we think it's improper for plaintiff

25   to tack on these new claims for the first time on a reply.

We don't have a full opportunity to address them in an opposition brief and in any type of other analysis by experts or otherwise. You know, plaintiff may say, Well, it's $298,000, but that is a lot of money to tack on in a reply brief where the other side doesn't have a full opportunity to respond.

Second, the bulk of plaintiff's new claims appear to involve preparation of its fee petition. As we discussed, we don't think those fees are recoverable, but even if they are, plaintiff hasn't produced invoices for this period showing what its attorneys are doing or whether the hours they billed during this period are reasonable. By my math using average billing rates, they probably billed about 900 more hours during these months and so it can't just be assumed that those hours are reasonable.

Now, plaintiff didn't really respond to any of those numbers in its presentation today. Instead it spent much of the presentation trying to blame PRMI for having the temerity just to defend itself. But, Your Honor, I think all the numbers that I have gone through show that this wasn't a case about plaintiff responding to an overly-aggressive defendant. This was a case about plaintiff choosing to litigate a Rolls Royce prosecution by overstaffing every step along the way.

Your Honor, we didn't force plaintiff to do any of

1    that.  We didn't force it to overstaff.  We didn't force

2    them to employ two firms full time.  We didn't force them to

3    send 10 timekeepers or more to every hearing; 12 timekeepers

4    on average to every trial day.  Those are their choices for

5    which they have to bear the cost now because they can't

6    shift those fees as reasonable.

7         We also didn't force them to bill more than 5.66

8    million long past the amount at issue by July 2019, showing

9    that they never really made any serious effort to calibrate

10   their spending to the amount at issue in this case.

11        Furthermore, the fact that PRMI raised certain

12   defenses doesn't somehow absolve plaintiff of the

13   responsibility to prove that its fees are reasonable.

14   Defenses are raised in every case.  They are always raised

15   in commercial contract cases that get litigated.  There's

16   nothing unusual about that.  And in this case they haven't

17   shown that any of these defenses that they complain about

18   were major drivers of their fees as opposed to the

19   overstaffing which I've gone through.

20        Now, first of all, they complain about having to

21   relitigate issues from Wave One.  But, Your Honor, PRMI

22   wasn't the defendant in Wave One.  It wasn't bound by those

23   rulings.  We, as its lawyers, had a duty to defend it.  But

24   setting all that aside, you know, we took an efficient

25   approach in this case by saying that plaintiff could

1   incorporate prior briefing where not appropriate, and that's

2   exactly what plaintiff did time after time after time, so

3   it's hard to understand why they billed so much.

4          Also, you know, Mr. Nesser talked about

5   disproportionality in terms of the amount of fact

6   depositions or the amount of re-underwriting.  But, Your

7   Honor, as we talked about, there were only 13, I believe --

8   I may have that wrong -- 14 total depositions, fact

9   depositions, in the entire case, which is less than the

10  standard rule.  And as to re-underwriting, we only

11  challenged 28 loans in our expert report at the loan-level

12  and only 12 at trial.  So this is hardly a case of us

13  forcing them to litigate some -- to litigating in this Rolls

14  Royce fashion.

15         Now, the issues that Mr. Nesser pointed to, you

16  know, none of them really incredibly account for a large

17  percentage of their fees.  He pointed to the additional

18  settling trusts issue.  That was an issue involving a

19  discrete set of bankruptcy documents.  It was raised

20  relatively late in the case.  It doesn't explain any of

21  their massive billing in the earlier case.  They didn't

22  respond to it with any new expert analysis or anything.

23  They just address it in written briefs which were ten pages

24  in total at summary judgment, less than --

25         THE COURT:  Mr. Nicholson, would you just un-share

1    your screen?

2              MR. NICHOLSON:  Oh, I'm sorry.  I apologize.  I

3    didn't realize I still had that up.

4              THE COURT:  Okay.  Very good.  Thank you.

5              MR. NICHOLSON:  My apologies.  Still kind of new

6    to Zoom hearings.

7              So they address that issue in ten pages of all of

8    their summary judgment briefs, less than three pages of

9    *Daubert* briefs, and one sentence in the motion in limine.

10   The Court excluded the issue entirely from trial and it came

11   up only once at a sidebar after plaintiff arguably opened

12   the door to that evidence.  So plaintiff can't credibly

13   claim that that's somehow a massive driver of its over $10

14   million in fees.

15             They also point to the Ally issue, which they

16   addressed in all of two pages in their summary judgment

17   opposition, two sentences in the motion in limine, and three

18   paragraphs of a letter.  And then they complained about a

19   number of issues which they say were worth less than the

20   associated fees, but they nowhere identify the amount of

21   money that they spent litigating any of these issues or the

22   amount of hours.  And to the extent the amount of fees

23   exceeded the amount at-issue here, it was probably due to

24   the fact that plaintiff responded by overstaffing the case

25   and over-litigating these issues.

1        Consider the monoline allocation.  First of all,

2    plaintiff itself injected this issue into the case by not

3    sampling from all the monoline settlements in Wave One, and

4    then taking the aggressive and unprecedented position that

5    it could blend monoline rates across monoline settlements.

6    Now, whatever one's view of the merits of that argument

7    were, and I know the Court allowed them to do that, it

8    certainly wasn't a position that had support in the case

9    law.  It was a very novel position.  And they accused us of

10   monoline damages of over $400,000, so it was hardly

11   unreasonable for us to point this problem out.  And indeed

12   it had been pointed out in the *HLC* case and it was probably

13   a major driver in the reduction of damages there.

14       You know, they complain that they had to respond

15   to it by having Dr. Snow do this alternative monoline

16   analysis, but they didn't re-underwrite any additional loans

17   at that point.  Instead, he just shifted his calculations

18   and re-ran the numbers in a different way based on the same

19   underlying loans.

20       And on top of that, I fail to see why their

21   counsel would have spent a tremendous amount of time on

22   that.  It was an issue that was handled by Dr. Snow.  And

23   their counsel spent, I believe, the total testimony on this

24   issue by McCrary and Snow accounted for only 3.5 percent of

25   the trial by plaintiff's own math.

1          Now, they also point to, you know, the Countrywide

2     pool.  That's one they harp on.  Well, first of all, you

3     know, we don't agree that this was a $30,000 issue.  The

4     plaintiff, despite making that assertion, has never shown

5     why it was $30,000 to begin with.  The allegedly breaching

6     loan in question had lost $61,000 and to be extrapolated

7     across the at-issue population.

8          And furthermore, the issue had broader

9     implications because it concerned whether an entire pool of

10    loans originated for Countrywide were sold outside the

11    Client Guide and thus could not be recovered upon because

12    plaintiff was suing only under the Client Guide.  That pool

13    contained 12 at-issue loans and losses of over a million

14    dollars.  And if PRMI prevailed on this argument, then it

15    had an argument at the damages phase.  The experts were

16    supposed to recalculate damages later.  That plaintiff could

17    not recover indemnity on any of those loans in that pool.

18         But in any event, this issue that plaintiff

19    complains about hardly justified them spending a massive

20    chunk of their hours, which they haven't even explained how

21    much they spent on it.  It accounted for one additional

22    deposition that occurred during trial, and it accounted for

23    just 2 percent of the trial transcript.  So it's hard to see

24    how this could be an explanation for why they billed so

25    much.

1          Now, changing gears a little bit, plaintiff didn't

2     really say a word today about its claim for costs, and I

3     think that's notable because their claim for costs had some

4     serious problems attached to it.  They are seeking over $3.5

5     million in costs on top of all the attorney's fees that they

6     are seeking.  This includes costs for expert witnesses and

7     fact witnesses.

8          Now, we think the Court should reduce this $3.5

9     million cost claim for several reasons.  First of all, as

10     part of this claim, plaintiff is charging PRMI $430,000 for

11     expert work that was performed in Wave One.  That is

12     obviously improper.  It's axiomatic that an attorney cannot

13     bill in one case for work that he performed in another prior

14     case.  By the same token, an expert may not bill in one case

15     for prior work he did in another case.  Instead, an expert

16     or an attorney can only bill for the incremental time that

17     he spent updating that work for the new case.

18          So here, plaintiff's experts performed this

19     $430,111 of work in connection with the Wave One cases to

20     which PRMI was not a party, so plaintiff therefore may not

21     charge PRMI's share of that work.

22          Now, tellingly, plaintiff's reply brief addressed

23     this issue only in a footnote where they said, Well, if

24     Dr. Snow hadn't been deposed in Wave One, then PRMI never

25     would have agreed to a half-day deposition in this case.

1    But, Your Honor, that misses the point entirely.  Attorneys

2    and experts are expected to take advantage of their prior

3    work product and to litigate in an efficient manner in the

4    present case.  And the fact that Dr. Snow had been deposed

5    in a prior action doesn't somehow justify plaintiff in

6    charging PRMI for that prior work in this case, nor does it

7    justify charging PRMI with any of the $430,000 in Wave One

8    expert costs.

9         On top of that, plaintiff is seeking $2.15 million

10   in additional expert costs for this case for either Wave Two

11   common work or case-specific work, and plaintiff hasn't

12   shown that those costs are reasonable.  It didn't even

13   mention them today other than in passing, and an analysis of

14   those costs shows that they are unreasonable.

15        For example, consider the period up to May 2019

16   when they issued their expert reports.  Their opening

17   reports.  During that period, plaintiff spent over $746,000

18   in expert reports, expert costs, even though it was largely

19   recycling narrative reports from Wave One using the same

20   methodologies developed in Wave One.

21        You know, for example, Mr. Hawthorne made only

22   minor revisions to his report, yet his law firm billed 88.37

23   hours and charged over $64,000 for those minor revisions.

24        As another example, Dr. Snow made only minor

25   revisions to his opening report which consisted mainly of

1   deleting passages and then re-running his already determined

2   formulas on PRMI's loans, and its firm charged $230,000 for

3   that opening report and billed over 530 hours.  Plaintiff

4   provides no justification for any of this.

5          Now, consider the expert discovery period.  During

6   that period plaintiff spent another $721,000 in expert

7   costs; and for much of that period, plaintiff's experts were

8   just waiting on PRMI's experts to issue reports.

9          Furthermore, only three of their experts issued

10  reply reports.  Mr. Hawthorne's was virtually identical to

11  his Wave One report.  Dr. Snow's recycled work product from

12  its prior Wave One supplemental report and only added these

13  two new additional monoline issues which plaintiff says

14  wasn't a big deal, and yet plaintiff still racked up over

15  $700,000 in expert costs during this period.

16         Now, take Mr. Hawthorne, for example.  He

17  billed -- his firm, Axinn, billed over $239,000 and 280

18  hours, including 87 hours by Mr. Hawthorne at $1,150 per

19  hour, and in was to issue a largely recycled supplemental

20  report.  On top of that, you know, they point to the fact

21  that there was a deposition scheduled for him, but it was a

22  deposition that was canceled a week in advance.  That hardly

23  explains these massive hours.

24         And then they also say he had to review Mr. Woll's

25  report, which was only 36 double-spaced pages, and that

1    Mr. Hawthorne did not even issue a reply report to it.  So

2    280 hours over this period seems unreasonable to me.  Again,

3    you don't have to be a green-eyeshade accountant to see

4    that.

5         Now, Dr. Snow over this period where he issued

6    this supplemental report with only two new analyses,

7    billed -- his firm billed $385,000 and over 810 hours.  So

8    plaintiff likes to talk about how little the monoline issue

9    was, yet its own expert billed $385,000 to put together his

10   supplemental report.

11        And then consider the trial period.  During this

12   period plaintiff spent over $682,000 in expert costs,

13   despite the fact that only three of its experts testified at

14   trial.  All three of those experts had actually testified at

15   the *HLC* trial, and Butler testified only on the Global

16   sample, but two of the experts, Dr. Snow and Mr. Hawthorne,

17   had already testified on similar issues; yet Mr. Hawthorne's

18   firm charged $276,00 and billed 260 hours for his trial

19   preparation.  This included 140 hours by Mr. Hawthorne at

20   $1,210 per hour.  Dr. Snow's firm charged $315,000 and

21   billed over 460 hours for trial prep, including 128 hours by

22   Dr. Snow himself who had already testified many times.

23        So given that these experts had already had

24   experience testifying, it's unclear why it was necessary to

25   bill these massive amounts of hours preparing for trial,

1    especially in a case involving just $5.4 million in damages.

2            Now, lastly, Your Honor, I would like to briefly

3    touch on the issue of pre-judgment interest which plaintiff

4    didn't address and I think there's a good reason for that.

5    Plaintiff is asserting in this case for the first time that

6    it's entitled to interest of 10 percent under Minnesota law

7    running from the date the Court issued its post-trial ruling

8    on August 14th, 2020, through the date the Court entered

9    judgment on August 17th, 2020, until the future date when

10   the Court enters a, quote, unquote, final judgment.

11           Now, in so arguing, they invoke the Minnesota

12   interest statute which uses the words "final judgment" but

13   that argument fails because these -- this issue is an issue

14   of federal law, not Minnesota law.  State law governs

15   pre-judgment interest in a diversity suit, but the Eighth

16   Circuit has held that federal law governs the award of

17   post-judgment interest.  In this respect, the federal

18   post-judgment interest statute says it applies to, "any

19   judgment in a civil case recovered in a district court."

20           Notably, that statute doesn't use the words "final

21   judgment."  It's not limited to final judgments.  It applies

22   to, quote, any judgment.

23           And Rule 58, by reference, discusses when judgment

24   gets entered and says it's entered when there's a separate

25   document put on the docket.  Here the Court entered judgment

1    through the clerk's office pursuant to Rule 58 on August

2    17th, 2020, so plaintiff isn't entitled to state law

3    interest at 10 percent after that date.  Instead, any

4    post-judgment interest is governed by the federal floating

5    rate, which is just 0.13 percent.

6         Now, plaintiff's only real response to this is to

7    argue that the judgment isn't really final because the Court

8    still has to determine the pre-judgment interest.  But

9    plaintiff cites cases addressing whether judgments count as

10   final decisions for purposes of appeal under 28 U.S.C. 1291.

11   Those cases are inapposite here because Section 1961 applies

12   to any judgment, not just final ones.

13        Further, the purposes in 1291 that plaintiff

14   relies on and 1961 are very different.  1291 is about

15   resolving every possible issue before the case goes up on

16   appeal to avoid piecemeal appeals, but Section 1961 is about

17   compensating the plaintiff for the loss of monies that are

18   due as damages once the amount of damages has been

19   determined.  Here the Court has determined the amount of

20   damages and entered judgment on August 17th, 2020.

21   Accordingly, the federal post-judgment interest statute

22   applies from that date forward.

23        Now finally, it's worth noting that plaintiff

24   itself filed a proposed order saying it was entitled to

25   state law interest only through "the judgment date of August

1    17, 2020," but then changed course and filed a corrected

2    order asserting it was entitled to state law interest

3    through date of the final judgment.  Your Honor, we think

4    plaintiff had it right the first time.  Any interest after

5    the judgment date of August 17th is a question of federal

6    law, not state law.

7              If the Court has no questions, I'll rest.

8              THE COURT:  Thank you, Mr. Nicholson.

9              Mr. Nesser, Ms. Christensen?

10             MR. NESSER:  Yes, Your Honor, I will be responding

11   and I'll try to keep it to a handful of targeted issues.

12             Your Honor, first, it's just difficult in a sense

13   to imagine a better illustration of the issues that I was

14   talking about this morning than what we just listened to.

15   We had 95 minutes of argument.  We had slides that I

16   couldn't even read without squinting because of all of the

17   detail.  We've gone back and forth about green-eyeshades and

18   all the rest, but it's like I almost literally needed some

19   kind of an eye shade just to read those charts, and that's

20   just not what this is supposed to be.  That's what the

21   Supreme Court has held and that's what this Court has held.

22   And this, you know, hour-and-a-half-long travel through

23   every single event in the history of the litigation and

24   every single time entry is just inherently not appropriate.

25             Mr. Nicholson started, it was a while ago, but

1  started by saying that -- talking about how there was a

2  standard amount of standard litigation activities that were

3  routine litigation activities, that there was nothing

4  unusual here.  Again, I just think that what we just lived

5  through is precisely the nonstandard, nonroutine, unusual,

6  expensive, extraordinary process that we have lived through

7  for the last several years.

8          Your Honor, second, on the issue of

9  Mr. Nicholson's comments about Mr. Cambronne's declaration,

10  our expert.  Mr. Nicholson said he could not think of a more

11  damning indictment than our expert's failure to opine on

12  reasonableness.

13          Your Honor, I'm just a little speechless.

14  Mr. Cambronne was not retained to offer opinions on

15  reasonableness.  He was retained to rebut Mr. Remele's

16  report.  And because Mr. Remele had no opinion on

17  reasonableness, neither could Mr. Cambronne.  The whole

18  point of Mr. Cambronne's declaration is that it's not

19  appropriate for an expert and not feasible for an expert in

20  this case to opine on reasonableness because Your Honor is

21  the expert having lived through this and supervised it

22  closely.

23          Next, Your Honor, Mr. Nicholson mentioned this a

24  couple of times, this point that -- not in the brief but he

25  says that we spent $5 million prior to July 2019 and he says

1    how can plaintiffs possibly have done that, and that was

2    before any of the issues that they complained about.

3         Your Honor, if you'd look back at the exhibit we

4    went through before with all the examples of when we raised

5    the issue of proportionality, we complained eight different

6    times, eight, prior to July 2019 about the manner in which

7    they were litigating this case.  Eight times.  And so these

8    arguments about $5 million before 2019, that's exactly our

9    point, Your Honor.

10        You know, the Court, Your Honor in the *HLC*

11   decision and also -- also Your Honor in the *Ewald* decision,

12   the Court's *Ewald* decision, cited Judge Easterbrook's

13   decision in the *Cuff* case, and there was a long quote from

14   that case in the Court's decision, in Your Honor's decision,

15   so I won't belabor it.  But I think -- I think Judge

16   Easterbrook's assessment there of what it is in the real

17   world to litigate under circumstances like this is

18   perceptive and true.  We spent amounts that we thought were

19   appropriate to spend and then we had to deal with additional

20   issues that went far beyond what we thought was appropriate

21   to spend.

22        And at that point in time the Trust had two

23   decisions to make.  Either it could drop the claim because

24   it was going to cost a lot of money to litigate, or spend

25   the money to continue prosecuting the claim, even though it

1    would cost some amount of additional money.

2          The first of those options is just not fair.  It's

3    not consistent with the law.  It's not consistent with the

4    contract.  It's not consistent with the Trust's fiduciary

5    duties.  And so we spent the money that we needed to spend

6    to address the issues that were arising as they arose, even

7    where it costs more than we would have preferred to spend.

8    But it would have been unfair and ultimately irrational for

9    us to have behaved differently, and those are the words that

10    Judge Easterbrook uses.

11          Your Honor, next on the issue of proportionality,

12    I just wanted to note this briefly.  Mr. Nicholson compared

13    the fee request here to our -- to the verdict, to damages

14    plus fees and interest, and that's not the correct

15    comparison.  Your Honor addressed this issue in the *HLC* fee

16    decision at page 852 of the Westlaw version.  What Your

17    Honor held there is that the comparison is fees against the

18    damages, plus pre-judgment interest.  And that comparison is

19    about $10 million in fees relative to $7 and a half million

20    of damages and pre-judgment interest.

21          And so, you know, again, the numbers are what they

22    are.  I just think that Mr. Nicholson was overstating

23    significantly the delta between the -- the relationship

24    between those two numbers.

25          Your Honor, on the issue of just kind of taking a

1   step back, you know, on the issue of whether our $10 million

2   or so fee request here is reasonable, I want to underline

3   what Ms. Christenson mentioned this morning about what it

4   costs to litigate this case versus -- what was involved in

5   litigating this case versus what was involved in litigating

6   *HLC*.  It was the same 150-loan sample.  It was the same

7   indemnity claim.  It was the same bankruptcy.  It was the

8   same, right?  I mean, there was no less work required here

9   than was required there.

10          The issues were different and we had to reinvent,

11  we had to address distinctions and all kinds of other

12  issues, but the scope of the case was no narrower here than

13  it was in *HLC*.  The cases in terms of scope are the same.

14  The only difference happens to be the happenstance of how

15  much money that 150-loan sample extrapolated to.  It

16  happened to extrapolate to $5 million here.  It happened to

17  extrapolate to a larger number at PRMI, but the scope was

18  the same.

19          And if it was reasonable, as Your Honor held, to

20  have spent -- to have an $18 million fee award in *HLC* to

21  litigate a case of that scope, it's equally reasonable, it's

22  more reasonable to litigate, to have spent $10 million in

23  fees here.  The scope of the case was the same.  The fee

24  request is almost half, almost 50 percent less.

25          So that's the comparator.  If we're looking for a

1   comparator, that's the comparator.  This case ought to be

2   compared to *HLC* which was the same scope but on which we

3   spent almost twice as much money.

4          Your Honor, I guess just in closing, it's not an

5   exaggeration to say that working on this case with this team

6   and with the Court was the honor of my career.  You know, we

7   were talking over the break and, you know, getting maybe a

8   little emotional about it; and I don't want to go too far

9   but I can't imagine a group that I've ever been prouder of

10  or that I ever would be prouder of.  I can't imagine the

11  work that we would have been prouder of.  We think we did

12  great work together and we think that the Trust ought to be

13  compensated appropriately for that.

14         Your Honor, I hope -- it's a funny thing to say --

15  I hope this will be the last time we're before the Court in

16  these cases.  I hope it's not the last time we're before

17  Your Honor in other cases, but we really do appreciate

18  having spent all these years with Her Honor and it was a

19  privilege to appear before you and to learn from the Court,

20  and we thank you very much.

21         THE COURT:  Well, thank you, Mr. Nesser.

22         And thank you, Mr. Nicholson and Mr. Johnson.

23         It was a privilege to preside over this case for

24  seven years, these cases for seven years, and it was an

25  extraordinary opportunity for me and I will always look back

1    on it very fondly, and the work on both sides in these cases

2    was outstanding.  Outstanding work, highest level work.  Two

3    very interesting trials.  Perhaps the first pandemic order

4    about witnesses in a trial in the country, so it was a

5    wonderful experience for me as well.

6            The Court will study this, of course, and take it

7    under advisement, and I wish everybody a happy holiday but,

8    most importantly, a healthy new year.

9            Court is adjourned.

10           MR. NESSER:  Thank you, Your Honor.

11           MS. CHRISTENSON:  Thank you, Your Honor.

12           MS. NELSON:  Thank you, Your Honor.

13           (Court adjourned at 11:42 p.m.)

14                        *      *      *

15

16

17       I, Carla R. Bebault, certify that the foregoing is

18   a correct transcript from the record of proceedings in the

19   above-entitled matter.

20

21

22           Certified by:  s/Carla R. Bebault
                            Carla Bebault, RMR, CRR, FCRR
23

24

25