# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| ResCap Liquidating Trust,<br>Plaintiff<br><br>v.<br><br>Primary Residential Mortgage, Inc.,<br>Defendant | Case No. 0:16-cv-4070 (SRN/HB)<br><br>REDACTED for public access<br>4/28/21<br><br>**AMENDED ORDER ON ATTORNEY'S FEES, COSTS, AND PREJUDGMENT INTEREST**\*<br><br>~~Temporarily Filed Under Seal~~ |

Isaac Nesser, Heather Christenson, Peter Calamari, and Jeffrey Carl Miller, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave., Floor 22, New York, NY 10001; Anthony Alden and Matthew R. Scheck, Quinn Emanuel Urquhart & Sullivan, LLP, 865 Figueroa St., Floor 10, Los Angeles, CA 90017; Donald Heeman, Jessica Nelson, Randi Winter, and Laurie Quinn, Spencer Fane, 100 S. 5th St., Ste. 2500, Minneapolis, MN 55402, for Plaintiff.

Matthew Johnson, Jesse T. Smallwood, Matthew Nicholson, and Krista Anderson, Williams & Connolly, LLP, 725 12th St. NW, Washington, DC 20005; Elizabeth Kniffen and Rory Zamansky, Zelle, LLP, 500 Washington Ave. S., Ste. 4000, Minneapolis, MN 55415, for Defendant.

---

\* This Order amends the April 20, 2021 Order [Doc. No. 126] to correct a typographical error on page 102. Other than this correction and the designation in the caption of this Order as an "Amended Order," it is identical to the April 20, 2021 Order.

# TABLE OF CONTENTS

I.   BACKGROUND ...................................................................................... 1

A.   RFC's Bankruptcy ...................................................................... 1

B.   Indemnification and Fee-Shifting Provisions................................ 2

C.   Litigation in Minnesota .............................................................. 3

D.   Summary Judgment and Trial Between ResCap and PRMI ......... 7

E.   Plaintiff's Motion for Attorney's Fees, Costs, and Prejudgment Interest..... 8

II.  DISCUSSION ...................................................................................... 13

A.   Whether ResCap's Attorney's Fees are Reasonable ................... 14

1.   Supporting Evidence .......................................................... 17

a.   Expert Opinions of Messrs. Remele and Cambronne .......... 18

b.   Redacted Invoices ...................................................... 21

2.   Reasonable Hourly Rates .................................................. 25

3.   Reasonable Hours............................................................. 28

a.   The Nature and Difficulty of the Responsibility Assumed... 29

(1)   PRMI Loan-Specific Work ........................................ 30

(2)   PRMI's New Arguments............................................ 31

(3)   Comparable Litigation .............................................. 33

(4)   Challenges to Work Performed................................... 35

(a)   Pre-Complaint Period Through Month Complaint Filed (December 1, 2014 to December 31, 2016) ........................................................... 36

(b)   Pre-Stay Period/Document Discovery (January 1, 2017 to July 31, 2018)............................................ 36

(c)   Stay Period (August 1, 2018 to January 31, 2019) ........................................................... 39

(d)   Fact Depositions and Opening Expert Reports (February 1, 2019 to May 31, 2019) .......................... 40

(e)     Expert Discovery/Opening Summary-Judgment and Daubert Briefs (June 1, 2019 to October 31, 2019) ................................................................... 41

(f)     Summary Judgment and Daubert Opposition, Replies, and Hearings (November 1, 2019 to December 11, 2019), and Pre-Trial Proceedings (December 12, 2019 to February 9, 2020) ................. 43

(g)     Bench Trial (February 10, 2020 to March 13, 2020) ........................................................... 45

(h)     Post-Trial Submissions (March 14, 2020 to April 30, 2020) ........................................................ 48

(i)     Months Following Post-Trial Submissions (May 1, 2020 to July 31, 2020) ................................... 49

(j)     Fee Petition Litigation (November 2020 to December 2020) ........................................................ 49

b.     Amount Involved and Results Obtained ............................. 50

(1) Prejudgment Interest Included in Damages Award ......... 52

(2) Amount of Plaintiff's Attorney's Fees ........................... 53

(3) Challenges to Components of Damages Claim ............... 54

(a) Countrywide Loan ................................................ 55

(b) Monoline Allocation ............................................. 56

(c) At-Issue Population and NDS Trusts ................... 58

(d) Assetwise Loans ................................................... 59

(4) Previously-Decided Issues .............................................. 60

(5) ResCap's Warnings ......................................................... 65

(6) Results Obtained ............................................................. 68

c.     Fees Customarily Charged for Similar Legal Services ......... 72

(1) Comparison with Opposing Counsel's Billable Hours ... 72

(2) Comparison Between ResCap's Hours Billed in *PRMI* and *HLC* ............................................................................ 74

(3) Comparison of Hours Billed Among Plaintiff's Counsel ............................................................................... 75

d.     Remaining *Milner* Factors.................................................. 79

e.     Fees for Preparing the Fee Petition ................................. 81

f.     Adjustments to the Lodestar .............................. 82

B.     Whether ResCap's Costs are Reasonable ........................................ 83

1. Expert and Support Firms ..................................................... 84

a. ResCap's Allocation Methodology ............................... 84

b. ResCap's Request and Supporting Documentation for
Expert Costs ........................................................................ 87

2. Document Vendors ........................................................... 93

3. Witnesses and Trial Vendors................................................ 93

C.     Post-Award Prejudgment Interest ........................................... 96

**III.    ORDER**...............................................................................**102**

SUSAN RICHARD NELSON, United States District Judge

Before the Court is the Motion for Attorney's Fees, Costs, and Prejudgment Interest [Doc. No. 22] filed by Plaintiff ResCap Liquidating Trust ("ResCap"). For the reasons set forth below, Plaintiff's motion is granted in part and denied in part.

## I.    BACKGROUND

The Court has previously addressed the complex background and unique legal issues involved in this contractual indemnification lawsuit in numerous orders and opinions, most notably in its 210-page Findings of Fact and Conclusions of Law ("FOF & COL") following the parties' 13-day bench trial in this case. *In re ResCap Liquidating Tr. Litig.*, No. 13-cv-3451 (SRN/HB), 2020 WL 4728109 (D. Minn. Aug. 14, 2020); (*ResCap Consol. Liquid. Tr. Litig.*, 13-cv-3451 [Doc. No. 5527].) While the Court will not reiterate its past findings in detail here, to provide the necessary context for Plaintiff's motion, the Court will briefly describe the origins of this case, the underlying relationship between Plaintiff's predecessor, Residential Funding Corporation ("RFC"), and Defendant Primary Residential Mortgage, Inc. ("PRMI"), and the procedural history of this action, including the relationship of this case with similar cases filed in this District.

### A.  RFC's Bankruptcy

This lawsuit stems from the 2012 bankruptcy (the "Bankruptcy") of the Minnesota company known as RFC. (FOF & COL ¶ 1.) Following the 2008 collapse of the housing market, RFC was sued by various "Trusts" and "Monoline Insurers" for breaching the "representations" and "warranties" ("R&Ws") RFC had made to those entities, or their insureds, when selling them bundles of home mortgages pooled together into residential

1

mortgage-backed securities ("RMBS").  *In re RFC & ResCap Liquid. Tr. Action*, 399 F. Supp.

3d 827, 831 (D. Minn. 2019) ("*HLC Fee Award*").  Facing billions of dollars of liability, RFC

filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New

York (the "Bankruptcy Court").  (FOF & COL ¶ 2.)  In the Bankruptcy Court, after much

negotiation, RFC reached a series of settlements, totaling approximately $9 billion, with the

RMBS Trusts and several of the Monoline Insurers.  *HLC Fee Award*, 399 F. Supp. 3d at 831.

In December 2013, the Bankruptcy Court Judge, the Honorable Martin Glenn, approved the

settlements as "fair and reasonable" in a 134-page order.  (FOF & COL ¶ 111); *HLC Fee

Award*, 399 F. Supp. 3d at 831.  At the hearing in which Judge Glenn approved the

settlements, he further observed that "this case is certainly the most legally and factually

complicated case that I've presided over in my seven years on the bench," and that "ResCap

presented more unsettled legal issues than I've seen in one case before, whether during my

seven years on the bench or thirty-four years in law practice before that."  *HLC Fee Award*,

399 F. Supp. 3d at 831.

### B.  Indemnification and Fee-Shifting Provisions

As part of RFC's Bankruptcy, RFC's creditors formed ResCap, a trust authorized to

sue the dozens of banks and mortgage lenders that had sold RFC the loans that were

subsequently bundled into RMBS, on grounds that those lenders breached *their*

(corresponding) R&Ws to RFC, and thus directly caused RFC to breach *its* R&Ws to the

Trusts and Monoline Insurers, which, in turn, contributed to RFC's $9 billion in Bankruptcy

liabilities.  *Id.*  ResCap's legal claims against the lenders were rooted in the "Client Contract"

that those lenders had signed with RFC, which itself incorporated a lengthier agreement called

2

the "Client Guide," or in PRMI's case, both the Client Guide and a similar agreement called the "AlterNet Guide" (collectively, "the Guides"). *Id.*

In addition to the R&Ws that the lenders made to RFC, such as a promise that all of the borrower information the lender provided RFC was accurate, (FOF & COL ¶¶ 20–21), both the Guides contained broad indemnification provisions requiring the originating lenders to indemnify RFC from "all losses, damages, penalties, fines, forfeitures, *court costs and reasonable attorneys' fees*, judgments, and any other costs, fees and expenses resulting from any Event of Default." *(Id.* ¶¶ 26, 28) (citing PTX-001 § 274; PTX-032 § A223; PTX-1055 § A212; *In re ResCap Liquid. Tr. Litig.*, 428 F. Supp. 3d 53, 67 (D. Minn. 2019) ("*PRMI Summ. J. Order*") (emphasis added)).

## C. Litigation in Minnesota

Based on this broad indemnification language, and the $9 billion in "losses and liabilities" incurred in RFC's Bankruptcy settlements, in late 2013, ResCap began filing dozens of materially identical lawsuits in the District of Minnesota against a wide range of mortgage lenders, all asserting claims for breach of contract and contractual indemnification. (Horner Decl. [Doc. No. 27] ¶ 3.)

At the outset of the litigation, ResCap was represented solely by attorneys at the Minneapolis firm of Felhaber Larson, ("Felhaber"), RFC's longstanding counsel, as well as attorneys at the Columbus, Ohio law firm of Carpenter, Lipps & Leland LLP ("Carpenter Lipps"), RFC's Bankruptcy counsel. *HLC Fee Award*, 399 F. Supp. 3d at 832. Early in the proceedings, ResCap and counsel at Felhaber determined that ResCap also "needed to obtain national counsel with significant RMBS litigation and RMBS-related bankruptcy expertise to

3

represent [it]." (Heeman Decl. [Doc. No. 26] ¶ 9.) However, "[ResCap] could not locate counsel in Minneapolis/St. Paul with the requisite expertise who were capable and able to litigate the cases, particularly in light of the many conflicts that law firms in this market had due to their ongoing representation of many of the defendant-originators in these cases." (*Id.*)

Plaintiff was not alone in seeking national counsel, as "the overwhelming majority of Defendants in these cases, including PRMI, hired lead counsel from outside of Minnesota," (*id.*), often from some of the most prestigious law firms in the country. *HLC Fee Award*, 399 F. Supp. 3d at 833 (noting that defense counsel included Williams & Connolly, Jones Day, Munger, Tolles & Olson, Orrick, Herrington & Sutcliffe, Ropes & Gray, Simpson Thatcher & Bartlett, Sullivan & Cromwell, and Wachtell, Lipton, Rosen & Katz).

Ultimately, ResCap obtained the services of national counsel at the firm of Quinn Emanuel Urquhart & Sullivan, LLP, due to Quinn Emanuel's well-regarded RMBS, bankruptcy, and insurance litigation experience, including its success in recovering over $25 million for the Federal Housing Finance Agency in RMBS litigation. *HLC Fee Award*, 399 F. Supp. 3d at 833; (Heeman Decl. ¶13). Plaintiff also continued to be represented by local counsel, attorneys at Felhaber, with those attorneys subsequently moving to Spencer Fane LLP, and by RFC's Bankruptcy counsel, Carpenter Lipps. (*See* Heeman Decl. ¶¶ 3, 12–15.)

As of January 2015, 68 of ResCap's cases were consolidated for pretrial purposes before the undersigned judge as part of the ResCap RMBS Litigation. (Horner Decl. ¶ 3.) Of these 68 cases, five involved default, three were "loan-level cases" distinct from the other consolidated cases, and one settled shortly after consolidation. (*Id.*) As of February 2015, 59 cases remained part of the consolidated ResCap RMBS Litigation. (*Id.*)

4

In addition, as of February 2015, there were three non-consolidated cases pending in this District (with one additional case filed the following month), four cases pending in Minnesota state court, and five cases pending in the Southern District of New York. (*Id*. ¶ 4.) The cases filed on or before 2015, which did not include the instant case against PRMI, were considered part of a "first wave" of ResCap's litigation, and have been referred to as "Wave One" or "First Wave" actions during this litigation. (*Id*.)

After the consolidation of the Wave One cases, the litigation proceeded through joint discovery for three years, with the Court holding monthly in-person case management conferences with all participating counsel. *HLC Fee Award*, 399 F. Supp. 3d at 833. As the Court has observed, during that time, "the complexity of these cases became readily apparent, as ResCap undertook the daunting task of attempting to apportion billions of dollars in liabilities across dozens of defendants, and among the tens of thousands of individual mortgage loans that defendants had sold to RFC over the course of the 2000s." *Id.* At the same time, ResCap prepared a case against the many, and sometimes individualized, contract law defenses asserted by defendants, and utilized a sampling protocol in order to manage the sheer volume of discovery in this complex litigation. *Id.* ResCap's legal team responded to voluminous discovery requests and defended over 150 fact depositions and third-party depositions in Wave One. *Id.* at 834.

In April 2018, ResCap and the remaining nine defendants in Wave One of the consolidated action (the other defendants had settled), filed cross motions for summary judgment on "common issues," as well as *Daubert* motions. *Id*. The briefing totaled nearly

600 pages, and some defendants also filed defendant-specific briefing, to which ResCap responded in kind. *Id.*

At the end of 2016, and the beginning of 2017, ResCap filed 10 additional actions against loan originators—including the instant lawsuit against PRMI—in the District of Minnesota. (Horner Decl. ¶ 5.) These additional cases were considered part of the "second wave" of ResCap's litigation, and have been referred to as "Wave Two" or "Second Wave" actions. (*Id.*) Shortly after these cases were filed, they were consolidated before the undersigned judge, and four remaining Wave Two actions were assigned to the Honorable Paul A. Magnuson. (*Id.*)

In July 2018, the Court stayed proceedings in the PRMI case, pending the outcome of the Wave One summary judgment and *Daubert* motions, and the results of ResCap's potential trial against the first defendant in the Wave One trial queue, Home Loan Center ("HLC"). (*See* July 24, 2018 Hr'g Tr. [Doc. No. 4061] at 31–32.) HLC was represented by the same counsel who represent PRMI in this action, Williams & Connolly.

The Court's August 15, 2018 summary judgment order in the Wave One cases left a number of complex issues for jury determination. *See HLC Fee Award*, 399 F. Supp. 3d at 834. Given the potential impact of the HLC trial on the remaining cases in Waves One and Two, ResCap prepared an extremely thorough and detailed case to present to the jury, as if the HLC trial were a "bellwether" trial. *Id.* at 835.

At the conclusion of the 16-day trial against HLC in November 2018, the jury returned a verdict of $28.7 million in favor of ResCap. (*In re ResCap Liquid. Tr. Litig.*, 13-cv-3451 (SRN/HB) [Doc. No. 4705].) Subsequently, the Court awarded ResCap $14,066,931.50 in

preverdict prejudgment interest, for a total damages award against HLC of $42,766,931.50. *HLC Fee Award*, 399 F. Supp. 3d at 851, 862. Also, pursuant to the same contractual fee-shifting provision found in the instant case, the Court awarded ResCap an additional $23,081.252.31 in attorney's fees and costs. *Id.* Finally, the Court awarded ResCap $2.6 million in postverdict prejudgment interest. (*ResCap v. HLC*, 14-cv-1716 (SRN/HB) [Doc. No. 82 at 2].)

The verdict against HLC impacted the remaining cases, because within a few months of the HLC trial, all of the remaining Wave One defendants had settled their cases with ResCap, and by August 2019, PRMI was the only remaining defendant among the Wave Two cases. *See HLC Fee Award*, 399 F. Supp. 3d at 835, 861; (Christenson Decl. [Doc. No. 25] ¶ 7.)

### D.  Summary Judgment and Trial Between ResCap and PRMI

After an unsuccessful mediation in June 2019, (Christenson Decl. ¶ 5), ResCap and PRMI filed cross motions for summary judgment and *Daubert* motions in the instant action. The Court's 176-page summary judgment order granted some aspects of ResCap's motion and denied others, and deferred ruling on some aspects of PRMI's motion and denied others. *PRMI Summ. J. Order*, 428 F. Supp.3d at 53.

The parties proceeded to a 13-day bench trial in February and March 2020, during which they introduced over 300 exhibits and testimony from 27 witnesses. (FOF & COL, 2020 WL 4728109, at *4.) While the content of the PRMI trial shared some similarities with the HLC trial, it differed in several ways, as the Court discusses in greater detail below. In brief, Plaintiff was required to undertake the review, analysis, appraisal, and reunderwriting

7

of PRMI's specific loans, and present this loan-level evidence at trial. (Supp'l Christenson Decl. [Doc. No. 85] ¶¶ 21, 24–27, 29, 32, 44.) PRMI also raised significant causation and allocation issues specific to securitization-level representations, (*id*. ¶¶ 47–48), and litigated the case breach-by-breach. Also unlike *HLC*, which solely involved loans sold under the Client Guide, the loans that PRMI sold to RFC were governed by the AlterNet Guide, in addition to the Client Guide. (FOF & COL ¶¶ 132–55.) Also, PRMI raised new arguments not previously asserted in *HLC* concerning Assetwise Loans and the Additional Settling Trust Settlement, both of which the Court addresses separately, below.

On August 14, 2020, the Court issued its Findings of Fact & Conclusions of Law, finding that PRMI had breached its Client Contracts with RFC, the breaches contributed to RFC's liability, and ResCap's damages methodology was reasonable and non-speculative. (*Id*. ¶¶ 113–73, 174, 450.) The Court therefore directed entry of judgment in favor of ResCap, and against PRMI, in the full amount of $5.4 million in damages, and permitted Plaintiff to submit a motion for attorney's fees, costs, and prejudgment interest. (*Id*., 2020 WL 4728109, at *91.)

### E.  Plaintiff's Motion for Attorney's Fees, Costs, and Prejudgment Interest

In the instant motion, Plaintiff seeks $14,156,095.26 in attorney's fees and costs, (Second Supp'l Horner Decl. [Doc. No. 118] ¶ 9, Ex. 48 [Doc. No. 118-1]), and $1,999,180.27 in pre-award prejudgment interest. (Pl.'s Mem. [Doc. No. 24] at 3, 13, 19.[1]) It further asks that the Court permit it to calculate post-award prejudgment interest on the total

---

[1]    All pinpoint citations to the parties' memoranda refer to the parties' internal pagination found on the bottom of each page.

of the damages award and pre-award interest (i.e., a total of $7,399,180.27), from August 14, 2020 to the date on which the Court enters final judgment, at a rate of 10% per year.  (*Id.* at 13, 20.)  In support of its motion and initial memorandum, ResCap submits the following:  (1) the Declaration of Jill Horner,  ResCap's Chief Finance Officer ("CFO"), who oversaw the review and payment of invoices received by ResCap; (2) the Declaration of Heather Christenson, one of ResCap's attorneys at Quinn Emanuel; (3) the Declaration of Donald Heeman, ResCap's lead local counsel; (4) full or redacted invoices showing detailed time entries and time spent; and (5) summaries of invoices for 24 professionals and witnesses.  (*See* Pl.'s Mem. at 8; Horner Decl. ¶¶ 21–23, 26–28, 31–33, 36–37, 41–42, 45–47, 50, 52, 56–57, 60, 62, 64–68, Exs. 7–22, 23-A, 23-B, 24, 25-A, 25-B, 26-A, 26-B, 27-A, 27-B, 28–31, 32-A, 32-B, 33-A, 33-B, 34, 35-A, 35-B, 37–38, 39-A, 39-B, 40, 41-A, 41-B, 42, 43-A, 43-B, 44–48.)

Prior to filing the instant motion, ResCap asked PRMI whether it intended to retain an expert to challenge the reasonableness of Plaintiff's fee request, and if so, to disclose its expert.  (Supp'l Christenson Decl. ¶ 55.)  At that time, PRMI stated that it had made no decision about the use of an expert.  (*Id.*)  On September 2, 2020, ResCap submitted the instant motion, which was not accompanied by an expert opinion.

On September 16, 2020, after ResCap again asked PRMI if it intended to retain an expert in opposition to ResCap's fee petition, PRMI responded that it had still not made a decision.  (*Id.*, Ex. A.)  On September 23, 2020, after the parties met and conferred to discuss ResCap's invoice redactions, counsel for ResCap emailed defense counsel asking about

9

PRMI's intention to use an expert, noting that PRMI had agreed to inform ResCap of its decision by October 1.  (*Id.*, Ex. B.)

The following day, PRMI filed a letter with the Court, voicing its opposition to Plaintiff's redacted invoices, (Def.'s Sept. 24, 2020 Letter [Doc. No. 41]), accompanied by the Declaration of Lewis A. Remele, Jr., an expert witness whom PRMI had retained "to review the reasonableness of the fee and expense request submitted by the Plaintiff."  (First Remele Decl. [Doc. No. 41-1] ¶ 1.)  PRMI argued that it was unable to assess the reasonableness of Plaintiff's billing entries because they contained improper redactions that either removed non-privileged, non-protected information, or were so excessive as to make the billing entries "indecipherable."  (Def.'s Sept. 24, 2020 Letter at 1.)

In *HLC*, after the defendant there raised nearly identical objections about redacted invoices, the Court denied HLC's requests for unredacted time entries and a privilege log, and instead required HLC to identify a reasonable number of disputed redactions, for which it required ResCap to submit the corresponding unredacted entries to the Court for *in camera* review.  *HLC Fee Award*, 399 F. Supp. 3d at 845–46.  Ultimately, after conducting the review in *HLC*, the Court found the redactions were proper.  *Id.*

With respect to Plaintiff's fee petition in the instant case, ResCap followed the methodology used in *HLC* and redacted billing entries subject to privilege or work-product protection.  (Pl.'s Oct. 2, 2020 Letter [Doc. No. 44] at 1–2.)  ResCap opposed PRMI's request for revised redactions and a privilege log because the parties remain adverse in ongoing litigation, as PRMI has stated its intention to appeal the Court's rulings and trial findings. (*Id.*)

10

In response to the parties' dispute about redactions, the Court followed *HLC* procedures and conducted an *in camera* review of certain invoices to determine whether ResCap had properly redacted information subject to attorney-client privilege or work-product protection. (Oct. 9, 2020 Order [Doc. No. 46] at 4–5.)

On October 21, 2020, PRMI filed its opposition memorandum ("Def.'s Opp'n") [Doc. No. 54], along with a second declaration from its expert, Mr. Remele ("Second Remele Decl.") [Doc. No. 63], and the supporting Declaration of D. Keith Clouser [Doc. No. 57], one of PRMI's attorneys formerly at Williams & Connolly. PRMI argues that ResCap has not proven the reasonableness of its request for attorney's fees and costs for the following reasons: (1) the nature and difficulty of the case do not justify the requested amount; (2) the request is disproportionate to the amount at issue in the case and the results obtained; (3) Plaintiff failed to produce adequate documentation to assess reasonableness of law-firm hours; (4) the information provided shows excessive or duplicative billing; and (5) Plaintiff cannot shift the blame for its excessive fees to PRMI's defense strategy. (Def.'s Opp'n at 8–34.) In addition, PRMI argues that ResCap has not proven the reasonableness of its costs, including expert costs pertaining to common work from Wave One, and expert costs and fact witness costs incurred in this action. (*Id*. at 34–40.) Further, PRMI contends that ResCap may not recover fees for the work performed in preparing its fee petition, and is not entitled to prejudgment interest. (*Id*. at 40–42.)

After the Court conducted an *in camera* review of Plaintiff's invoices, it found that the relevant billing entries "describe[d] tasks undertaken by ResCap's counsel relating to trial preparation, including preparation for the testimony of trial witnesses, experts, the preparation

11

of exhibits, the preparation of deposition designations, the identification of objections to PRMI's exhibits, the preparation of motions in limine, the preparation of the trial brief, the preparation of ResCap's opening statement, and strategy discussions regarding trial." (Nov. 3, 2020 Order [Doc. No. 70] at 2.) Accordingly, the Court found that the entries were properly redacted either as work product or attorney-client privileged. (*Id.*)

Plaintiff responded to PRMI's criticisms of its fee petition in its Reply memorandum [Doc. No. 84] and accompanying declarations and exhibits, including the Supplemental Declaration of Heather Christenson, and the First Supplemental Declaration of Jill Horner ("First Supp'l Horner Decl.") [Doc. No. 90]. In addition, in response to Mr. Remele's expert opinion, ResCap submitted the Rebuttal Expert Declaration of Karl L. Cambronne ("Cambronne Decl.") [Doc. No. 88].

Although the parties had already stipulated that PRMI would be permitted to file a sur-reply memorandum, (*see* Nov. 12, 2020 Order [Doc. No. 79] at 1–2), PRMI filed a letter on December 8, 2021, objecting to the Court's consideration of Plaintiff's additional declarations. (Def.'s Dec. 8, 2020 Letter [Doc. No. 94] at 1.) PRMI argued that the declarations addressed issues "that Plaintiff reasonably should have anticipated at the time it filed its initial motion and on which Plaintiff bears [the] burden of proof." (*Id.*) It also argued that the Court should strike Plaintiff's Reply declarations, as they were not filed with its initial motion. (*Id.*)

In PRMI's sur-reply, it repeats these arguments, (Def.'s Sur-Reply [Doc. No. 98] at 1 n.1), but if the Court considers Plaintiff's Reply declarations, PRMI asks that the Court

consider a third declaration from Mr. Remele ("Third Remele Decl.") [Doc. No. 102], along with the Declaration of Jesse T. Smallwood ("Smallwood Decl.") [Doc. No. 99].

On December 18, 2020, the Court entertained two hours and 45 minutes of oral argument on the instant motion, via video-conference. (Dec. 18, 2020 Minute Entry [Doc. No. 107].)

With the Court's permission, on February 23, 2021, ResCap filed the Second Supplemental Declaration of Jill Horner, updating its prior request for attorney's fees and costs to include the more recent fees and costs incurred with respect to the instant motion. (*See* Feb. 19, 2021 Order [Doc. No. 117] at 2.)

Also with the Court's permission, PRMI filed a memorandum in response to the Second Supplemental Horner Declaration ("Def.'s Supp'l Opp'n") [Doc. No. 120], again arguing that it would be improper for the Court to consider the Cambronne Declaration, filed with Plaintiff's Reply, and that Plaintiff may not recover fees or costs for litigating its fee petition. (*Id.* at 1–6.) Furthermore, PRMI contends, even if such fees and costs are considered, ResCap has not demonstrated the reasonableness of its request. (*Id.* at 8–15.)

## II.    DISCUSSION

As a general rule in Minnesota, each party bears its own attorney's fees, absent a statutory or contractual exception, such as the fee-shifting provision in the Guides. *HLC Fee Award*, 399 F. Supp. 3d at 839 n.15 (citing *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 422 (Minn. 2003)). PRMI acknowledges the Court's prior rulings holding that the Guides permit Plaintiff to shift fees. (Def.'s Opp'n at 5 n.2.) However, in a footnote in its opposition memorandum, PRMI argues that the applicable indemnification provisions do

13

not include language "expressly requiring" PRMI to pay ResCap's fees and costs in the event of "litigation between the parties." (*Id*.)

This Court has previously observed that the Guides contained provisions highly favorable to RFC, providing it with broad discretion, recourse, and protections. *See, e.g., In re RFC & ResCap Liquid. Tr. Action*, 332 F. Supp. 3d 1101, 1134 (D. Minn. 2018) ("*HLC Summ. J. Order*"). However, "because RFC and [PRMI] were sophisticated business parties, there can be no claim that [PRMI] lacked either understanding or notice of [its] obligation to indemnify[.]" *Id.* The Court finds no reason to revisit its long-settled finding that the Guides contain a fee-shifting provision, applicable to the parties here. Indeed, the plain language of the Guides requires PRMI to identify RFC for "all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses resulting from any Event of Default." (FOF & COL ¶¶ 26, 28) (citing PTX-001 § 274; PTX-032 § A223; PTX-1055 § A212; *PRMI Summ. J. Order*, 428 F. Supp. 3d at 67); *accord HLC Fee Award*, 399 F. Supp. 3d at 839 n.15.

### A. Whether ResCap's Attorney's Fees are Reasonable

The amount of an attorney's fee award must be determined on the facts of each case and is within the district court's discretion. *Hensley v. Eckerhart*, 461 U.S. 424, 429, 437 (1983); *see Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005) (citation omitted) ("Attorney's fees are within the broad discretion of the district court . . . ."). The starting point for determining a reasonable attorney's fee is the "'lodestar'" calculation, which is the number of

hours reasonably expended on the litigation multiplied by a reasonable hourly rate.[2]  *Hanig*, 415 F.3d at 825 (citation omitted); *see Hensley*, 461 U.S. at 433.   The fee applicant "should submit evidence supporting the hours worked and rates claimed." *Hensley,* 461 U.S. at 433.  If "the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* Courts consider "all relevant circumstances" when determining the reasonableness of hours and hourly rates. *Milner v. Farmers Ins. Exch.*, 748 N.W.2d 608, 621 (Minn. 2008) (citing *State v. Paulson*, 188 N.W.2d 424, 426 (Minn. 1971)).   Factors relevant to the determination of reasonableness (the "*Milner* factors") include:

> (1) the time and labor required; (2) the nature and difficulty of the responsibility assumed; (3) the amount involved and the results obtained; (4) the fees customarily charged for similar legal services; (5) the experience, reputation, and ability of counsel; and (6) the fee arrangement existing between counsel and the client.

*Id.*  Federal courts consider the same or similar factors[3] when determining whether to adjust the loadstar amount upward or downward, although "many of these factors usually are subsumed within the initial [lodestar] calculation." *Hensley*, 461 U.S. at 434 n.9.

---

[2]     Although the Supreme Court applied the lodestar methodology in *Hensley* to a statutory fee-shifting petition, courts have also applied it in cases involving contractual fee provisions. *See Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-cv-2310 (DSD/JJG), 2011 WL 1321387, at *3–4 (D. Minn. Apr. 4, 2011).)

[3]     These factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys;

However, in determining the lodestar, courts "need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Courts "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id*. But "[t]he determination of fees 'should not result in a second major litigation.'" *Id.* (quoting *Hensley*, 461 U.S. at 437).

Here, Plaintiff seeks to recover $14,156,095.26 in attorney's fees and costs, with $10,627,716.35 attributable to attorney's fees.[4]  In preparing the fee petition, Plaintiff identified the fees and costs related to the PRMI action, which consisted of both direct and indirect fees and costs.  (Horner Decl. ¶¶ 6–11.)  As Plaintiff explains, the direct fees and costs were incurred solely in the PRMI action, such as drafting the complaint, settlement negotiations during a tolling period, offensive depositions of PRMI witnesses, reunderwriting and analysis of PRMI loans, and work related to dispositive motions and the *PRMI* trial.  (*Id.*

---

(10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley*, 461 U.S. at 429–30 n.3 (citing *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

[4]     This revised fees total, $10,627,716.35, consists of the following total amounts billed per law firm:  $6,714,563.18 (Quinn Emanuel) + $3,114,595.08 (Spencer Fane) + $609,353.23 (Felhaber) + $189,204.86 (Carpenter Lipps).  (Second Supp'l Horner Decl., Ex. 48.)  It also reflects a deduction in the amount of $5,828 for an error in Plaintiff's original submission that ResCap discovered upon review.  (First Supp'l Horner Decl. ¶ 9.)  Although ResCap believes that it would also be appropriate for the Court to award a contingency fee based on its arrangement with Quinn Emanuel, because the Court declined to grant a contingency award in *HLC*, ResCap is not seeking such an award here.  (Horner Decl. ¶ 21 n.3.)

¶ 9.)  Indirect fees and costs were related to work applicable to all active Wave One and Two cases, or a subset of them, such as preparing for Wave Two case management conferences and Wave One expert work related to the global sample and the reasonableness of the bankruptcy settlements (which was relevant to the PRMI action).  (*Id.* ¶¶ 10–11, 18.)  ResCap allocated a portion of this work to PRMI for common work applicable to all cases after December 2, 2016, when PRMI became an active case.  (*Id.* ¶ 10.)

PRMI does not appear to challenge Plaintiff's allocation methodology as a general matter, but argues more narrowly that Plaintiff may not charge PRMI for expert costs pertaining to common work from Wave One.  (Def.'s Opp'n at 34–37.)  The Court addresses this issue in its discussion of Plaintiff's request for reimbursement of its costs.

ResCap has thoroughly documented its methodology for allocating its attorney's fees to PRMI, (Horner Decl. ¶¶ 13–38), and the Court finds that its methodology is reasonable.

## 1.  Supporting Evidence

In support of its motion, ResCap has submitted hundreds of full or redacted invoices showing detailed time entries and time spent, along with summaries of invoices for approximately 24 professionals and witnesses, describing their work, in either redacted or unredacted form.  (*See* Pl.'s Mem. at 8.)  Along with those invoices and summaries, ResCap has filed several declarations from its attorneys regarding their work, as well as declarations from Ms. Horner, ResCap's CFO, describing the billing records and her methodology in identifying the fees and costs incurred in the ResCap litigation related to work on the PRMI case.  (*See generally* Christenson Decl. [Doc. No. 25]; Heeman Decl. [Doc. No. 26]; Horner

Decl. [Doc. No. 27]; Supp'l Christenson Decl. [Doc. No. 85];  First Supp'l Horner Decl. [Doc. No. 90]; Second Supp'l Horner Decl. [Doc. No. 118].)

### a. Expert Opinions of Messrs. Remele and Cambronne

As noted, in PRMI's opposition, it offers the expert opinion of attorney Lewis A. Remele, Jr., a well-regarded Twin Cities attorney with many years of experience, including experience in RMBS litigation.  (Second Remele Decl. ¶ 3.)   In general, Mr. Remele states that Plaintiff's substantially redacted invoices make it impossible to conclude that its fees are reasonable, without speculation.  (*Id*. at 11.)  Even so, Mr. Remele opines that Plaintiff has not met its burden of proving that its fees are reasonable.  (*Id.*)

PRMI notes that in ResCap's opening memorandum, it failed to submit its own objective expert opinion regarding the reasonableness of its fee petition.  (Def.'s Opp'n at 8– 9.)  By simply relying on the opinions of ResCap's own attorneys and its CFO, Ms. Horner, PRMI argues that ResCap cannot establish the reasonableness of its request for fees and costs. (*Id*.)

In response to PRMI's opposition, ResCap offers the rebuttal expert opinion of Karl L. Cambronne, who is also a well-regarded Twin Cities attorney with many years of experience in complex litigation.  (Cambronne Decl. ¶¶ 1–2.)  In general, Mr. Cambronne opines that "Mr. Remele fails to account for applicable rulings and other important considerations in rendering his opinion," and that "the Court is best positioned to assess the reasonableness of Plaintiff's counsels' time spent litigating this case."  (*Id.* at 19.)

As noted earlier, PRMI opposes the Court's consideration of Mr. Cambronne's rebuttal opinion, arguing that ResCap improperly submitted the opinion with its Reply

18

memorandum, as opposed to affirmatively offering the opinion with its initial memorandum. (Def.'s Dec. 8, 2020 Letter at 1.)

In his third declaration, Mr. Remele agrees with Mr. Cambronne that "given [the Court's] extended supervision of the ResCap litigation, [it] has the experience and skills to determine the reasonableness of Plaintiff's fee request."   (Third Remele Decl. ¶ 3.) Nonetheless, Mr. Remele opines that Plaintiff bears the burden of establishing the reasonableness of its request, and he notes that Mr. Cambronne does not opine that Plaintiff's fees are reasonable.  (*Id.* ¶ 4.)

In the context of dispositive motions, the comments to Local Rule 7.1(b)(2) state that the factual basis for such motions "will be established with affidavits and exhibits served and filed in conjunction with the initial motion and the responding party's memorandum of law." D. Minn. L.R. 7.1(b)(2) 1999 Advisory Cmte.  However, the comments note that the rule "neither permits nor prohibits the moving party from filing affidavits or other factual material" in support of a reply memorandum.  *Id.*  Rather, reply affidavits "are appropriate only when necessary to address factual claims of the responding party that were not reasonably anticipated."  *Id.*

Assuming that Local Rule 7.1(b)(2) applies to the instant motion, the Court finds that ResCap's Reply declarations were properly submitted, as they address PRMI's factual claims and expert opinions that were not reasonably anticipated.  Prior to ResCap filing its initial memorandum, its counsel asked defense counsel if PRMI planned to retain an expert witness to challenge the fee petition, but received no definite answer.  (Supp'l Christenson Decl. ¶ 55.)  Instead, PRMI dodged the question until it filed Mr. Remele's initial declaration with

19

the Court.  (*Id.*)  Mr. Cambronne's opinion simply rebuts Mr. Remele's opinion.  It does not present new information.  Nor did ResCap "withhold" Mr. Cambronne's opinion in order to gain an advantage.  *See* D. Minn. L. R. 7.1(b)(2), 1999 Advisory Cmte. Note ("It is improper to withhold information—either from discovery or from initial moving papers—in order to gain an advantage.").  If anything, PRMI withheld from ResCap its plans to retain an expert, not the other way around.  Moreover, the Court permitted PRMI to file a sur-reply in which it could respond to the Cambronne Declaration, which PRMI filed, along with the Third Remele Declaration.  Under these circumstances, the Court does not find it "improper" to consider Mr. Cambronne's rebuttal opinion.[5]

But setting aside the propriety of Mr. Cambronne's opinion, ultimately, the Court finds it unnecessary to consider the opinion of either expert.  There is no question that both Messrs. Remele and Cambronne are eminently qualified, well-respected attorneys, whom the Court holds in high regard. However, here, both attorneys understandably defer to the Court's expertise in evaluating the reasonableness of Plaintiff's requested fees and costs.  (Third Remele Decl. ¶ 3; Cambronne Decl. ¶ 27.)  In addition to all of the cases in Wave One and Wave Two over which the Court presided for more than seven years, the Court presided over this case from its 2016 filing through monthly status conferences, countless written disputes, dispositive motion practice, motions in limine, in-trial rulings, a 13-day bench trial, resulting

---

[5]     Additionally, the Court does not find it improper to consider the supplemental declarations submitted by Ms. Christenson and Ms. Horner, as they either respond to arguments raised by PRMI that could not be reasonably anticipated, or correct or update the amount of ResCap's request for fees and costs in light of the discovery of an error or subsequently-incurred fees and costs.

in the Court's 210-page Findings of Fact and Conclusions of law, and the instant motion, which spawned a number of ancillary disputes concerning redactions, expert witnesses, and supplemental briefing. When compared to the Court's in-depth, years-long experience in this litigation, the Court respectfully finds that the opinions of Messrs. Remele and Cambronne do not meaningfully inform the question of reasonableness.

In addition to the Court's deep familiarity with this litigation, "courts may draw on their own experience and knowledge of prevailing market rates." *Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005). The undersigned is also well acquainted with the local billing market. *See HLC Fee Award*, 399 F. Supp. 3d at 845 n.26. For all of these reasons, the Court finds it unnecessary to consider the parties' expert opinions, and declines to do so.

### b. Redacted Invoices

As noted, Plaintiff submitted redacted portions of its billing statements on grounds of attorney-client privilege and work-product protection, and, in response, PRMI argued that the redactions were improper and rendered it unable to assess the reasonableness of the fee petition. Consistent with the procedure ResCap utilized with respect to its fee petition in *HLC*, it provided unredacted copies of its invoices for the Court's *in camera* review. (Horner Decl. ¶¶ 22, 26–27, 31–32, 36–37.) The Court compared the redacted entries against the unredacted entries that PRMI identified, and found that the redactions were properly made. (Nov. 3, 2020 Order at 2.)

Defendant relies on *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 544 (9th Cir. 2016), for the proposition that due process requires PRMI to have access to ResCap's unredacted invoices. (Def.'s Opp'n at 16.) But *Yamada* does not dictate that result under

these facts.  Rather, in *Yamada,* class counsel did not provide *any* time records to the defendants "in the first instance" due to concerns that the records contained privileged information.  825 F.3d at 544.  The district court found it was a  "more efficient use of time and resources" for the court to review the records *in camera*, as opposed to requiring class counsel to redact the time records and provide a copy to the defendants.  *Id.*  The Ninth Circuit disagreed, finding that the lack of any access whatsoever to billing records violated the defendants' due process rights.  *Id.* at 545–46.  On remand, the Ninth Circuit directed the district court to allow the defendants access to the redacted timesheets.  *Id.* at 546.  The Ninth Circuit distinguished the facts in *Yamada* from those in *United States v. Eyraud*, 809 F.3d 462, 471 (9th Cir. 2015), in which the court found no denial of due process where the defendant had access to the victim's law firm's declaration "describing the work it performed relating to Eyraud's fraud and the invoice summaries listing the amount of time that work took."  825 F.3d at 546 n. 7.

Relying on *Yamada*, the district court in *In re Anthem, Inc. Data Breach Litigation*, 15-MD-02617-LHK, 2018 WL 3960068, at *34 (N.D. Cal. Aug. 17, 2018), found no due process violation where plaintiffs partially redacted their timesheets to remove privileged information, providing narrative descriptions such as "email/call to [client] regarding ___," and "research legal issues relating to ___."

Even if *Yamada* or *In re Anthem* were controlling authority here, ResCap has provided similar descriptions in many of its invoices.  (*See* First Remele Decl. ¶¶ 5–9) (providing examples of billing entries such as "review and revise ___"; "revise and update ___";

22

"analysis and correspondence with Quinn regarding ___ and coordinate review of ___";
"teleconference with PRMI regarding ___.").

And again, the Court has reviewed Plaintiff's invoices and continues to find that the redactions contain attorney-client privileged and work-product information. Given that the parties remain adverse and the entries are voluminous, ResCap's full billing invoices need not be disclosed. *See HLC Fee Award*, 399 F. Supp.3d at 845–46 (finding redactions were proper and ResCap was not required to disclose unredacted invoices) (citing *United States v. Petters*, No. 08-cv-5348 (ADM/JSM), 2009 WL 1922320, at *2 (D. Minn. June 30, 2009) (finding, in case involving *in camera* review of billing statements, that disclosure of billing statements was not required due to burdensomeness and "risk of inadvertently disclosing confidential and protected information" while related criminal proceedings were ongoing); *Bruckelmyer v. Ground Heaters, Inc*., No. 02-cv-1761 (DWF/RLE), 2003 WL 21524741, at *3 (D. Minn. June 5, 2003) (noting that "in recognition of the privileged status of the time entries of Plaintiff's counsel, the time sheets involved were not disclosed to the Defendants," who had an opportunity to review the total fees and costs requested)); *see also Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 545 n.14 (8th Cir. 2006) (noting that the defendant was free to argue on remand that the district court abused its discretion in awarding attorney's fees for time entries that the court examined *in camera*, but which were not disclosed to the defendant, but discouraging such an argument and "remind[ing] the [defendant] that the District Court has substantial discretion in awarding fees and costs); *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 871–72 (8th Cir. 2014) ("In large cases, especially one of prodigious proportions like this, reliance on summaries is certainly within the direction of the district

23

court," and "discovery in connection with fee motions is rarely permitted."); *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 711 F. Supp.2d 991, 1008 n.4 (D. Minn. 2010) ("To the extent that Fair Isaac contends that the decision to allow the *in camera* submission is improper, the Court is not persuaded), *aff'd*, 650 F.3d 1139 (8th Cir. 2011); *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 776 N.W.2d 172, 180 (Minn. Ct. App. 2009) (noting that under Minnesota law, "a moving party may either submit unredacted billing statements to a district court for in camera review or, alternatively, 'the court can permit submission of redacted copies, with privileged material removed from all copies.'" (citing Minn. R. Gen. P. 119).

Unlike *Bores v. Domino's Pizza LLC*, No. 05-cv-2498 (RHK/JSM), 2008 WL 4755834, at *5 n.8 (D. Minn. Oct. 27, 2008), invoked by PRMI for the notion that a fee petitioner may not simply "dump" voluminous time records on the court with little explanation of billing rates and work expended, (Def.'s Opp'n at 7), ResCap has, in fact, fully explained its hourly rates and the propriety of the hours expended here. Moreover, this Court is exceptionally familiar with all aspects of the work performed on this case, having shepherded it, and the other consolidated cases, from discovery through trial or settlement.

The Court also rejects PRMI's argument that ResCap's redactions hindered PRMI's ability to properly challenge the billing records. PRMI is well acquainted with all periods of this litigation and can sufficiently glean any redacted activities for which ResCap's counsel billed. Borrowing Defendant's own turn of phrase, its claim that the redactions render it unable to assess Plaintiff's invoices "blinks reality." (*Id.* at 32.) In fact, given PRMI's own experience litigating this case alongside ResCap's counsel, even with redacted invoices,

24

PRMI presents a plentiful array of substantive arguments in opposition to Plaintiff's motion in the form of:  (1) three memoranda in opposition totaling 73 pages, (*see* [Doc. Nos. 54, 98, 120]); (2)  three expert declarations from Mr. Remele totaling 84 pages, (*see* [Doc. Nos. 41-1, 63, 102]); (3) two substantive declarations from counsel totaling 61 pages, (*see* [Doc. Nos. 57, 99]); (4) numerous single-spaced letters totaling 33 pages, (*see* [Doc. Nos. 41, 50, 66, 68, 94, 116]); and (5) 95 minutes of oral argument at the hearing on the fee petition.  (*See* Dec. 18, 2020 Hr'g Tr. [Doc. No. 109] at 28–94.)

Again, the goal in evaluating and potentially awarding a fee request is to "do rough justice, not to achieve auditing perfection," *Fox*, 563 U.S. at 838, lest the determination of fees "result in a second major litigation." *Id*. (quoting *Hensley*, 461 U.S. at 437).  The Court finds that the redactions here were properly made, and PRMI has access to the redacted invoices, as well as declarations from Plaintiff's counsel and ResCap's CFO describing the work performed and the methodology used to prepare the fee petition.  The procedure followed here has not deprived PRMI of due process, nor had it hindered its ability to challenge the reasonableness of Plaintiff's petition.

### 2.  Reasonable Hourly Rates

As noted, the Court examines the plaintiff's hourly billing rates when determining the proper lodestar.  *Hanig*, 415 F.3d at 825.  The hourly rates for Plaintiff's counsel are as follows:

(1) Quinn Emanuel incorporated a ███ discount, with hourly rates for attorneys ranging from $160 to $722.50, and hourly rates for paralegal and litigation support ranging from $150 to $167.50;

(2) Spencer Fane's hourly rates for attorneys ranged from $145 to $540, and hourly rates for paralegal and litigation support ranged from $100 to $150;

(3) Felhaber's hourly rates for attorneys ranged from $85 to $440, and hourly rates for paralegal and litigation support ranged from $130 to $160; and

(4) Carpenter Lipps' hourly rates for attorneys ranged from $280 to $415.

(Horner Decl. ¶¶ 21, 28, 33, 38.)

Generally, to determine whether an hourly rate is reasonable, courts look at the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *accord McDonald v. Armontrout*, 860 F.2d 1456, 1458–59 (8th Cir. 1988). Sometimes, where particular legal specialization is required, courts may consider a national billing rate. *Casey v. City of Cabool*, 12 F.3d 799, 805 (8th Cir. 1992). Again, "[t]he party seeking an award of fees should submit evidence supporting the . . . rates claimed." *Hensley*, 461 U.S. at 433.

Here, the Court finds that the requested hourly rates are reasonable and supported by the local billing rate for similar work or the particular expertise of counsel. In the *HLC Fee Award*, 399 F. Supp.3d at 847, the Court found that counsel's rates, which, like here, included Quinn Emanuel's ▮▮▮ hourly discounted rate, were reasonable. At that time, Quinn Emanuel's highest discounted hourly rate for attorneys was $675 per hour, *id.* at 846, whereas here, the highest discounted hourly rate for Quinn Emanuel attorneys is $722.50. Courts in Minnesota have awarded fees to attorneys at similar hourly rates. *Id.*; *see also Miller v. Bd. of Regents of Univ. of Minn.*, 402 F. Supp.3d 568, 592 & n.17 (D. Minn. 2019) (finding hourly rates up to $750 for attorneys and $250 for paralegals "do not exceed the upper limit of what professions with comparable experience, expertise, and reputation command in this market"

for a case litigated from 2015 to 2019); *Roeser v. Best Buy Co.*, No. 13-cv-1968 (JRT/HB), 2015 WL 4094052, at *12 (D. Minn. July 7, 2015) (concluding that attorney hourly rates up to $880 and administrative professional rates up to $160 per hour for work performed between 2013 and 2015 were reasonable in light of quality of work and contingency nature of case); *see also Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, No. 17-cv-5009 (JRT/KMM), 2020 WL 1910589, at *16 (D. Minn. Apr. 20, 2020) (finding that $500 attorney hourly rate was reasonable for work performed in 2019), *report and recommendation adopted*, 2020 WL 4915832 (D. Minn. Aug. 21, 2020); *Polaris Indus. Inc. v. TBL Int'l, Inc.*, No. 19-cv-291 (WMW/DTS), 2020 WL 1075019, at *7 (D. Minn. Mar. 6, 2020) (approving hourly rates ranging from $315 to $550); *Radisson Hotels Int'l, Inc. v. Fairmont Partners LLC*, No. 19-cv-1176 (WMW/BRT), 2020 WL 614810, at *4 (D. Minn. Feb. 10, 2020) (concluding that attorney hourly rates between $220 and $550 were "reasonable and comparable to the rates charged by law firms of similar size and stature in the Minneapolis legal market for attorneys with similar levels of experience).

While the hourly rates for Quinn Emanuel and Spencer Fane attorneys have increased slightly from those approved by the Court in *HLC*, the increase is reasonable in light of the expertise of ResCap's counsel, and the passage of time.[6]  Notably, Quinn Emanuel possesses

---

[6]      As noted, in *HLC*, Quinn Emanuel's highest approved hourly rate was $675 per hour, versus $722.50 per hour here, and Spencer Fane's highest approved hourly rate in *HLC* was $500 per hour, versus $540 per hour here. *Compare HLC Fee Award*, 399 F. Supp. 3d at 846, *with* Horner Decl. ¶¶ 21, 28.)  The highest approved hourly rates in *HLC* for work performed by counsel from Felhaber and Carpenter Lipps remain unchanged, at $440 per hour, and $415 per hour, respectively.  *Compare HLC Fee Award*, 399 F. Supp. 2d at 846, *with* Horner Decl. ¶¶ 33, 38.

specialized RMBS litigation experience, and Felhaber/Spencer Fane was RFC's longtime counsel, with prior experience in its mortgage-related litigation. The Court likewise finds the hourly rates for timekeepers at Carpenter Lipps to be reasonable, particularly given the firm's RMBS bankruptcy-related expertise.

In general, Defendant does not challenge the reasonableness of ResCap's counsel's hourly rates. However, PRMI notes that the rates for the attorneys at Felhaber increased when they moved to Spencer Fane, and PRMI argues that ResCap provides no explanation for the increase. (*See* Second Remele Dec. ¶ 12.) The Court does not find the hourly increase of approximately $100 between the upper range of Felhaber's and Spencer Fane's billing rates to be unreasonable. Local counsel moved between these two firms in January 2019, and it is not unusual for firms to have different billing rates within the same market, or for firms to increase hourly rates annually within a given firm. Ms. Horner, ResCap's CFO, states that counsel must obtain ResCap's approval prior to implementing any rate increases. (First Supp'l Horner Decl. ¶ 16.) When ResCap's local counsel moved from Felhaber to Spencer Fane, ResCap found the rate increase to be reasonable and approved it. (*Id.*) The Court does not disagree.

Accordingly, for all of the foregoing reasons, the Court finds that the requested billing rates are reasonable.

### 3. Reasonable Hours

The next considers whether the expenditure of billed hours was reasonable. PRMI argues that ResCap fails to establish reasonableness in light of the nature and difficulty of the case, and the amount involved and the results obtained. (Def.'s Opp'n at 8–13.) In addition

28

to PRMI's general objections to ResCap's redacted invoices, it also argues the invoices show that ResCap billed excessive or duplicative hours, particularly with regard to local counsel's work, and in comparison with defense counsel's hours. (*Id.* at 18–34.)

### a. The Nature and Difficulty of the Responsibility Assumed

Among the factors that courts consider when determining a reasonable lodestar is the nature and difficulty of the responsibility assumed by counsel. *Hensley*, 461 U.S. at 434 n.3; *Milner*, 748 N.W.2d at 621.

Unlike defense counsel's prior argument in *HLC* that the lawsuit was straightforward, *HLC Fee Award*, 399 F. Supp. 3d at 850, PRMI does not necessarily dispute the complexity of this case, which involved issues such as statistical sampling, allocation, structured finance, appraisals, and bankruptcy. (*See* Def.'s Opp'n at 8.)   However, it asserts that in light of ResCap's involvement in Wave One, and in particular, the *HLC* case, ResCap should have litigated this "follow-on case" much more efficiently. (Def.'s Opp'n at 8; Def.'s Sur-Reply at 4–6.)   PRMI contends that "Plaintiff's firms largely recycled work product from prior cases," and the amount of additional work that this case entailed was "far from extraordinary." (Def.'s Opp'n at 8.)   PRMI asserts that the parties took only 14 fact or 30(b)(6) depositions, the Court held only "15 case management conferences addressing Wave [Two] or this case, 12 of which were brief hearings following Wave [One] conferences; four in-person or telephonic motions hearings; and only one pretrial conference." (*Id*. at 9) (citing Clouser Decl. ¶¶ 26–45, 85–86, 91).

The Court takes exception with PRMI's characterization of this case as streamlined, non-exceptional, or less difficult than *HLC*.  PRMI freely entered into contracts with ResCap

in which it agreed to pay attorney's fees and costs that were incurred on PRMI's account. Nothing in the Guides requires that those fees and costs be incurred due to extraordinary litigation or exceptional circumstances. That said, this litigation was exceptional. As the Court explained in the *HLC Fee Award* ruling, the very nature of this type of litigation is expensive, complicated, and time-consuming. 399 F. Supp. 3d at 849–50.

### (1) PRMI Loan-Specific Work

While PRMI focuses narrowly on the number of depositions or other proceedings, (Def.'s Opp'n at 9), the bench trial in this case represented the culmination of four years of aggressive, complicated litigation about scores of individual PRMI loans. Throughout the course of the instant lawsuit, ResCap was required to engage in time-consuming, case-specific work, which included, among other things: (1) reunderwriting the 157 loans in question; (2) addressing complicated causation questions concerning securitization representations in different Trust documents; (3) presenting and responding to evidence regarding RFC's Bankruptcy; (4) presenting and defending a complicated damages allocation model as to PRMI; and (5) presenting and responding to unique fact witnesses.

Each of these activities required numerous underlying case-specific steps. For example, with respect to reunderwriting, ResCap undertook the following actions: (1) identifying and reviewing all versions of all loan files for each of PRMI's loans, some of them hundreds of pages long, and providing them to experts and vendors; (2) identifying and providing all relevant program-specific guidelines and contract representations to ResCap's vendors and experts to assess alongside the loans; (3) retaining valuation and mortgage loan schedule experts to conduct analyses for use in ResCap's reunderwriting expert report; (4)

30

providing the information to ResCap's reunderwriting expert, Steven Butler, in order to identify PRMI's material breaches; and (5) confirming all of the data points and document citations supporting each breach, and performing the same work with respect to Mr. Butler's rebuttal opinion.   (Supp'l Christenson Decl. ¶¶ 21, 24–27, 29, 32.)    At trial, ResCap's reunderwriting expert presented breach-level evidence for 12 PRMI loans with 24 breaches, totaling 50 pages of testimony and the introduction of 5,711 pages of loan file exhibits.  (FOF & COL ¶¶ 152–73; 13-cv-3451, Feb. 12, 2020 Trial Tr. [Doc. No. 5481] at 544:11–547:4; 574:22–623:13.)

### (2) PRMI's New Arguments

Even with this loan-specific work, PRMI argues that this case was similar enough to *HLC* that ResCap could have nevertheless litigated this "follow on" case much more efficiently.   (Def.'s Opp'n at 8; Def.'s Sur-Reply at 4–6.)  Ironically, throughout the Wave Two litigation, when Plaintiff sought to minimize duplicative work from Wave One, PRMI frequently objected to such proposals, citing the unique facts of its case.   PRMI repeatedly emphasized that it was "differently situated than the first-wave defendants," (13-cv-3451 [Doc. No. 5223] at 1), and that this case was "fundamentally different," (13-cv-3451 [Doc. No. 5020] at 2), with evidence that differed in "myriad ways."  (13-cv-3451 [Doc. No. 5296] at 6.)  Consequently, when ResCap suggested that the Wave Two parties streamline discovery by relying on the Wave One depositions of some of ResCap's witnesses, PRMI adamantly opposed the suggestion:

> There will be an issue in the Second Wave cases if Plaintiffs' position is some other Defendant deposed some other—deposed a witness in Wave One about their case and you should live with their testimony in your case in Wave Two.

31

> My client PRMI has a right under the federal rules to depose individuals that are relevant to the case against it where Plaintiffs are seeking millions of dollars in damages.
>
> So I'll say at the outset that to the extent that Plaintiffs' refrain here is going to be, Well, somebody was deposed in Wave One so they shouldn't be deposed in Wave Two, we're going to have an issue.

(13-cv-3451, Apr. 19, 2018 CMC Tr. [Doc. No. 3498] at 68:25-69:8, 70:23-71:8.)

Indeed, there were new issues and new evidence in this case. Causation and allocation issues regarding the fraud disclaimers and pool-wide representations were a much more significant issue at PRMI's trial than in the *HLC* trial. (Supp'l Christenson Decl. ¶¶ 47–48.) This required ResCap to search for documents showing the meaning that industry representatives ascribed to these representations at the time, prepare Plaintiff's witnesses Teresa Farley and Steven Butler to testify at their depositions and trial, and prepare to cross-examine defense witnesses Kori Keith, David Woll, and Steven Schwarcz on these representations and disclaimers.

In addition, unlike *HLC*, ResCap was required to litigate this case breach-by-breach, as PRMI's reunderwriting expert contested the breaches that ResCap had identified. (FOF & COL ¶¶ 126–73.) Thus, at trial, ResCap "had to develop . . . a presentation explaining each of the 24 breaches" by "identif[ying] and explain[ing] all evidence supporting those breaches from loan files and other information spanning thousands of pages," and respond to PRMI's challenges to each breach. (Pl.'s Mem. at 9.)

This was also the only case involving loans sold, in part, by PRMI to RFC pursuant to the AlterNet Guide. The loans at issue in *HLC* were exclusively sold pursuant to the Client Guide. In this case, ResCap "undertook extensive searches for later versions of the AlterNet

32

Guide" to respond to PRMI's contention that the 1997 version of the AlterNet Guide was not the applicable version, and to demonstrate that Mr. Butler's use of the 1997 version was appropriate. (FOF & COL ¶ 127–28.) Also, given the presence of the two Guides in this case, ResCap and its expert undertook a comparison of the two Guides, concluding that the R&Ws were "very similar." (*Id.*)

Finally, while the issue of Assetwise-approved loans was present in *HLC*, in this case, PRMI offered the new argument that the applicable R&Ws were limited to those identified in an Assetwise Direct Criteria Agreement. (13-cv-3451, Jan. 23, 2020 Pretrial Hr'g Tr. [Doc. No. 5389] at 90:17-23.) Thus, ResCap was required to litigate this issue through motion practice, by preparing its witnesses Renee Bangerter and Steven Butler, and by preparing to cross-examine defense witness Dave Zitting.

### (3) Comparable Litigation

PRMI minimizes all of the complex and time-intensive work in this case, comparing it to *Assured Guaranty Municipal Corporation v. Flagstar Bank, FSB*, an RMBS case involving $90 million in damages, but only $3.69 million in attorney's fees. (Def.'s Sur-Reply at 5) (citing 920 F. Supp. 2d 475 (S.D.N.Y. 2013)). *Flagstar*, however, is an inapt comparison, as it lasted merely one-and-a-half years from the filing of the complaint to trial, with only 107 docket entries during that time. *See* 920 F. Supp. 2d at 477–78. By contrast, the docket entries here related to the instant motion alone span over 90 entries, and the docket entries in the consolidated action number 5,529 entries. In addition, *Flagstar* involved only two underlying trusts, *id.* at 478, whereas this case involved over 500 settling trusts. (*See* FOF & COL ¶ 323 (discussing whether a defense applied to a subset of the "506 Trusts

33

covered by the Bankruptcy Settlements."); *HLC Fee Award*, 399 F. Supp. 3d at 849 (referring to the 506Trusts involved in the Bankruptcy Settlements). And unlike the damages expert in *Flagstar*, who calculated how the defective loans impacted the two trusts by dividing the original loan balance of defective charged-off loans against the total original loan balance of all charged-off loans, 920 F. Supp. 2d at 486–87, ResCap's expert, Dr. Snow, performed far more complicated calculations. Dr. Snow was tasked with allocating billions of dollars of RFC's Bankruptcy Settlements to PRMI, while accounting for all of the losses and breach rates of hundreds of defendants and other originators. (*See* FOF & COL ¶¶ 271–76.)

Indeed, the only comparable case is *HLC*, which involved a final award of $42,766,931.50 in damages, and $18,002,732.84 million in attorney's fees. *HLC Fee Award*, 399 F.3d at 851, 862. Despite the fact that the extrapolated damages at issue in this case were less than those in *HLC*, in both cases, ResCap utilized a complicated sampling methodology to determine damages. This required ResCap to analyze over 150 PRMI-specific loans, just as it analyzed over 150 HLC-specific loans in *HLC*.

Certainly, some of the groundwork for this case was laid in the Wave One actions, including *HLC*, in particular. When possible, ResCap sought to maximize any efficiencies from the prior litigation. ResCap's streamlined approach is apparent when looking at comparable billing-intensive time periods in the months immediately surrounding and including the trials in both *HLC* and *PRMI*. ResCap expended 40,698.4 hours in *HLC* (from July 2018 through November 2018), compared to only 11,681.5 hours in *PRMI* (from November 2019 through April 2020). (First Supp'l Horner Decl. ¶ 14, Ex. 54 [Doc. No. 105].) Similarly, while ResCap's fees in *HLC* amounted to $13,851,133 during this window

34

of time, the fees in *PRMI* during the comparable period—in fact, a one-month longer time period, to account for ResCap's preparation of proposed findings of fact and conclusions of law—amounted to $9,214,243.  (*Id.*)  ResCap utilized the services of a smaller team of attorneys, including more junior attorneys and local counsel, to a greater degree in the instant action, leading to lower fees.[7]  (*Id.* ¶¶ 12–13; *see also* Dec. 18, 2020 Hr'g Tr. at 16–17.)

PRMI also overlooks a critical component of the factor "the nature and difficulty of the responsibility assumed by counsel" as it applies to this case.    *Hensley*, 461 U.S. at 434 n.3; *Milner*, 748 N.W.2d at 621.  As a court-appointed liquidating trust, ResCap is responsible for pursuing recoveries against originating lenders such as PRMI for selling RFC defective mortgage loans.  (Horner Decl. ¶ 2.)  As such, ResCap has been obliged to conduct the litigation in a manner that will maximize its overall recovery.  (*See* First Supp'l Horner Decl. ¶ 17) ("Over the course of the last seven years of litigating these cases, ResCap has viewed its expenditure of legal fees in each action in light of the larger context of the ResCap litigation, which  has yielded $1.3 billion in settlements as of September 30, 2020.").

### (4) Challenges to Work Performed

PRMI presents challenges to the reasonableness of ResCap's billable hours, broken down by specific time periods.  Overall, it argues that ResCap's fees are excessive because it merely recycled work from prior litigation and overstaffed this case.

---

[7]     In the Court's consideration of other *Milner/Hensley* factors below, it will address whether a reduction in billed hours is warranted for any inefficient or redundant staffing.

### (a) Pre-Complaint Period Through Month Complaint Filed (December 1, 2014 to December 31, 2016)

First, PRMI objects to 105 hours billed from the "Pre-Complaint Period Through Month Complaint Filed" (December 1, 2014 to December 31, 2016), arguing that during that time period Plaintiff merely entered into tolling agreements and filed a complaint that "mimick[ed] complaints" that ResCap had filed in prior actions. (Def.'s Opp'n at 20.)

The Court disagrees with PRMI's assessment. The Complaint here contained PRMI-specific allegations, revisions to ResCap's global allegations, and included specific examples of breaches in PRMI loans that required loan-level analyses. (Compl. [Doc. No. 1] ¶¶ 2–3, 6, 14–15, 18–22, 26–27, 31–47, 52–55, 61–62, 66, 68, 70.) ResCap's counsel also prepared PRMI-specific exhibits to the Complaint that summarized the loan defects found during pre-suit reunderwriting and forensic review. (*See id.*, Exs. A, B.) During this period, counsel for ResCap also spent considerable time negotiating tolling agreements with defense counsel and engaging in pre-suit settlement negotiations. (Supp'l Christenson Decl. ¶¶ 17–18.) Finally, during this time, ResCap relied heavily on local counsel with lower billable rates to finalize, file, and prepare the Complaint, and to prepare pre-mediation materials. (*Id.* ¶ 19.)

In short, the Court finds that Plaintiff has sufficiently supported its billable hours and distribution of work during this time period, set forth in its invoices and declarations.

### (b) Pre-Stay Period/Document Discovery (January 1, 2017 to July 31, 2018)

PRMI also objects to the reasonableness of work performed during the "pre-stay period/document discovery" (January 1, 2017 to July 31, 2018), during which ResCap's counsel billed 4,784 hours. (Def.'s Opp'n at 20–21.) While it acknowledges that Plaintiff

36

produced discovery during this period, PRMI contends that ResCap hired a separate vendor, Night Owl, to collect, process, review, search, and maintain 300,000 documents.  (*Id.* at 21) (citing Horner Decl. ¶ 62).  Given the assistance of Night Owl, PRMI argues that ResCap cannot justify its firms' expenditure of billable hours for document production, and it also argues that as to written discovery, "Plaintiff's firms largely recycled requests and responses from earlier cases." (*Id.* at 21) (citing Clouser Decl. ¶ 19).  Finally, PRMI asserts that ResCap offers no explanation for why its local counsel billed more hours than its national counsel during this period.  (*Id.*)

The Court disagrees with PRMI's characterization of the work performed by ResCap's counsel during this pre-stay discovery period.  As ResCap's counsel observes, multiple issues arose during this time that required the attention of counsel, including:  (1) negotiating and preparing the Wave Two case management order; (2) negotiating and briefing the duration and scope of additional 30(b)(6) testimony sought by Wave Two defendants; (3) negotiating and supplementing ESI search terms and additional custodians, then analyzing the new documents; (4) addressing a discovery dispute concerning third-party Ocwen; (5) conferring with PRMI and presenting argument regarding PRMI's desire to re-depose Wave One witnesses; and (6) briefing and arguing a dispute concerning PRMI's service of a subpoena on a person who had served an expert report in pre-Bankruptcy litigation, James Aronoff.  (Supp'l Christenson Decl. ¶ 20.)

Moreover, ResCap could not "recycle" its past work without considering the specific work and analysis relevant to Wave Two.  (*Id.* ¶ 21.)  To that end, it was required to identify information specific to PRMI's relationship with RFC and serve several unique loan-level

37

disclosures, including a PRMI-specific loan list with detailed information about all at-issue loans. (*Id.*) Furthermore, during this time, ResCap's counsel analyzed PRMI's Answer, met and conferred with PRMI's counsel, filed a motion to strike PRMI's affirmative defenses, and attended 13 case management conferences that required the attendance of both local and national counsel, as well as preparation for the conferences, including written submissions. (*Id.* ¶ 22.)

Also, among other things, Plaintiff's counsel identified contracts and matched guidelines for the reunderwriting in this matter, with local counsel taking the lead in this process. (*Id.* ¶ 23.) The parties exchanged disclosures identifying all the contracts, commitments, and bulk purchase agreements applicable to the at-issue loans subject to the Contract Identification Protocol (13-cv-3451 [Doc. No. 3154]), which involved an extraordinary amount of underlying work, including searching additional sources of data in order to identify potential exceptions or variances to the underwriting guidelines. (Supp'l Christenson Decl. ¶¶ 24–25.) As part of the guideline-matching process, ResCap's counsel then analyzed on a loan-level basis the applicable guidelines, contracts, commitment data, bid tapes and loan files or exception documents pertinent to each of the 157 loans in the PRMI sample, and provided that information to its reunderwriting experts. (*Id.* ¶ 27.)

Finally, during this time, ResCap's counsel furnished additional time-consuming loan-specific analyses for its Automated Valuation Model ("AVM") experts and appraisal experts, Drs. John Kilpatrick and Albert Lee, and Mr. Steve Albert. (*Id.*)

In sum, the Court finds that ResCap has sufficiently supported the necessity of the work performed during this time period, as well as the distribution of labor between local and

national counsel, as reflected in its invoices and declarations.  It was also not unreasonable for ResCap to rely heavily on local counsel at this time, given their lower billing rates.

### (c) Stay Period (August 1, 2018 to January 31, 2019)

Next, PRMI argues that during the "stay period" (August 1, 2018 to January 31, 2019), ResCap's counsel unreasonably billed 921 hours.  (Def.'s Opp'n at 21–22.)  Again, it also questions why local counsel billed more hours than national counsel during this time period. (*Id.* at 22.)

As ResCap's counsel notes, the majority of fees during this period were billed in January 2019, when the parties were preparing to reengage in fact and expert discovery and litigation.  (Supp'l Christenson Decl. ¶ 28.)  Throughout December 2018 and January 2019, the parties held lengthy negotiations regarding the scope of post-stay discovery.  (*Id.*)   In anticipation of the stay being lifted, ResCap also began preparing for depositions and expert discovery in January, which involved resuming work on the labor-intensive guideline-matching project.  (*Id.* ¶ 29.)

The Court finds that ResCap has sufficiently supported the necessity of the work performed during this time, as well as its billable hours and distribution of work, through the submission of its invoices and declarations.  The Court accounts for any duplicative work, *infra*, in its discussion of fees customarily charged for similar services, but as a general matter, it was reasonable for ResCap to rely heavily on the services of local counsel at this time, given their lower billing rates.

39

**(d) Fact Depositions and Opening Expert Reports
(February 1, 2019 to May 31, 2019)**

PRMI next points to the period of fact depositions and opening expert reports (February 1, 2019 to May 31, 2019) during which ResCap's counsel billed 6,186 hours. (Def.'s Opp'n at 22–23.)  PRMI contends that ResCap took only eleven depositions during this period, yet routinely overstaffed them.  (*Id.*) (citing Clouser Decl. ¶¶ 50–59, 61–63).  In addition, while PRMI acknowledges that Plaintiff issued expert reports during this time, it claims that Plaintiff "repurposed expert reports from prior cases," and that ResCap's local counsel "inexplicably" billed nearly as many hours as national counsel, raising concerns about duplicative billing.  (*Id.* at 23.)

PRMI understates the labor-intensive work performed during this time period.  In addition to preparing for fact depositions and opening expert reports, the parties were engaged in ongoing disputes and negotiations concerning the case management order and schedule, fact depositions, and the scope of 30(b)(6) depositions.  (Supp'l Christenson Decl. ¶ 30.)  Plaintiff's preparation for fact depositions was understandably time-consuming, involving witness preparation about events occurring years ago, and the disclosure of all potential deposition exhibits in advance of the deposition.  (*Id.* ¶ 31.)  For example, PRMI identified over 100 documents for the deposition of ResCap witness Renee Bangerter, which necessitated hours of review.  (*Id.*)

As to PRMI's claim that ResCap simply "repurposed" past expert reports, it overlooks the substantial work involved in submitting PRMI-specific exhibits and analyses with certain

reports.  (*Id.* ¶ 32.)  For example, in support of Mr. Butler's expert report, he submitted 12 exhibits detailing his breach analyses for the PRMI loans.  (*Id.*)

In addition, during this time period, PRMI served case-specific written discovery on ResCap, requiring substantial document searches and analyses, as well as document-by-document review for privileged material, since some of the requests targeted documents involving RFC's in-house counsel.  (*Id.* ¶ 33.)

Local counsel was actively involved during this period, serving deposition exhibit disclosures, handling custodial document certification for deposition witnesses, second-chairing depositions, and meeting and conferring regularly with PRMI's counsel.  (*Id.* ¶ 34.)

The Court finds Plaintiff has sufficiently demonstrated the reasonableness of the work performed during this period and the delegation of work, as reflected in its invoices and declarations.  Again, the Court accounts for any duplicative work in its discussion of fees customarily charged for similar services.

### (e) Expert Discovery/Opening Summary-Judgment and *Daubert* Briefs (June 1, 2019 to October 31, 2019)

Next, PRMI notes that in the period of "expert discovery/opening summary-judgment and *Daubert* briefs" (June 1, 2019 to October 31, 2019), ResCap's counsel billed 4,174 hours. (Def.'s Opp'n at 23.)  PRMI finds these billable hours unreasonable because the parties took only two additional fact or Rule 30(b)(6) depositions during this period.  (*Id.*) (citing Clouser Decl. ¶¶ 60, 64).  And, regarding expert discovery, PRMI contends that ResCap spent most of this period "waiting for PRMI's rebuttal reports to be issued in August," after which ResCap issued "only three short reply reports," two of which included work previously done

41

in Wave One cases.  (*Id.* at 23–24) (citing Clouser Decl. ¶ 68).  PRMI also claims that the work involved in expert depositions was relatively minor ("the parties took or defended only seven expert depositions" for a total of "only about 41 hours"), and the preparation of opening summary judgment and *Daubert* memoranda was not unusual (the briefs "were within standard word limits," with the *Daubert* brief incorporating prior briefing or rulings on 19 of 24 issues.").  (*Id.* at 24) (citing Clouser Decl. ¶¶ 68, 70–71, 80–82).

The Court finds that PRMI understates the amount of work and its necessity during this time period.  As to expert discovery, ResCap's expert reports were not copies of its prior work, as reflected in Dr. Snow's supplemental report, which addressed two new PRMI-specific damages approaches (a monoline-by-monoline approach, and a non-extrapolated approach.) (Supp'l Christenson Decl. ¶ 35.)  Counsel for ResCap also prepared for the seven expert depositions during this time, and the parties were involved in other expert-related work, including stipulations concerning the expert reports of Mr. Thomas Kaufman, Prof. George Triantis, and Justice Anthony Carpinello, as well as ResCap's Motion for a Protective Order, and PRMI's Motion to Compel the production of Wave One expert reports and a resulting stipulation.  (*Id.* ¶ 36.)

Also during this period, PRMI belatedly, and unsuccessfully, sought to demand a jury trial for the first time, arguing that the Court was biased due to its role in presiding over the *HLC* trial.  (*Id.* ¶ 37; *see also* July 25, 2019 Order [Doc. No. 5189].)  PRMI's belated motion to request a jury trial necessitated the filing of memoranda and argument.

In addition, because of new issues in this case, ResCap's summary judgment and *Daubert* memoranda were substantially different from those in Wave One.  (Supp'l

42

Christenson Decl. ¶ 38.)  In fact, ResCap limited its discussion of 19 previously-decided issues to five pages of its 28-page initial summary judgment memorandum.  (13-cv-3451, Pl.'s PRMI Summ. J. Mem. [Doc. No. 5276] at 4–9.)  Its remaining briefing either addressed new issues or responded to arguments that PRMI had asserted on previously-decided issues. (*See id.*)

Also at that time, ResCap's counsel engaged in ongoing negotiations and modifications of case scheduling, numerous submissions to the Court on discrete issues, multiple meet and confers, letter briefing, and argument on whether PRMI intended to pursue 41 affirmative defenses identified in its Answer.  (Supp'l Christenson Decl. ¶ 39.)

Having reviewed ResCap's invoices and declarations, the Court finds that ResCap's fee request for work performed during this period is sufficiently supported and is reasonable.

> **(f) Summary Judgment and *Daubert* Opposition, Replies, and Hearings (November 1, 2019 to December 11, 2019), and Pre-Trial Proceedings (December 12, 2019 to February 9, 2020)**

Next, PRMI takes issue with Plaintiff's counsel's 1,671 hours billed during the period of filing summary judgment and *Daubert* opposition memoranda, reply memoranda, and related hearings (November 1, 2019 to December 11, 2019).  (Def.'s Opp'n at 27–28.)  While PRMI acknowledges that ResCap filed various briefs, it argues that "they all were within standard word limits and largely addressed issues Plaintiff had briefed before."  (*Id.* at 27) (citing Clouser Decl. ¶¶ 80–84.   In addition, PRMI argues that ResCap overstaffed the hearings on summary judgment and *Daubert* with more timekeepers than those who presented substantive arguments.  (*Id.*)  It also notes that during this time, while Plaintiff's counsel billed

1,671 hours, PRMI's counsel only billed 881 hours.[8]  (*Id.* at 28) (citing Second Remele Decl. ¶ 63).

PRMI also challenges ResCap's 4,426 billable hours incurred during the period of "pre-trial proceedings" (December 12, 2019 to February 9, 2020).  (*Id.* at 28–29.)  It argues that opposing counsel "should have been far more efficient, especially since they already had tried a similar case to verdict."  (*Id.* at 28.)  It notes that Plaintiff used three repeat witnesses from the *HLC* trial, Plaintiff filed just three motions in limine, PMRI filed no motions in limine, and the parties filed short trial briefs.  (*Id.*) (citing Clouser Decl. ¶¶ 89–90).  These activities were not so extraordinary, PRMI argues, to justify the number of ResCap's billable hours, and PRMI also contends that ResCap has not explained why its local counsel billed more than 1,500 hours during this time.  (*Id.* at 28–29.)  By contrast, PRMI notes that during this same period, PRMI's counsel billed only 2,210 hours compared to ResCap's 4,426 hours.  (*Id.* at 29) (citing Second Remele Decl. ¶ 68).

The Court finds that, again, PRMI understates the significant case-specific work that ResCap's counsel undertook during this time—work that led to an outstanding result.  For example, PRMI's initial trial exhibit list included 725 documents which ResCap's counsel had to individually analyze, and identify all of its evidentiary objections for each document in advance of trial.  (Supp'l Christenson Decl. ¶ 40.)  Likewise, ResCap's counsel prepared responses to PRMI's objections to the 364 documents on ResCap's own exhibit list.  (*Id.*)

---

[8]   The Court addresses the general matter of comparing the billable hours of Plaintiff's counsel and Defendant's counsel, *infra*, in its discussion of fees customarily charged for similar services.

As to the 14 fact and expert witnesses whom PRMI intended to call for live testimony, ResCap's counsel prepared examination outlines based on prior testimony and analysis of related exhibits, in addition to preparing for the examination of Plaintiff's own nine identified witnesses. (*Id.* ¶ 41.)  The case also involved significant deposition testimony, requiring ResCap's counsel to analyze transcripts from 17 witnesses, making affirmative and rebuttal designations to the testimony of its own witnesses, and objecting to the testimony of PRMI's witnesses. (*Id.* at ¶ 42.)

Furthermore, during this time, the parties engaged in substantial briefing on evidentiary issues, met and conferred regarding ResCap's breach of contract claim and the submission of alternative damages calculations at trial, and submitted multiple trial stipulations. (*Id.* ¶ 43. )  Regarding the number of attorneys attending hearings, there were many reasons for multiple attorneys to be present, including the ability to research issues as they arose, and to draw upon an attorney's expertise.  Again, the Court accounts for any duplicative work in its discussion of fees customarily charged for similar services, *infra*.

The Court finds that through its invoices and declarations, Plaintiff has sufficiently demonstrated the overall reasonableness of the hours billed to these tasks during this period of time.

### (g) Bench Trial (February 10, 2020 to March 13, 2020)

PRMI also finds unreasonable the 4,117 hours billed by ResCap's counsel during the period of the bench trial in this matter, held on non-consecutive days from February 10, 2020 to March 13, 2020.  (Def.'s Opp'n at 29–31.)  It argues that the bench trial was not exceptional in length, there were only 12 live witnesses, and there were collective deposition designations

from 14 witnesses. (*Id.* at 29–30) (citing Clouser Decl. ¶¶ 94, 108). In addition, PRMI contends that ResCap overstaffed its trial team, with 30 timekeepers compared to PRMI's 16 timekeepers, and "overstaffed the trial itself." (*Id.* at 30) (citing Second Remele Decl. ¶¶ 71, 73). In particular, PRMI takes issue with the 125 hours billed by Carpenter Lipps during trial, noting that counsel from that firm did not question witnesses or enter an appearance at trial. (*Id.* at 30) (citing Second Remele Decl. ¶ 74). Overall, PRMI argues that a comparison between ResCap's 4,117 billable hours and PRMI's 2,296 billable hours during trial shows that ResCap's billable hours are unreasonable. (*Id.* at 31.)

The Court has reviewed the applicable invoices and finds that the hours billed by ResCap's counsel during trial were reasonable. As noted, the trial involved multiple complicated issues. At trial, ResCap was required to identify the loan-level breaches in question, requiring its expert to master details contained in loan files and related documents that spanned thousands of pages. (Supp'l Christenson Decl. ¶ 44.) To that end, ResCap's reunderwriting expert presented breach-level testimony for 12 PRMI loans relating to 24 breaches, amounting to 50 pages of testimony and the introduction of 5,711 pages of loan file exhibits. (*Id.*)

In addition, with respect to a single loan issued by Countrywide Financial, discussed separately, *infra*, ResCap presented breach-level evidence at trial and prepared for and took the deposition of PRMI's fact witness, Jim Crawford, during trial. (*Id.* ¶ 45.) After PRMI rejected ResCap's offer to submit Mr. Crawford's full deposition testimony in lieu of trial testimony, five trial witnesses addressed this loan, totaling 62 pages of trial testimony. (*Id.*)

With respect to loans that had been approved through RFC's proprietary automated underwriting system, Assetwise (the "Assetwise Loans"), also discussed separately, *infra*, six trial witnesses testified for 309 pages of trial testimony.  (*Id.* ¶ 46.)

Moreover, as compared to the *HLC* trial, securitization-level representations and warranties were a much more significant issue in the *PRMI* trial.  (*Id.* ¶¶ 47–48.)  In *PRMI*, a total of nine witnesses (four ResCap witnesses and five PRMI witnesses) testified about these issues for over 927 pages of the trial transcript, whereas in *HLC*, four ResCap witnesses provided unrebutted testimony about securitization representations for 101 pages of the trial transcript.  (*Id.*)

In addition, the damages testimony in the *PRMI* trial involved a significant number of PRMI-specific issues and approaches.  (*Id.* ¶ 49.)  Drs. Snow and McCrary testified for 101 pages of trial testimony regarding the monoline allocation methodology, and for 83 pages of trial testimony regarding the at-issue population and the NDS Trust breach rate.  (*Id.* ¶ 50.)

Finally, as to staffing at trial, there are many reasons for attorneys to be present, including the ability to research issues as they arise, and to draw upon an attorney's expertise. Because of that expertise, long-standing institutional knowledge, and preexisting relationship with trial witnesses, counsel from Carpenter Lipps appropriately attended trial.  (First Supp'l Horner Decl. ¶ 12.)

In sum, having considered the parties' arguments and after reviewing the applicable invoices, the Court finds that Plaintiff has sufficiently supported its fee request for the complicated work performed during trial.

**(h) Post-Trial Submissions (March 14, 2020 to April 30, 2020)**

PRMI next challenges the 1,467 hours billed by ResCap's counsel during the post-trial period from March 14, 2020 to April 30, 2020, when the parties prepared and submitted proposed findings of fact and conclusions of law.  (Def.'s Opp'n at 31–32.)  By comparison, PRMI notes that its counsel billed only 762 hours, yet filed a document of comparable length.  (Def.'s Opp'n at 31–32.)  Also, PRMI argues that the number of hours billed by local counsel at this time (548) raises concerns about duplicative billing and overstaffing.  (*Id.* at 31.)

Having reviewed the invoices for this period, the Court finds that Plaintiff's billable hours incurred during this period were generally reasonable.  ResCap's 233-page proposed findings of fact and conclusions of law was understandably the product of multiple attorneys, including the members of the attorney teams who had been responsible for certain witnesses during the trial.  (Supp'l Christenson Decl. ¶ 52.)  Moreover, ResCap delegated the time-consuming work of providing record citations to junior attorneys, with lower billable rates.  (*Id.* ¶ 53.)   The fact that PRMI billed fewer hours on its own proposed findings of fact and conclusions of law is not an apt comparison, as the Court discusses in greater detail, *infra*, regarding fees customarily charged for similar services.  Again, the Court finds ResCap's staffing complement at this time to be generally reasonable, given the magnitude of the work performed and the need for multiple attorneys' familiarity with the issues and evidence.  Again, the Court accounts for any duplicative hours below.

### (i) Months Following Post-Trial Submissions (May 1, 2020 to July 31, 2020)

PRMI argues that from May 1, 2020 to July 31, 2020, after the filing of the proposed findings of fact and conclusions of law, ResCap unreasonably incurred 376 billable hours. (Def.'s Opp'n at 32.) It argues that there was no case activity during this time, therefore ResCap's billable hours are unreasonable. (*Id.*)

The Court disagrees. As Plaintiff notes, during this time period, it anticipated the instant motion and began drafting its supporting memorandum and declaration. (Supp'l Christenson Decl. ¶ 54.) Plaintiff's counsel worked with ResCap to analyze and prepare the supporting law firm and vendor invoices, which included applying search terms, categorizing fees, reviewing entries of privileged material, and redacting privileged information. (*Id.*) Having reviewed the numerous invoices for this period submitted in connection with the First Supplemental Horner Declaration, the Court finds that the 376 hours billed during this time were reasonable.

### (j) Fee Petition Litigation (November 2020 to December 2020)

Finally, PRMI objects ResCap's billable hours for the period of time it labels "fee petition litigation" (November 2020 to December 2020), for which ResCap seeks $316,751 in fees and costs. (Def.'s Supp'l Opp'n at 5.) It again takes issue with the provision of redacted invoices and the amount of billable hours. (*Id.* at 5–6.) And, in general, it argues that Plaintiff may not recover fees incurred in litigating or preparing the fee petition. (*Id.* at 7–8.)

Having reviewed the invoices applicable to this period, submitted with the Second Supplemental Horner Declaration, the Court finds ResCap's $316,751 in fees and costs related to this work to be reasonable. ResCap obtained an expert, submitted several letters, and additional briefing, declarations, and exhibits in response to PRMI's opposition to the instant motion. The Court addresses the general propriety of recovery of fees for the preparation of a fee petition separately, below.

In sum, having considered the nature and difficulty of the responsibility assumed, the Court finds that this litigation was extraordinarily complex, and involved issues unique to this particular lawsuit and this particular Defendant. PRMI also downplays the fact that this case involved expensive loan-by-loan litigation.

When possible, ResCap sought to streamline its work and its staffing complement. At all times, however, because it carried the burden of proof, ResCap was required to affirmatively establish its right to indemnification in a complex case, and to respond to PRMI's equally complex defenses and arguments. PRMI was entitled to vigorously defend itself. However, based on the provisions of the Guides, PRMI conducted its defense knowing full well that it might be required to compensate ResCap for its attorney's fees. The Court has reviewed ResCap's detailed invoices, and for all of the foregoing reasons, finds that consideration of the nature and difficulty of the responsibility assumed supports Plaintiff's request for attorney's fees.

### b. Amount Involved and Results Obtained

Another factor for determining a reasonable lodestar and whether an adjustment to the lodestar is warranted, is the overall amount involved in the litigation and the results

obtained.  *Hensley*, 461 U.S. at 434 n.9; *Milner*, 748 N.W.2d at 621 (citing *Paulson*, 188

N.W.2d at 426).   This factor is not dispositive.   *Best Buy Stores, L.P. v. Developers*

*Diversified Realty Corp*., No. 05-cv-2310 (DSD/JJG), 2011 WL 1321387, at *4 (D. Minn.

Apr. 4, 2011).  Courts do not apply a "dollar value proportionality rule," but consider this

factor, among many others, in assessing reasonableness.  *Green v. BMW of N. Am., LLC*,

826 N.W.2d 530, 537 (Minn. 2013).   And in particular, the Minnesota Supreme Court

advises that the "amount involved" factor is not limited to the "prevailing party's

percentage of success," but rather, should be considered in tandem with the results

obtained.  *Id.*

Thus, given these fact-specific considerations, a "court may find a fee award in

excess of damages to be reasonable." *See Best Buy*, 2011 WL 1321387, at *4;   While this

may arise more commonly in civil rights litigation, where damages awards do not

necessarily reflect the overall public benefit of the litigation, *see City of Riverside v. Rivera*,

477 U.S. 561, 575 (1986), courts have also awarded fees exceeding damages in breach of

contract actions.  On the other hand, given different facts, courts have found fee requests

that exceed that the results obtained to be unreasonable.  *See Milner*, 748 N.W.2d at 620

(finding enhanced fee award of $1.8 million, on a $376,000 Minnesota Fair Labor

Standards Act judgment inappropriate and not "reasonable in relation to the results

obtained.").

PRMI argues that ResCap's fee request is particularly unreasonable in light of the

amount involved and the results obtained—$5.4 million.  (Def.'s Opp'n at 9–13; Def.'s Sur-

Reply at 2–4.)  It argues that ResCap's requested attorney's fees of $14,156,095.26 are

entirely disproportionate to the $5.4 million damages award, and demonstrate the unreasonableness of the fee request. (Def.'s Opp'n at 9–13; Def.'s Sur-Reply at 2–4.)

### (1) Prejudgment Interest Included in Damages Award

An accurate comparison between the amount of ResCap's fee request and the amount of its damages must include pre-award prejudgment interest on the damages side of the ledger. As in *HLC*, defense counsel again argues that prejudgment interest should not be included in the damages total. (Def.'s Opp'n at 12 n.4.)

As relevant here, Minn. Stat. § 549.09 provides for pre-award prejudgment interest on pecuniary damages from the time of the commencement of the action until the time of the verdict or award. Minn. Stat. 549.09, subds. 1(a), (b) & (c)(2). Where the damages award is greater than $50,000, as is the case here, the interest rate is 10% per year. Minn. Stat. § 549.09, subd. 1(c)(2). Plaintiff's damages award is not for future damages likely to occur in the future, but for losses incurred many years ago, *see In re RFC & ResCap Liquid. Tr. Litig.*, No. 13-cv-3451 (SRN/HB), 2019 WL 1237166, at *4 (D. Minn. Mar. 18, 2019) ("*HLC Prejudgment Int. Order*"), since "final and actual liability is required for the accrual of an indemnification claim" in Minnesota. *HLC Summ. J. Order*, 332 F. Supp. 2d at 1187 (citing *Metro. Prop. & Cas. Ins. Co. v. Metro Transit Comm'n*, 538 N.W.2d 692, 695 (Minn. 1995)). Consequently, in *HLC*, the damages award including pre-verdict prejudgment interest was $42,766,931.50, and the Court awarded attorney's fees and costs in the amount of $23,081,252.31. *HLC Fee Award*, 399 F. Supp. 3d at 850–51, 862.

The Court finds that here too, pre-award prejudgment interest is an element of ResCap's damages, as opposed to an award of future damages. *See id.*; *HLC Prejudgment*

52

*Int. Order*, 2019 WL 1237166, at *4.   Accordingly, adding ResCap's requested prejudgment interest of $1,999.180.27 to its previously-awarded damages of $5.4 million results in a total damages award of $7,399,180.27.

### (2) Amount of Plaintiff's Attorney's Fees

While the addition of approximately $2 million in pre-award prejudgment interest to the damages award increases ResCap's damages total to approximately $7.4 million, ResCap seeks an award of attorney's fees of approximately $10.6 million.  (Supp'l Horner Decl., Ex. 48.)  There are several reasons why ResCap's requested fee award is higher than its damages award.  First, as discussed earlier, the sheer complexity of numerous issues in this case resulted in time-consuming, expensive litigation, as did the loan-by-loan nature of this litigation, unlike *HLC*.

Second, a significant driver for the high amount of ResCap's attorney's fees was the manner in which PRMI conducted its defense.  PRMI contends that ResCap cannot assign blame for its high attorney's fees on PRMI.  (Def.'s Opp'n at 32–34.)  That proposition is incorrect as a general matter.  *See, e.g., Riverside*, 477 U.S. at 580 n.11 ("[A defendant] cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.") (quotation omitted); *Ewald v. Royal Norwegian Embassy*, No. 11-cv-2116 (SRN/SER), 2015 WL 1746375, at *15 (D. Minn. Apr. 13, 2015) (Noting that "a heavily-litigated case is not typically a one-sided affair," which explains why [plaintiff's] attorney's fees and costs are relatively high."); *Coral Grp., Inc. v. Shell Oil Co.*, No. 4:05-CCV-633-DGK, 2013 WL 4067625, at *5 (W.D. Mo. Aug. 12, 2013) (Awarding attorney's fees to defendant, and stating, "Of course, both parties litigated this case with a concede

nothing, contest everything attitude which dramatically increased their litigation costs. But it is well-established that where one party, in this case the Plaintiffs, litigates tenaciously, they cannot complain about the time spent by the other party.")

PRMI's contention that it cannot be "blamed" for ResCap's attorneys fees is especially inapt here, given the Guides' fee-shifting provision. PRMI was fully aware of the Guides' fee-shifting provisions and the possibility that it might be required to pay ResCap's attorney's fees. Moreover, it was equally aware of this Court's attorney's fee award in *HLC*, as both *HLC* and *PRMI* involved the same attorneys on both sides. Nevertheless, PRMI's defense counsel employed legal strategies that significantly increased ResCap's attorney's fees by challenging individual components of Plaintiff's damages claim that were of relatively low or modest financial value; and rearguing numerous issues that were either previously decided in *HLC*, on very similar facts, or previously decided in the instant case. Due to the Guides' fee-shifting provisions, PRMI's conduct carries consequences.

### (3) Challenges to Components of Damages Claim

PRMI aggressively challenged components of ResCap's damages claim, even when the individual components had a relatively low or modest financial impact on damages. While PRMI argues that ResCap's fee request is out of proportion to its damages award, PRMI overlooks its own practice of litigating aspects of Plaintiff's damages claim in ways that were out of proportion to the amounts at issue, thereby driving up ResCap's attorney's fees.

### (a) Countrywide Loan

One example of PRMI's disproportionate defense conduct with respect to damages concerned the "Countrywide Loan."  PRMI had purchased loans from Countrywide Financial, also an originating lender, that were underwritten to Countrywide's guidelines. *PRMI Summ. J. Order*, 428 F. Supp. 3d at 88.  PRMI later sold a pool of the Countrywide-underwritten loans to RFC, and a single one of these loans, the Countrywide Loan, was at issue in this litigation, amounting to approximately $30,000 in damages.  (FOF & COL ¶ 171.)  PRMI argued that because the loan had been underwritten to Countrywide's guidelines, the Guides' more stringent R&Ws were inapplicable to it.  *PRMI Summ. J. Order*, 428 F. Supp. 3d at 90.  Litigating the $30,000 Countrywide Loan involved discovery, motion practice, expert and fact witness deposition testimony (some of which occurred in the midst of trial), and trial testimony.[9]  However, at trial, even PRMI's expert, Kori Keith, conceded

---

[9]     At the final pretrial conference in this case, counsel addressed issues concerning the deposition and trial testimony of PRMI's proposed fact witness on the Countrywide Loan, Mr. Crawford.  ResCap's counsel stated:

On Countrywide, I don't want to spend any more time on this than we already have . . . except to say Mr. Crawford should be stricken as a witness. . . . [T]here's no need and no basis for Mr. Crawford to come and do the same thing [as PRMI's fact witness Mr. Zitting] in the context of a loan where our claim is worth $30,000.  And not only that, but then they are asking us to fly to Utah to depose him pretrial.

The whole thing is—counsel used the word "crazy," and I won't go that far, but the whole thing is distressing.  I will go that far.

And I will say two more things on this.  Number one, I think it will be useful for us to know if Mr. Crawford will be covering anything other than the Countrywide [Loan].  And I would also be interested to know whether if we were forced to fly to Utah, will they stipulate that if we prevail in the

that no set of guidelines would permit borrower fraud, and PRMI's fact witness, Jim Crawford, agreed that a prohibition on misrepresentation in origination is a standard industry representation required by all investors, including Countrywide.  (FOF & COL ¶ 173.)

Despite the relatively low value of the Countrywide Loan, PRMI unsuccessfully persisted in challenging it, in a manner that far exceeded the loan's impact on damages. Ultimately, the Court concluded that ResCap "easily" met its burden to establish that the Countrywide Loan was in breach and contributed to its damages.  (*Id.*)  Despite PRMI's arguments to the contrary, (Def.'s Sur-Reply at 9–10) (citing Smallwood Decl. ¶ 49), PRMI's outsized approach to the Countrywide Loan increased ResCap's attorney's fees exponentially.

### (b) Monoline Allocation

Although PRMI downplays the impact of its Monoline Allocation argument on Plaintiff's fees, (Def.'s Sur-Reply at 9), it litigated the $400,000 Monoline Allocation, worth approximately 7% of ResCap's total damages, as if it were a multi-million-dollar issue. PRMI's expert Dr. McCrary criticized Dr. Snow's methodology to allocate a portion of the Monoline Settlement to PRMI, which relied on blended monoline breach rates that included loans insured by different monoline insurers.  (FOF & COL ¶ 358.)  But the Court found that Dr. Snow's methodology accounted for potential differences between the breach rates in

---

litigation and put in an attorneys' fee application, will they stipulate that they are not going to argue that spending $50,000 to depose somebody on a $30,000 issue is unreasonable.

(13-cv-3451, Jan. 23, 2020 Pretrial Hr'g Tr. at 108:18-109:25.)

different monoline settlements. (*Id*. ¶ 359.)   Moreover, the costs of drawing and reunderwriting monoline-by-monoline samples, in the manner Dr. McCrary advocated, would have added approximately $11 million to ResCap's expert expenses, far outstripping the $400,000 in damages that ResCap sought for the Monoline Allocation. (*Id*. ¶ 360.)

While Dr. McCrary failed to quantify the impact of his critique on the Monoline Allocation, in a rebuttal response to Dr. McCrary's criticisms, Dr. Snow verified his methodology, and further performed a non-extrapolated calculation, to which Dr. McCrary did not meaningfully object. (*Id*. ¶ 361.)   In fact, Dr. Snow's subsequent calculations, which accounted for the maximum possible impact of Dr. McCrary's criticisms, found a difference of only $115,000 between Dr. Snow's baseline calculation and his non-extrapolated calculation. (*Id*.)   Although PRMI claims that the Monoline Allocation accounted for just 3.5% of the time at trial, (Def.'s Sur-Reply at 9), it glosses over the fact that this $115,000 potential difference in damages necessitated ResCap's rebuttal report, argument in *Daubert* motions and summary judgment motions, deposition testimony, and expert testimony and cross-examination at trial. (13-cv-3451, Feb. 20, 2020 *PRMI* Trial Tr. [Doc. No. 5486] at 16–22) ("Q:  And so the 40 minutes that all of us in this courtroom spent in cross-examination regarding your monoline allocation methodology, that was all a dispute around $115,000?  . . . Dr. Snow:  Yes.").  The Court ultimately concluded that Dr. Snow's baseline monoline methodology, resulting in a Monoline Allocation of $400,000, was reasonable and reliable, (FOF & COL ¶ 361), and was part of ResCap's overall damages allocation that met the requirements of Minnesota law for the determination of damages, and the allocation of settlements across multiple defendants. (*Id*. ¶ 450.)

### (c) At-Issue Population and NDS Trusts

Through trial, PRMI litigated Dr. Snow's determination of the At-Issue Loan Population and his treatment of the NDS Trust breach rate. As to the At-Issue Population, Dr. Snow based his allocation methodology on samples drawn from the At-Issue Population of loans, i.e., loans included in the Bankruptcy Settlements that had actual losses of at least $500, or expected losses, as of May 2013. (*Id.* ¶ 354.) Regarding the NDS Trust breach rate, Dr. Snow deducted $269 million from the RMBS Trust Allowed Claim to account for settlement proceeds attributable to NDS Trusts for which ResCap did not seek indemnity. (*Id.* ¶ 350.)

PRMI chose to contest these issues, even though its damages expert, Dr. McCrary, had previously acknowledged in *HLC* that the maximum possible impact of these issues on damages was "minor." (*Id.* ¶ 369.) In fact, while PRMI attempts to undercut the impact of this issue on Plaintiff's attorney's fees, it concedes that this issue was previously litigated, stating, "both experts already had addressed these issues in *HLC*, and the issues accounted for just 3% of this trial." (Def.'s Sur-Reply at 9) (citing Smallwood Decl. ¶ 53). But PRMI's refusal to fully consider Dr. McCrary's prior opinion, and to press the issue instead, both amplified ResCap's attorney's fees and costs in *PRMI*, and undermined Dr. McCrary's credibility. (FOF & COL ¶ 369) ("Indeed, after having testified that a larger $350,000 impact [of the issues regarding the NDS Trust and at-issue population] in *Home Loan Center* was minor, Dr. McCrary undermined his credibility here by insisting that it was 'not for [him] to say' whether a $330,000 impact here would be too small.").

58

### (d) Assetwise Loans

Also fiercely litigated by PRMI were loans underwritten through RFC's proprietary automated underwriting system, Assetwise (the "Assetwise Loans"). (*Id*. ¶ 150.)  In general, PRMI argued that some of the Guides' R&Ws were inapplicable to the Assetwise Loans, and that by purchasing the Assetwise-approved loans, ResCap was estopped from seeking recovery for them.  The Assetwise Loans were worth approximately $425,000, but were the subject of letters to the Court, summary judgment motions, *Daubert* motions, and fact and expert witness testimony.  ResCap warned PRMI that the cost to litigate the Assetwise Loans—and other issues—eclipsed their value, (13-cv-3451, Pl.'s Jan. 21, 2020 Letter [Doc. No. 5380] at 1, 3–5), but PRMI insisted that the loans were "incredibly consequential to PRMI," and that "plaintiff doesn't get to dictate how PRMI defends itself."  (13-cv-3451, Jan. 23, 2020 Pretrial Hr'g Tr. at 127:22–23; 128:16–17.)  ResCap reviewed and objected to 300 Assetwise-related trial exhibits, which the Court found were "insufficient, even cumulatively, to establish waiver or estoppel, and [would] be subject to exclusion.  (13-cv-3451, *PRMI Mots. in Limine Order* [Doc. No. 5390] at 34.)  In addition, although PRMI's reunderwriting expert was "not capable of offering testimony . . . about estoppel and waiver," (13-cv-3451, Jan. 23, 2020 Pretrial Hr'g Tr. at 93:16–17), PRMI argued that she should be permitted to rebut Assetwise Loan breaches.  ResCap then had to cross-examine her and PRMI's fact witnesses Mr. Zitting and Mr. Crawford about Assetwise Loans.  However, Mr. Zitting confirmed that all Assetwise Loan breaches "relate[d] to Reps that PRMI concedes continue to apply . . . even under its theory of estoppel."  (FOF & COL ¶ 391.)

59

Following trial, the Court concluded that PRMI had approved the four Assetwise Loans in question without complying with certain requirements of the Client Guide, and that ResCap could, in any event, declare a breach of these loans in its sole discretion to do so under the Client Guide. (*Id.* ¶¶156–70.) In short, PRMI's Assetwise arguments increased ResCap's attorney's fees out of proportion to the impact of the Assetwise Loans on ResCap's damages.

### (4) Previously-Decided Issues

In addition to PRMI's extensive defense to relatively modest components of ResCap's damages, it repeatedly required ResCap and the Court to revisit previously-decided issues or slight variations of previously-decided issues for purposes of "clarification." While PRMI could have briefly noted a continuing objection to the Court's prior rulings, it instead pursued previously-decided issues as if litigating them for the first time. Because this unquestionably increased Plaintiff's legal fees, any discussion of the amounts involved and the results obtained must consider this aspect of PRMI's litigation conduct.

One example of PRMI's litigation déjà vu was its insistence in expert discovery, *Daubert* motions, summary judgment motions, motions in limine, and at trial, that the Court failed to understand and properly apply *UnitedHealth Group Incorporated v. Executive Risk Specialty Insurance*, 870 F.3d 856, 863 (8th Cir. 2017), to Plaintiff's damages model. The Court's reading of *UnitedHealth* could hardly surprise PRMI, since here, the Court ruled consistently with its ruling in *HLC* that *UnitedHealth* did not alter long-standing Minnesota law on the allocation of damages, or on the calculation of damages generally. (*Compare* FOF & COL ¶ 443, *with HLC Summ. J. Order*, 332 F. Supp.3d at 1199–1204.)

PRMI also relitigated matters previously settled in prior rulings in this case.  While PRMI raised an admittedly new issue in this case involving the Additional Settling Trust Settlement, it continued to assert its argument, despite the Court's contrary rulings in summary judgment and *Daubert* orders.  PRMI had argued in its expert's supplemental report that ResCap's damages model was impermissibly speculative because it failed to account for separate settlement amounts with respect to the Original Settling Trusts and the Additional Settling Trusts.  *See PRMI Summ. J. Order*, 428 F. Supp. 3d at 134–43.  On summary judgment, the Court rejected PRMI's argument, *id.*, and therefore precluded PRMI's expert from testifying about the Original Settling Trusts and the Additional Settling Trusts.  *In re ResCap Liquid. Tr. Litig.*, 432 F. Supp. 3d 902, 947 (D. Minn. 2020) ("*PRMI Daubert Order*").

Yet shortly before trial, PRMI again found the issue of the "separate" settlement for the Additional Settling Trusts "still relevant" to the case.  (*See* 13-cv-3451, *PRMI Mots. in Limine Order* at 36.)   In fact, in PRMI's effort to downplay the impact that this recurring issue had on ResCap's fees, it actually catalogs the extent to which it repeatedly asserted the issue of the Additional Settling Trust Settlement, forcing ResCap to repeatedly respond.  Addressing the Additional Settling Trusts in its sur-reply to the instant motion, PRMI states, "This issue concerned a discrete set of bankruptcy documents, and Plaintiff[] addressed it in (i) less than 1 page of a letter, (ii) less than 10 pages of summary-judgment briefs, (iii) less than 3 pages of *Daubert* briefs, (iv) 1 sentence in a motion *in limine*, (v) in less than 3 transcript pages at the pre-trial conference, and (vi) in less than 2 transcript pages at trial." (Def.'s Sur-Reply at 9) (citing Smallwood Decl. ¶ 39).  Every time PRMI resurrected this

issue, it necessitated more work in opposition, and required the Court to reiterate its summary judgment and *Daubert* rulings on the matter, stating, in its order on the motions in limine, "Factually and legally, there is no *relevance* to evidence concerning a separate allocation for the Additional Settling Trusts—whether the evidence comes from the Supplemental Term Sheet, Dr. McCrary, or from the cross examination of Plaintiff's witnesses.  The underlying "Additional Settling Trust Settlement" was not the RMBS Trust Claim allowed by the Bankruptcy Court, for which ResCap seeks indemnification in this lawsuit."  (13-cv-3451, *PRMI Mots. in Limine Order* at 36*.*)

In addition, PRMI argued that ResCap's allocation methodology failed to account for the value of purportedly non-indemnifiable claims against RFC's parent, Ally Financial.  This argument relied on the opinion of the defendants' excluded expert from Wave One.  (*See id*. at 41.)  On summary judgment in PRMI, the Court found as a matter of law that it was undisputed that Ally was not a debtor, and therefore Plaintiff's allocation methodology did not "fail" to account for the value of claims against Ally.  *PRMI Summ. J. Order*, 428 F. Supp. 3d at 147–48.

Yet, before trial, PRMI maintained that the Ally allocation remained a live issue simply because the Court had denied summary judgment to PRMI on an issue for which ResCap had not affirmatively sought summary judgment.  (*See* 13-cv-3451, *PRMI Mots. in Limine Order* at 42.)  Granting Plaintiff's motion in limine to exclude any such Ally evidence, the Court explained that because it had ruled as a matter of law on summary judgment, no issues of material fact remained in dispute, and the Court precluded PRMI from offering any evidence concerning Ally at trial.  (*Id.* at 43.)  Again, in PRMI's effort to minimize the impact

of the recurring Ally issue on Plaintiff's fees, it effectively concedes that its refusal to abide by the Court's rulings repeatedly necessitated ResCap's opposition work, stating, "Plaintiff addressed this issue in less than 2 pages of its summary-judgment opposition and in 2 sentences of a motion *in limine*; it later filed a letter addressing it in 3 paragraphs and citing designations of at most 23 pages." (Def.'s Sur-Reply at 9) (citing Smallwood Decl. ¶ 41). Plaintiff performed much of this work because PRMI failed to follow the Court's rulings.

As to expert opinions, the Court excluded PRMI's experts' opinions on a number of issues, noting that the Court had previously rejected them. *PRMI Daubert Order*, 432 F. Supp. 3d at 928–930, 935–36, 941–42. Citing its past rulings, the Court excluded the following opinions of PRMI's experts: (1) Phillip Burnaman's views on loss causation, ("Nothing has changed between Mr. Burnaman's testimony on this subject in *HLC* and this case, and accordingly, Mr. Burnaman's testimony on this issue is still unreliable due to a lack of competent, reliable evidence on this supposed 'break in causation'"); (2) Mr. Burnaman's opinion regarding the proxy MLS data presented by Plaintiff's expert, Louis Dudney, (noting that Mr. Burnaman's opinion in this regard had been "consistently rejected by this Court); (3) Steven Schwarcz's opinion on whether RFC was solely responsible for its liabilities, ("[T]he Court rejects any invitation to return to, or request for reconsideration of, Wave One briefing on this issue. Those questions have long been decided, and the Court sees no reason to depart from its prior conclusions. The fact remains that whether characterized as a causation argument or allocation critique, PRMI offers no competent evidence sufficient to permit the "sole responsibility" theory to go to the factfinder"); and (4) Lee Kennedy's critique of Plaintiff's AVM methodology, ("[T]he Court has already held several times that the Guides'

63

knowledge- and reliance-sections established that PRMI's R&Ws to RFC were 'not affected by any investigation or review made by RFC unless expressly waived in writing' and that RFC's knowledge of any potential defects in a loan file 'is wholly irrelevant.'"). *Id.* Again, PRMI concedes that it reasserted these arguments, but downplays the extent to which ResCap was forced to respond, stating, "Plaintiff addressed 'inadmissible' reports in less than two pages of a letter, . . . , and in summary judgment and *Daubert* briefs that were within standard limits and incorporated prior briefing." (Def.'s Sur-Reply at 9) (citing Clouser Decl. ¶¶ 80–84). But the only reason that ResCap was put to this extra work was because PRMI persistently pressed previously-rejected arguments.

As an example of PRMI relitigating previously-decided issues at trial, PRMI disclosed certain proposed exhibits for use in its cross-examination of ResCap's witnesses Ms. Bangerter and Mr. Butler that included repurchase documents, documents lacking foundation, and RFC/PRMI business relationship documents, all of which the Court had excluded in the Order on the parties' motions in limine. (13-cv-3451, *PRMI Mots. in Limine Order* at 22–23, 24–34, 47–48.) As Plaintiff's counsel observed, "PRMI continues its pattern of forcing the Court and parties to revisit settled issues and relitigate volumes of inadmissible evidence based on its self-servingly implausible readings of prior rulings." (13-cv-3451, Pl.'s Feb. 9, 2020 Letter [Doc. No. 5415] at 1.)

These are a few examples of the ways in which PRMI routinely reasserted previously-decided issues. While PRMI balks at the notion of having to "pick up the entire tab" for ResCap's attorney's fees and costs, (Def.'s Opp'n at 32), the plain language of the Guides and the *HLC Fee Award* alerted PRMI to the possibility that the parties would not "split the

tab" or "go Dutch" on attorney's fees and costs. Given all of this notice, PRMI cannot credibly express indignation now. Its own poor judgment in relitigating settled issues throughout this litigation significantly drove up ResCap's attorney's fees and costs.

### (5) ResCap's Warnings

Not only did the *HLC Fee Award* and the plain language of the Guides put PRMI on notice of its potential liability for attorney's fees and costs, ResCap's counsel expressly raised the issue at multiple points in this litigation in response to PRMI's litigation tactics. At nearly every step of the proceedings, PRMI knew that the manner in which it conducted its defense was increasing ResCap's attorney's fees and costs.

At the May 9, 2019 case management conference, for example, Plaintiff's counsel expressed concern about the scope of expert discovery in Wave Two, and with respect to PRMI, in particular. (13-cv-3451, May 9, 2019 CMC Tr. [Doc. No. 5105] at 19:17-22:14.) ResCap had sought to discuss with PRMI the ways in which the parties might streamline expert discovery, in light of the Court's rulings in Wave One. (*Id*. at 22:2-9.) ResCap reported that PRMI did not find it appropriate to have any such conversations, leading ResCap to comment at the case management conference, "I'll say as an aside, you know, if we go down that route, that's exactly the kind of, you know, attorney's fees and waste that . . . we had HLC complain about when we made our attorney fee application. I mean, there's just no reason for it that we can see." (*Id.* at 22:10-14.)

Four months later, in a status report to the Court in advance of a case management conference, ResCap similarly reported that PRMI refused to discuss the applicability of the Court's Wave One rulings on summary judgment and *Daubert* to the parties' contemplated

65

summary judgment and *Daubert* motions in *PRMI*.  (13-cv-3451, Pl.'s Sept. 13, 2019 Letter [Doc. No. 5204] at 3.)   ResCap stated, "Unfortunately, however, unless the Court has a different preference or instruction, the Trust perceives no meaningful option other than to make the Court aware of the issue now; to include all of the relevant issues in its forthcoming motions with appropriate cross-references to the Court's prior rulings; *and to make a record now, for purposes of any forthcoming fee application, as to PRMI's unapologetic insistence on processes that will require the Trust to waste time and money litigating settled issues*." (*Id*.) (emphasis added).

At numerous other times in this case, while not expressly invoking the fee-shifting provision, ResCap noted the costs of engaging in Wave One-duplicative work.  (*See, e.g.*, Supp'l Christenson Decl. ¶15(a)–(n); 13-cv-3451, Pl.'s July 24, 2018 Letter [Doc. No. 4050] at 4–5) (asking the Court to put reasonable limits on Wave Two discovery, and stating, "PRMI's demand for a full seven-hour deposition of witnesses who have already provided extensive testimony, including on common issues, is disproportionate and unnecessary."); (*id.*, Pl.'s Jan. 29, 2019 Letter [Doc. No. 4968] at 1) (stating, "[T]he Court should . . . deny PRMI's request to eliminate the current prohibition against taking deposition testimony that is duplicative of testimony in Wave One [and] PRMI's request to re-depose four former RFC employees who testified at length in Wave One (half of whom also testified in *MBIA*."); (*id.*, Pl.'s Feb. 26, 2019 Letter [Doc. No. 5027] at 2) ("[S]upplementing Ms. Whealdon's *MBIA* and Wave One testimony with yet a third deposition would not be 'proportional to the needs of the case[,]' [under Fed. R. Civ. P. 26(b)(1)")"; (*id.*, Pl.'s Apr. 25, 2019 Letter [Doc. No. 5060] at 2–5) ("[E]ven ignoring the irrelevance and impropriety of the [proposed Rule

30(b)(6)] testimony, the topics should be disallowed because RFC has already provided days of fact and Rule 30(b)(6) testimony on these issues. . . .  There is nothing new or PRMI-specific about the testimony PRMI is now requesting—it is a transparent effort to revisit the same issues that have been litigated repeatedly before."); (*id.*, May 9, 2019 CMC Tr. [Doc. No. 5105] at 30:11-31:2) (addressing PRMI's subjective bad faith argument, stating, "And certainly I have concern, and the Trust has concern, about whether an exercise like that would be proportional to the size of this case and to the needs of the case."); (*id.*, Pl.'s Mem. Supp. Mot. for Protective Order [Doc. No. 5140] at 1) (stating that "PRMI is inexplicably insisting on dragging the Trust and the Court into an irrelevant, expensive, and time-consuming process of rebuttal and reply reports, depositions, and associated motion practice (and, in PRMI's view, trial testimony) on th[e] same issues [previously rejected by the Court in prior orders]. The Court ought not indulge PRMI's bid to make believe that the Court's prior orders do not exist."); (*id.*, Dec. 2, 2019 Summ. J. Hr'g Tr. [Doc. No. 5352] at 7:12–19) (commenting, "I should note that the briefs, of course, dealt with all kinds of issues, pages and pages were rehashed of things that the Court has already addressed.  We were somewhat frustrated to do that all over again but we are—especially given the size of the case—but we are where we are."); (*id.*, Pl.'s Jan. 21, 2020 Letter at 1) (asserting, "Generally, the evidence to be introduced at trial should be limited to the issues left open under this Court's summary judgment, *Daubert*, and other decisions; presented in an efficient and non-cumulative manner; and reasonably reflective of the dollar amount of the Trust's claim in the aggregate and of the relative significance of the various disputed issues.  PRMI's positions . . . have been inconsistent with these principles, and would force the parties and Court to spend time

and resources relitigating settled issues, addressing volumes of irrelevant and cumulative evidence, and otherwise proceeding in seemingly as inefficient and expensive manner as possible.").

In sum, Plaintiff's counsel frequently reminded PRMI of the financial ramifications of how it chose to conduct its defense.  PRMI was free to aggressively defend itself, and it did.  However, it conducted its defense with full knowledge of the consequences of its conduct and its potential liability for ResCap's attorney's fees and costs.

### (6) Results Obtained

Along with the amount involved, the Court considers the results obtained.  *Green*, 826 N.W.2d at 537.  The results obtained here were exceptional. ResCap obtained a damages award of $5.4 million, amounting to 100% of its requested damages.  On top of that, pre-award prejudgment interest has increased ResCap's damages award to approximately $7.4 million.  PRMI cannot seriously dispute ResCap's undeniable success.  Instead, it argues that ResCap's expenditure of higher amounts in attorney's fees and costs diminishes the value of ResCap's success and renders the fee petition unreasonable.  (Def.'s Opp'n at 9–10.)

As noted earlier, Minnesota courts do not apply a "dollar value proportionality rule" between the amount involved and results obtained.  *Green*, 826 N.W.2d at 537.  Moreover, PRMI's myopic focus on "proportionality" ignores several important considerations here:  (1) the financial impact that PRMI's own disproportionate litigation conduct, discussed above, had in increasing ResCap's attorney's fees and costs; (2) ResCap's investment of  thousands of hours of sunk costs into this lawsuit and its concern that the outcome of *PRMI* could impact

68

other pending actions; and (3) past awards in Minnesota of "disproportionate" attorney's fees exceeding the amount of damages.

As the Court has previously observed, "a heavily-litigated case is not typically a one-sided affair," and may explain why a party's attorney's fees and costs are relatively high. *Ewald*, 2015 WL 1746375, at *15. PRMI "contest[s] only the aggregate outlay, yet the high total is the expected result of the way the defense was conducted." *Id.* (quoting *Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 610 (7th Cir. 2014)); *see also Green v. BMW of N. Am., LLC,* No. A14-0378, 2014 WL 5800412, at *4 (Minn. Ct. App. Nov. 10, 2014) (noting that the consideration of "[the defendant's] unwillingness to accept or acknowledge any liability" as "the primary factor driving up the legal fees from the beginning to date for this litigation" was relevant to the lodestar analysis of "the time and labor required" and "the amount involved and the results obtained.").

In *Cuff,* Judge Easterbrook of the Seventh Circuit acknowledged that the ratio between the plaintiff requested amount of attorney's fees ($325,000) and the awarded damages (less than $50,000) seemed high. 768 F.3d at 610. However, he recognized the "sunk costs" that plaintiffs continue to incur over the course of litigation, and criticized an analysis of attorney's fees that examines only the "bottom line," explaining,

> Sometimes events during the litigation change the calculus, and a lawyer must avoid the sunk-cost fallacy. If, after spending $25,000 in legal time, a lawyer is confronted with a defense that will cost $30,000 to defeat, counsel will not say: "It is irrational to spend $55,000 to get $50,000." The $25,000 is sunk; if the suit is abandoned the recovery will be zero, so the right question is whether it is reasonable to spend $30,000 more to get $50,000, and the answer is yes. Suppose the same thing happens over and over in a suit, with one unexpected development after another raising the costs without raising the expected recovery. It can be reasonable to meet each of these events by investing more,

> even though an analysis that looks only at the bottom line ($325,000 invested
> to get $50,000) makes the total seem unreasonable.

*Id.* Judge Easterbrook further stated that "hyperaggressive defendants who drive up the

expense of litigation must pay the full costs, even if legal fees seem excessive in retrospect."

*Id*.

Although Judge Easterbrook's comments about sunk costs and high legal fees arose

in the context of a case involving a fee-shifting statute, they are just as apt here.  Moreover,

ResCap's CFO, Ms. Horner, observes that while PRMI was the only remaining action at the

time ResCap filed the instant motion, up until October 21, 2020, HLC's appeal, and ResCap's

action against HLC's successor, *ResCap Liquid. Tr. v. LendingTree, LLC*, 19-cv-2360

(SRN/HB), remained open.  (First Supp'l Horner Decl. ¶ 17.)  Ms. Horner attests to ResCap's

concern that potential adverse rulings in the *PRMI* action could jeopardize ResCap's position

in the *HLC* and *LendingTree* actions.  (*Id.*)  In addition, she states that over the course of seven

years of ResCap's litigation in this district, it took a long view of its legal fees because, as of

September 20, 2020, its litigation had resulted in $1.3 billion in settlement recoveries.  (*Id.*)

Indeed, Minnesota courts have awarded attorney's fees in excess of damages in cases

involving breach of contract claims, commercial disputes, and/or cases involving fee-shifting

contracts.  *See, e.g., Kelbro v. Vinny's on the River LLC*, 893 N.W.2d 390, 400–01 (Minn. Ct.

App. 2017) (affirming $22,088.73 award of attorney's fees and costs pursuant to contractual

fee-shifting provision in breach of contract suit involving a $5,437.23 damages award); *650*

*N. Main Ass'n v. Frauenshuh, Inc.*, 885 N.W.2d 478, 494–98 (Minn. Ct. App. 2016)

(approving a statutory attorney's fees award of $171,000 in a breach of warranty action that

involved $101,250 in damages); *Northfield Care Ctr., Inc. v. Anderson*, 707 N.W.2d 731, 736

(Minn. Ct. App. 2006) (approving attorney's fees award of $14,265.62 pursuant to contractual

fee-shifting provision in breach of contract action involving $3,838.33 award).

Consideration of a broader scope of Minnesota cases involving statutory awards of

attorney's fees exceeding damages is informative as well, particularly where courts have

observed that the defendant's litigation conduct played a substantial role in increasing the

plaintiff's attorney's fees, as is the case here. *See, e.g., Ewald*, 2015 WL 1746375, at *15–16

(awarding statutory attorney's fees ($1,773,719.05) far exceeding damages ($270,594) in an

employment law action under federal and Minnesota law, and noting that the parties' "tooth

and nail" litigation explained why the plaintiff's fees and costs were relatively high); *Braatz

v. Parsons Elec. Co*., 850 N.W.2d 706, 712 (Minn. 2014) (rejecting a requirement of

proportionality and affirming award of statutory attorney's fees ($12,578.74) in worker's

compensation case exceeding recovery of medical benefits ($11,893.69)); *Toyota-Lift of

Minnesota, Inc. v. Am. Warehouse Sys., LLC*, A18-0199, 2018 WL 4201188, at *4 (Minn. Ct.

App. Sept. 4, 2018) (affirming award of attorney's fees ($217,209.11) greater than the

underlying recovery ($143,000) because the defendant's "'steadfast opposition throughout

the course of this case' prolonged the litigation and led [the plaintiffs] to 'incur[ ] significant

attorneys' fees, in excess of the underlying award for commissions,'" and because of presence

of novel legal issues and public policy considerations).

The Court therefore finds that consideration of the results obtained supports the

reasonableness of Plaintiff's fee request. Not only did ResCap obtain its requested damages

award and pre-award prejudgment interest, it did so in a case involving numerous complex issues, and vigorous opposition that greatly increased its attorney's fees and costs.

### c. Fees Customarily Charged for Similar Legal Services

When evaluating the reasonableness of a fee petition, courts also consider the fees customarily charged for similar legal services. *Milner*, 748 N.W.2d at 621.   In response to PRMI's criticisms about inefficient staffing, ResCap urges the Court to assess the reasonableness of its fee petition here by comparing it to its higher fee petition in *HLC*. (Pl.'s Reply at 12–14.)   PRMI argues that ResCap's fee request is unreasonable based on a comparison between the hours billed by ResCap's counsel versus PRMI's counsel.  It also contends that the fee request is unreasonable based on a comparison of the hours billed among Plaintiff's counsel.  The Court first turns to PRMI's invitation to compare ResCap's counsel's billable hours against defense counsel's billable hours.

### (1)  Comparison with Opposing Counsel's Billable Hours

As noted in the Court's discussion of the work performed during various time periods of this litigation, PRMI invites a comparison between the hours billed by its counsel against those billed by ResCap's counsel during various periods of this litigation.  (*See* Def.'s Opp'n at 25.)

While it may sometimes be useful to compare the hours billed by opposing counsel, the comparison is often irrelevant.  *See Burks v. Siemens En. & Automation, Inc.*, 215 F.3d 880, 884 (8th Cir. 2000) (describing the relationship as an "apples-to-oranges comparison," and noting that it requires courts to undertake an additional analysis of whether defense counsel's billings were reasonable); *Ewald*, 2015 WL 1746375, at *15 (noting that while

72

defense counsel's fees may sometimes be relevant to a determination of the reasonableness of plaintiff's counsel's fees, "frequently, the comparison is irrelevant.") (citations omitted).

Williams & Connolly suggested the same exercise in *HLC*, which the Court found not particularly useful. *HLC Fee Award*, 399 F. Supp. 3d at 854–56. For similar reasons, it is not useful here. "For starters, [PRMI] lost." *Id*. at 854. Had it devoted additional time to the case or retained additional counsel, it might have enjoyed a better outcome. Moreover, the billing arrangements as between Plaintiff and Defendant were entirely different. While ResCap utilized an hourly billing arrangement, PRMI utilized a flat-fee arrangement with Williams & Connolly. (Def.'s Opp'n at 4 n.1.) While both types of billing arrangements are proper, they involve such different considerations—some of which, for example, may incentivize additional work, and some of which may discourage additional work—that a comparison between Plaintiff's and Defendant's counsels' billable hours is particularly non-illuminating here in light of the different billing arrangements.

However, even comparing billable hours between national counsel from November 2019 to April 2020, for example, the 7,324 hours from Quinn Emanuel, and the 5,936 from Williams & Connolly are fairly similar. Assuming that Williams & Connolly's hours were reasonably expended, the relative similarity in hours suggests that Quinn Emanuel's hours were likewise reasonably expended.

While PRMI breaks down its comparative analysis of billable hours over particular time periods consistent with Mr. Remele's approach, (Def.'s Opp'n at 18–32), the work performed by both sides *throughout this litigation* was not the same. (*See* Supp'l Christenson Decl. ¶¶ 16–54.) At all times, ResCap bore the burden of proof. While ResCap did not build

73

three damages models from scratch in this case, as it did in *HLC*, it was still required to perform the case-specific work discussed above with respect to the at-issue loans, witnesses, and its damages model, and respond to PRMI's criticisms of its methodology. At no time did PRMI offer an alternative damages model. And, as discussed at length, ResCap was required to establish PRMI's liability loan-by-loan and breach-by-breach, and to respond to PRMI's strategy of relitigating previously-decided matters from *HLC* and this case.

Under these facts, the Court finds that a comparison between the hours billed by Plaintiff's counsel and Defendant's counsel does not meaningfully inform the reasonableness of Plaintiff's fee petition. Moreover, PRMI's invitation to engage in such an accounting comparison would require the Court to don "green eyeshades," *Fox*, 563 U.S. at 838, which it is not required to do. As noted, the Supreme Court reminds us that "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Id.*

### (2) Comparison Between ResCap's Hours Billed in *PRMI* and *HLC*

Rather than the apples-to-oranges comparison of ResCap's billable hours with PRMI's billable hours, a more informative comparison is between ResCap's attorney's fees in *HLC* and in this case. Despite undertaking a similar amount of work under the case-specific facts of each case, including a jury trial and bench trial of comparable length, ResCap's counsel in this case substantially reduced the number of timekeepers and billable hours when compared to a similar period in *HLC*. ResCap prudently implemented a reduced staffing strategy for the Wave Two cases in light of the lower amounts at issue in those cases as compared to the Wave One cases. (First Supp'l Horner Decl. ¶ 11.) For the six months leading up to and

including trial and the proposed findings of fact and conclusions of law in *PRMI* (November 2019 through April 2020), ResCap seeks fees from 37 timekeepers. (*Id.* ¶ 13, Ex. 54.) By contrast, in the five months leading up to and including trial in *HLC* (July 2018 through November 2018), ResCap sought fees for 137 timekeepers. (*Id.*) Thus, ResCap reduced the number of timekeepers by 100 as between the two trials. (*Id.*)

And, as noted earlier, with respect to billable hours, although the comparative period in *PRMI* includes an additional month of work to account for the preparation of the proposed findings of fact and conclusions of law, ResCap's counsel billed 11,681 hours in the months surrounding and including the trial in *PRMI*, as compared to 40,698 hours during the comparable trial period in *HLC*—a 71% difference. (*Id.* ¶ 14.) ResCap incurred $4,636,890 in fees in *PRMI* during this period, compared to $13,851,133 in fees in *HLC* during the comparable period—a 67% difference. (*Id.*)

### (3) Comparison of Hours Billed Among Plaintiff's Counsel

PRMI contends that a comparison of the hours billed among ResCap's counsel also underscores the unreasonableness of its fee request. (Def.'s Opp'n at 18–32.) In particular, PRMI argues that the hours billed by ResCap's local counsel, Spencer Fane, and its Bankruptcy counsel, Carpenter Lipps, show that ResCap overstaffed the case. (*Id.*) Further, PRMI contends, these billable hours raise concerns about inefficient work and duplicative billing. (*Id.*) As of the filing of PRMI's opposition memorandum, PRMI asserts that national counsel at Quinn Emanuel billed 15,698 hours, while local counsel at Spencer Fane unreasonably billed 12,614 hours "in a supporting role." (*Id.* at 18.) As to Carpenter Lipps,

PRMI argues that its work in this case did not necessitate 469 billable hours, noting that counsel from that firm did not argue any motions or examine witnesses. (*Id.* at 19.)

Again, ResCap tailored its legal team to the size of this case by substantially reducing the number of timekeepers and hours as compared to *HLC*. (First Supp'l Horner Decl. ¶¶ 13–15, Ex. 54.) As ResCap attests, local counsel at Felhaber/Spencer Fane, "played an instrumental role as co-counsel in this matter," as they did in the other Wave One and Wave Two matters. (Supp'l Christenson Decl. ¶ 4.) Minnesota-based RFC had a longstanding relationship with Felhaber, which had represented it on a number of prior matters. *HLC Fee Award*, 399 F. Supp. 3d at 855. When ResCap's counsel at Felhaber moved to Spencer Fane, the same attorneys continued to represent ResCap in financial services litigation, as they had for the last 16 years. (Heeman Decl. ¶¶ 5–6.)

As in *HLC*, ResCap's use of local counsel was different than PRMI's use of its local counsel. *HLC Fee Award*, 399 F. Supp. 3d at 855–56 ("But as with national counsel, the way in which ResCap used local counsel was different than HLC's use of local counsel—a decision that was certainly within each client's prerogative."). At ResCap's request, local counsel at Felhaber/Spencer Fane played a larger role in managing the Wave Two cases, (First Supp'l Horner Decl. ¶ 12), and was actively involved in the case against PRMI.

For example, Felhaber/Spencer Fane attorneys regularly met and conferred with PRMI's counsel throughout the litigation, and were involved in the initial case management order, case management conference agenda items and submissions, contract identification protocol, guideline matching, the loan documentation review process, discovery disputes, numerous stipulations, deposition disputes, trial submissions, evidentiary disputes, and

disputes regarding the fee petition.  (Supp'l Christenson Decl. ¶¶ 6, 9.)  In addition, they handled the preparation, management, and communications regarding third-party subpoenas, and first- and second-chaired both fact and expert witness depositions in *PRMI*.  (*Id*. ¶¶ 6–7.) Felhaber/Spencer Fane attorneys also attended every mediation in the Wave One and Wave Two cases, conducted legal research, assisted in the preparation for hearings on dispositive motions, motions in limine, the pretrial conference, and trial.  (*Id*. ¶ 10.)  They also filed every document submitted to the Court in this case, and served nearly every document during fact discovery and in advance of trial.  (*Id.* ¶ 12.)

In terms of trial, the Spencer Fane attorneys drafted trial submissions, letters, and portions of legal memoranda and the proposed findings of fact and conclusions of law.  (*Id*.) Furthermore, Felhaber/Spencer Fane attorneys prepared witness deposition and trial examination outlines, and analyzed and designated hundreds of potential deposition excerpts and trial exhibits.  (*Id.* ¶ 11.)  Felhaber/Spencer Fane attorneys also presented arguments at Wave Two case management conferences, and presented arguments, admitted deposition testimony and exhibits, and conducted a fact witness examination at trial.  (*Id.* ¶ 13.)

Carpenter Lipps attorneys, while playing a more limited role, maintained institutional knowledge from RFC's Bankruptcy, and had preexisting relationships with many of Plaintiff's fact witnesses.  (*Id*. ¶ 14.)  In light of this background, ResCap found it important for counsel from Carpenter Lipps to attend the *PRMI* trial.  (*Id.*)  In fact, Carpenter Lipps attorney Jeff Lipps was scheduled to testify as a trial witness in this matter before the parties stipulated to submit his Wave One testimony.  (*Id*.)  Moreover, in *PRMI*, Carpenter Lipps counsel also prepared deponents and defended fact witness depositions.  (*Id*.)

77

In short, the Court finds that ResCap's reliance on local counsel and Bankruptcy counsel does not render its fee request unreasonable.  In fact, as discussed above, ResCap utilized a leaner complement of attorneys in its case against PRMI than in its case against HLC.  ResCap had long-standing relationships with counsel from Felhaber/Spencer Fane and Carpenter Lipps, and relied on their collective institutional knowledge and expertise.  While PRMI's local counsel played a more limited role, that was PRMI's choice, just as it was ResCap's choice to give local counsel a larger role.  As the Court explained in HLC, "[g]iven the Felhaber[/Spencer Fane] attorneys' hands-on experience over the course of this years-long litigation, and its prior history representing the client, it is not surprising that ResCap utilized more of local counsel's time during [the period surrounding and including trial], as compared to [PRMI's] use of Zelle's attorneys." *HLC Fee Award*, 399 F.3d at 856.  Nor was ResCap's use of Carpenter Lipps reflective of overstaffing.  Carpenter Lipps possessed important institutional memory stemming from RFC's Bankruptcy, as well as unique bankruptcy expertise that was important in a case involving complicated bankruptcy law issues.

As in *HLC*, however, the Court notes that by using three law firms, and, in particular, by using local counsel in tandem, at times, it would not be surprising to find some overlap or redundancy in work, including some redundancy in communications among counsel.  *Id.* at 857.  While such communications and tandem work are sometimes necessary, at other times, the work could best be streamlined and performed by fewer attorneys, even on a case with a leaner legal team.  *See United States ex rel. Thompson v. Walgreen Co.*, 621 F. Supp. 2d 710, 716 (D. Minn. 2009).  The Court appreciates that ResCap voluntarily reduced its fee request

78

by eliminating billable hours attributable to a number of professionals at Spencer Fane (-$2,060) and Felhaber (-$28,801.01) who billed a relatively small number of hours.  (Horner Decl. ¶¶ 25, 30.)

Even so, having reviewed ResCap's unredacted invoices, the Court finds that a further reduction is warranted to account for duplication, redundancy, and interfirm communications with respect to local counsel's portion of ResCap's overall $10,627,716.35 fee request.  *See HLC Fee Award*, 399 F. Supp. 3d at 857 (reducing fee request by 2% to account for duplicative work and intrafirm and interfirm communications); *BP Grp., Inc. v. Capital Wings Airlines, Inc.*, No. 09-cv-2040(JRT/JSM), 2011 WL 4396938, at *2 (D. Minn. Sept. 21, 2011) (reducing fee request to account for numerous interoffice conferences).   Accordingly, the Court deducts 2% ($62,291.90) of the $3,114,595.08 portion of ResCap's fee request attributable to duplicative work performed by Spencer Fane, and 2% ($12,187.06) of the $609,353.23 portion of ResCap's fee request attributable to duplicative work performed by Felhaber. (Second Supp'l Horner Decl., Ex. 48.)   Consequently, the revised portion of Plaintiff's fee request attributable to Spencer Fane is $3,052,303.18, and the revised portion of Plaintiff's fee request attributable to Felhaber is $599,166.17, resulting in an overall revised fee total to Plaintiff of $10,553,237.39.

### d.  Remaining *Milner* Factors

The Court briefly addresses the remaining *Milner* factors that it has not expressly addressed:  the time and labor required, the experience, reputation, and ability of counsel, and the fee arrangement between the attorney and client.  *Milner*, 748 N.W.2d at 621.   The time and labor required for ResCap to successfully advance this case was substantial.  While PRMI

characterizes ResCap's fee request as "brazen" and "excessive," (Def.'s Opp'n at 1, 8), the Court disagrees, subject to the limited exception to account to duplicative work and interfirm communications. Consideration of this factor supports the general reasonableness of ResCap's fee request.

As to the experience, reputation, and ability of counsel, the Court's prior assessment of Plaintiff's counsel remains unchanged: their work was outstanding. The Court has had frequent opportunity to observe their work over the course of several years, including monthly status conferences, motions hearings, the 16-day jury trial in *HLC*, and the 13-day bench trial in this action. As the Court stated in *HLC*, "The excellent reputation of Plaintiff's counsel is well-deserved. At all times, they have been unquestionably candid, prepared, well-organized, effective, thorough, and respectful." *HLC Fee Award*, 399 F. Supp. 3d at 858. Consideration of this factor also supports a finding of reasonableness.

Finally, consideration of the fee arrangement between ResCap and its counsel does not impact the Court's assessment of the reasonableness of ResCap's petition.

In sum, the Court finds that the hourly rates of Plaintiff's counsel are appropriate to determine the lodestar. Plaintiff's invoices and summaries reflect the expenditure of billable hours resulting in its lodestar fee calculation of $10,627,716.35. (Second Supp'l Horner Decl. ¶ 9, Ex. 48.) Overall, the Court finds that these hours were generally properly expended, subject to the reduction for duplicative work and interfirm communications, discussed earlier. With the reduction, this results in a lodestar of $10,553,237.39, which the Court finds reasonable.

### e. Fees for Preparing the Fee Petition

As noted, ResCap has supplemented its fee petition in support of its request for attorney's fees and costs for work performed on preparing the fee petition. PRMI argues that Plaintiff is not entitled to any such fees or costs, relying on authority from other jurisdictions. (Def.'s Opp'n at 40–41) (citing *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1266 (2d Cir. 1987); *Houden v. Todd*, 324 P.3d 1157, 1165 (Mont. 2014)).

In *HLC*, defense counsel raised the same objection, which the Court rejected. *HLC Fee Award*, 399 F. Supp. 3d at 857. The Court sees no reason to depart from the ruling in *HLC.* Under Minnesota law, "attorney fees are not recoverable in litigation unless there is a specific contract permitting . . . such recovery." *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 554 (Minn. 2008)). The Guides expressly provide for all reasonable attorneys' fees and costs incurred in enforcing the contract or resulting from any event of default, without limitation. (FOF & COL ¶¶ 26, 28) (citing PTX-001 § 274; PTX-032 § A223; PTX-1055 § A212; *PRMI Summ. J. Order*, 428 F. Supp. 3d at 67). Pursuant to general contractual fee-shifting provisions, Minnesota courts have permitted the award of attorney's fees for work expended in preparing the fee petition, or relatedly, for fees incurred after entry of judgment. *See Boundary Waters Bank v. McGaughey*, No. A15-1950, 2016 WL 1397305, at *1, 5 (Minn. Ct. App. Apr. 11, 2016) (finding that "[i]t was within the district court's discretion to award attorney fees related to submitting the motion for fees, as these were incurred in pursuing its rights under the note and mortgage," which provided for "reasonable attorney fees"); *Riverview Muir Doran,* 776 N.W.2d at 180 (stating, in a case in which the loan agreement required the borrower to pay the lender's attorney's fees incurred in enforcing

81

the agreement, "[the borrower] provides no legal authority stating that a district court is unable to add attorney fees that a party has continued to incur after that judgment has been entered.").

Here, as in *HLC*, the Guides were freely negotiated contracts between two sophisticated parties and they contain no fee-shifting exceptions for fee petition work. PRMI fully anticipated that ResCap would move for attorney's fees, including fees and costs incurred in preparing the fee petition, particularly as it had successfully done so in *HLC*, in which Williams & Connolly also served as defense counsel. The Court has reviewed Plaintiff's invoices for this work and finds them to be reasonable. Plaintiff is entitled to fees for its work related to the fee petition.

### f. Adjustments to the Lodestar

Finally, the Court considers whether any adjustments to the lodestar are warranted. Courts may adjust the lodestar upward or downward in limited circumstances, such as a possible upward adjustment in contingency-fee cases to reflect counsel's risk of representation with no assurance of compensation, and in light of "the quality of the work performed as evidenced by the work observed, the complexity of the issues and the recovery obtained." *Pennsylvania v. Del. Valley Citizens' Counsel for Clean Air*, 478 U.S. 546, 563 (1986); *see also Milner*, 748 N.W.2d at 624. However, because there is a strong presumption that the lodestar amount represents a reasonable fee calculation, adjustments are only warranted in rare and exceptional cases. *Del. Valley*, 478 U.S. at 563; *Milner*, 748 N.W.2d at 624.

Plaintiff does not seek an enhancement here. While the Court recognizes the exceptional talents and efforts of ResCap's counsel, it finds that the lodestar calculation adequately measures their performance and market value. Nor are further reductions warranted. Indeed, Plaintiff's request for fees and costs is high, but so was the amount at stake in this case and its potential effect on two other cases that overlapped during the pendency of this litigation. Moreover, given ResCap's charge to obtain compensation for the trust's beneficiaries to the greatest extent possible, this case was part of ResCap's considerable effort to recoup some portion of the $9 billion in losses and liabilities incurred by RFC in the Bankruptcy Settlement. And, as the Court has noted, ResCap's counsel expended considerable time responding to PRMI's requests and arguments, many of which were variations of previously rejected arguments. *See HLC Fee Award*, 399 F. Supp. 3d at 860 (declining to reduce the lodestar in light of defendant litigating previously rejected arguments, and based on impact of case on other pending cases) (citing *I-Sys., Inc. v. Softwares, Inc.*, No. 02-cv-1951 (JRT/FLN), 2005 WL 1430323, at *12 (D. Minn. Mar. 7, 2005) (noting that "the extent of the work expended by plaintiffs' attorneys was not conducted in a vacuum. Rather, much of plaintiffs' attorneys' effort was spent responding to defendants' three sets of attorneys, whose participation and output in this case was prodigious.")). PRMI was entitled to present a vigorous defense, but it did so with full knowledge that the Guides contemplated an award of attorney's fees.

### B. Whether ResCap's Costs are Reasonable

ResCap also seeks reimbursement of its legal costs, in the amount of $3,528,378.92. (*See* Second Supp'l Horner Decl. ¶¶ 2, 8–9, Ex. 48.) ResCap divides these expenses into

three categories, in the following amounts:  (1) experts and support firms ($2,623,614.92); (2) document vendors ($528,642.61); and (3) fact witnesses and trial vendors ($376,121.39).  (Horner Decl. ¶¶ 39–69;  Second Supp'l Horner Decl., Ex. 48.)

"As with the award of attorneys' fees, the standard for the award of costs is one of reasonableness."  *I-Sys.*, 2005 WL 1430323, at *14.  PRMI argues that ResCap has failed to demonstrate the reasonableness of its costs with respect to expert costs and fact witness costs.  (Def.'s Opp'n at 36–40; Def.'s Sur-Reply at 11–12.)

### 1.  Experts and Support Firms

#### a.  ResCap's Allocation Methodology

As noted, Plaintiff seeks to recover costs for expert witnesses and related support firms in the amount of $2,623,614.92.  (Second Supp'l Horner Decl., Ex. 48.)    To determine costs for experts and support firms, ResCap's CFO, Ms. Horner, identified costs specifically related to the PRMI case, (Horner Decl. ¶ 9), and also sought to allocate to PRMI portions of common costs applicable to all Wave One and Two cases, and common work related only to the Wave Two cases.  (*Id.* ¶¶ 10–11, 39.)  As to the allocations, she identified the number of active cases in Waves One and Two during a given month.  (*Id.* ¶¶ 10–11.)  She then used the pleadings in these cases, along with settlement information from ResCap, to identify the active Wave One and Wave Two cases by month.  (*Id.*)  Ms. Horner divided common work pro rata based on the number of cases during the time of the work.  (*Id.*)  ResCap is only seeking costs against PRMI for common costs applicable to all cases after December 2, 2016, when PRMI became an active case.  (*Id.* ¶ 10.)

In response, PRMI argues that ResCap unreasonably seeks $430,111 in expert costs for common work performed during Wave One, from January 1, 2016 to December 31, 2018. (Def.'s Opp'n at 34–35.) It argues that just as "'an attorney is not entitled to be paid in a case for the work he or another attorney did in some other case,'" an expert is not entitled to be paid in a case for the work he did in another case. (*Id.* at 35) (citing *ACLU of Ga. v. Barnes*, 168 F.3d 423, 430 (11th Cir. 1999)). PRMI cites a charge of approximately $18,000 for Dr. Snow's work in February 2018, when he was deposed in Wave One, noting that it was not a party to that deposition (*Id.*) (citing Horner Decl., Ex. 39-A). Moreover, PRMI argues, ResCap seeks costs of $94,000 for Dr. Snow's work in October 2019, the month that he was deposed in the *PRMI* case. (*Id.*) It objects to the notion that it should be required to reimburse ResCap for both a share of Dr. Snow's Wave One deposition, and the entirety of his deposition in this case. (*Id.*) PRMI contends that just because its case was pending during Wave One does not warrant charging PRMI with Wave One expert costs, particularly because PRMI did not engage in expert discovery until the spring of 2019. (*Id.*)

PRMI further asserts that Plaintiff's allocation is unreasonable, stating, "the mere fact that Plaintiff's experts repurposed work from prior cases does not justify charging PRMI for that prior work." (*Id.* at 36) (citing *Darula v. BMW of N. Am., LLC*, No. A11-1457, 2012 WL 1813406, at *5) (Minn. Ct. App. May 21, 2012) (stating that where attorney's work is merely an adaptation of prior work, courts should closely scrutinize the time billed to such tasks)).

85

But even if it were proper to charge Defendant for this work, PRMI argues that ResCap's allocation methodology would be inappropriate, as PRMI finds the pro rata allocation fails to account for each defendant's share of liability.  (*Id.*) (citing *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 959 (1st Cir. 1984) (noting that the law concerning apportionment between defendants of liability for attorney's fees and costs "remains relatively unsettled," with some courts dividing the award equally among defendants, but opting, under specific facts, to apportion by degree of each defendant's liability)).  PRMI contends that its liability in this case is "just $5.4 million," while other defendants faced liability of up to $236.9 million.  (*Id.*)

The Court finds that both parties unquestionably benefitted from work performed in Waves One and Two, resulting in lower costs to both sides in the instant matter.  For example, the fact that PRMI took a half-day deposition of Dr. Snow in this case was made possible only because he had been previously deposed.   Under these circumstances, it is reasonable to allocate a portion of those prior expenses to PRMI—expenses that would otherwise be borne by ResCap.  Notably, Plaintiff is only seeking costs against PRMI for common costs applicable to all cases after December 2, 2016, when PRMI became an active case.  (Horner Decl. ¶ 10.)

The Court also finds ResCap's pro rata allocation proper.  This case is unlike a multi-defendant case in which relative percentages of liability have been adjudged per defendant.  Relatedly, throughout PRMI's opposition to the instant petition, it has argued that fees and costs should be proportional to damages and its share of liability.  Yet a cursory review of a sample of PRMI's invoices demonstrates that its own costs—in a $5.4

86

million case—were comparable to ResCap's.  (Johnson Decl., Ex. 4 [Doc. No. 56-2].)  In the *six-month* period from November 2019 through May 2020 for which PRMI has submitted partial invoices from Williams & Connolly (for November and December, 2019, and January, March, and April, 2020) and Zelle (for February through May, 2020), its costs total approximately $1.1 million.[10]  (*See id*. at 2, 7, 17, 23, 53, 139, 147, 152, 155.)   By contrast, ResCap's request for all costs spans over a *four-year* period, totaling $3.5 million. Certainly, the six-month period for which PRMI incurred its $1.1 million in costs included the intensive period of trial preparation, trial, and the preparation of its proposed findings of fact and conclusions of law.  However, the fact that ResCap, which bore the burden of proof, incurred total costs of $3.5 million over a number of years supports a finding that a pro rata allocation of a portion of ResCap's expert-related costs is reasonable here.

### b. ResCap's Request and Supporting Documentation for Expert Costs

In support of its initial memorandum, ResCap submitted supporting documentation for the costs incurred from fifteen experts and expert support firms who performed work attributable to the *PRMI* case.  (Horner Decl., Ex. 22.)  The experts and support firms performed work in the following general categories:  (1) reunderwriting; (2) AVM and Uniform Standards of Professional Appraisal Practice ("USPAP"); (3) bankruptcy settlements; (4) damages; and (5) securitization.  (*Id*. ¶ 39.)  Additionally, in response to PRMI's expert opinion from a local attorney offered in opposition to the instant motion, ResCap obtained its own rebuttal expert, Mr. Cambronne.  (Second Supp'l Horner Decl.

---

[10]     The costs reflected in PRMI's invoices are not limited to expert-related costs.

¶¶ 2, 8.)  In connection with that work, ResCap incurred costs for the work involved in preparing Mr. Cambronne's declaration, and preparing for and attending his deposition, among other things.  (*Id*. ¶ 8.)

As to reunderwriting, ResCap's experts and expert support firms conducted reunderwriting of the PRMI loans, reunderwriting of the global sample for Wave One that was performed after December 2, 2016, when PRMI became an active case, and prepared the global sample expert report submitted in *PRMI* and used at trial.  (Horner Decl. ¶ 40.) Plaintiff's expert, Steven Butler, conducted reunderwriting analysis with the support of three vendors:  Digital Risk, LLC, Opus Capital Markets Consultants, LLC, and the Barrent Group.  (*Id.*)  ResCap has submitted summaries of the costs associated with this work, as well as invoices.  (*Id*., Exs. 23-A, 23-B, 24, 25-A, 25-B, 26-A, 26-B, 27-A, 27-B.)

With respect to AVM/USPAP experts and support firms, costs were incurred for work on PRMI-specific loans, and allocations for work performed on the global sample of loans after December 2 2016, and on the "GAVM" (automated valuation model) after December 2, 2016.  (Horner Decl. ¶ 44.)  The following vendors performed this work: Greenfield Advisors (including John Kilpatrick), Summit Consulting (including Albert Lee), and Allstate Appraisal (including Steve Albert).  (*Id*.)  ResCap has submitted summaries of the costs associated with this work, as well as invoices.  (*Id.*, Exs. 28–31, 32-A, 32-B, 33-A, 33-B, 34.)

As to the Bankruptcy Settlements, Axinn Veltrop Harkrider LLP conducted this expert work, which was performed by Donald Hawthorne, Anthony Saunders, and Compass Lexecon LLC ("Compass").  (*Id*.  ¶ 49.)  Mr. Hawthorne served as ResCap's

expert witness on RFC's underlying liability prior to the Bankruptcy Settlements, and Mr. Saunders and Compass provided servicing analysis related to the Bankruptcy Settlements for purposes of responding to PRMI's expert Mr. Phillip Burnaman. (*Id*. ¶ 52.) ResCap has submitted summaries of the costs associated with this work, along with invoices. (*Id.*, Exs. 35-A, 35-B, 36–38.)

Regarding ResCap's experts and vendors on damages, it hired Bates White LLC , (including testifying expert Dr. Karl Snow), and expert Richard Solum. (*Id.* ¶ 56.) Mr. Solum was an expert on the reasonableness of the damages methodologies across all cases in Wave One. (*Id*.) Although PRMI's pro-rata share of Mr. Solum's work reflects $5,088.97 in costs, ResCap has chosen not to seek reimbursement of these costs from PRMI. (*Id.* n.11.) For work performed from May 2016 to March 2020, ResCap allocated all PRMI-specific work to PRMI in full. (*Id.*) It divided all non-defendant-specific common work pro rata by the number of active cases at the time of the work (in both Waves One and Two), and charged PRMI its pro rata share. (*Id.*) All work performed by Bates White after August 1, 2019, consisting of preparing for, testifying at, and assisting with the PRMI trial, was PRMI-specific work. (*Id.* ¶ 57.) Unless that work was otherwise identified as pertaining to a different defendant, ResCap charged all such work directly to PRMI. (*Id.*) ResCap has submitted summaries of the costs associated with this work, as well as invoices. (*Id*., Exs. 39-A, 39-B, 40.)

For ResCap's securitization-related work, it hired AlixPartners, which included testifying expert Louis Dudney, as well as Henry Hayssen. (*Id.* ¶ 59.) ResCap retained AlixPartners to analyze mortgage loan data and schedules for PRMI and the global sample.

(*Id.* ¶ 60.)  ResCap seeks reimbursement from PRMI of a pro-rata share of AlixPartners' expenses for work performed between March 1, 2019 through August 1, 2019, related to the Wave One cases.  (*Id.*)  For AlixPartners' work performed between August 1, 2019 to October 31, 2019, ResCap charged the full amount of the costs to PRMI, as all of the work was PRMI-specific.  (*Id.*)  ResCap has submitted summaries of the costs associated with this work, as well as invoices.  (*Id.*, Exs. 41-A, 41-B, 42.)

PRMI argues that ResCap's requested reimbursement for expert expenses is unreasonable, pointing to $2.15 million in expert costs for direct or Wave Two common work, and, in particular, to the work of Dr. Snow and Mr. Hawthorne.  (*Id.* at 37–39.)  Again, PRMI contends that "Plaintiff's experts largely recycled their opening reports from Wave One." (*Id.* at 37–38) (citing Clouser Decl. ¶¶ 68, 68(a)).  Also, PRMI asserts that during another period of this lawsuit, ResCap's experts were "simply waiting for PRMI's experts to issue rebuttal reports," and Mr. Hawthorne issued a short reply report that tracked his supplemental report in Wave One.  (*Id.* at 38) (citing Clouser Decl. ¶¶ 69–70).  While PRMI concedes that Dr. Snow's reply report "contained some new monoline analyses," it argues that the report also repeated analyses from his supplemental report in Wave One.  (*Id.* at 38–39) (citing Clouser Decl. ¶ 68(b)).  Further, PRMI argues that although the parties tentatively planned to depose Mr. Hawthorne, PRMI ultimately did not do so in this case, and Dr. Snow's deposition was limited to a half day.  (*Id.*) (citing Clouser Decl. ¶¶ 70 n.8, 73).  Finally, PRMI also takes issue with ResCap's expert costs from December 1, 2019 to March 31, 2020, arguing that "[o]nly three of Plaintiff's experts

testified at trial," and two of them (Mr. Hawthorne and Dr. Snow) "already had testified about similar issues in *HLC*. (*Id.* at 39) (citing Clouser Decl. ¶¶ 97–98, 100–02).

The Court rejects PRMI's characterization of the "recycled" nature of the work performed by Plaintiff's experts, for the many reasons set forth in the analysis of Plaintiff's request for attorney's fees. Simply because ResCap's expert reports may have been similar in certain respects to some of the earlier reports from Wave One, does not mean that the experts could simply cut and paste their prior work, without familiarizing themselves with the facts of this case and without responding to PRMI's experts' specific critiques. Nor does the fact that PRMI took shorter depositions of ResCap's experts, or ultimately elected not to depose other experts, mean that the experts were not performing necessary work.

Much of the work performed by ResCap's experts here was unique to the at-issue PRMI loans, and to issues newly raised in this action. For example, as discussed earlier, in addition to deposition and trial preparation, Dr. Snow also performed qualitative analysis regarding Dr. McCrary's critiques of his methodologies. (*See* Supp'l Christenson Decl. ¶ 35.) In fact, his supplemental report addressed two new PRMI-specific damages approaches. (*Id.*)

As to Mr. Hawthorne, given the greater emphasis in this case on securitization-level representations and warranties than in *HLC*, Mr. Hawthorne addressed, in greater detail here, the impact of various disclaimers and representations on RFC's underlying risk of liability prior to entering into the Bankruptcy Settlements. (*See, e.g.*, FOF & COL ¶¶ 216 (No-Default Rep), 233 (Loan Program Rep), 244 (Loan Program Rep), 251 (Fraud Disclaimer), 261 (Fraud Disclaimer), 266 (Substantial Compliance, Loan Program, and

Credit Grade Reps).) Furthermore, in this case, unlike *HLC*, PRMI countered Mr. Hawthorne's testimony with that of its own expert, Mr. Woll.

PRMI also argues that ResCap is not entitled to recover costs associated with Mr. Cambronne's expert opinion. (Def.'s Sur-Reply at 11–12.) As discussed earlier in the context of PRMI's overall objections to the Court's consideration of Mr. Cambronne's opinion, PRMI argues that his opinion was not a proper opinion offered in rebuttal to Mr. Remele's opinion, but an untimely affirmative declaration. (*Id.*) The Court disagrees with PRMI's characterization. PRMI was entitled to offer Mr. Remele's opinion, even though the Court gave little weight to the opinion of HLC's attorney's fees expert in the *HLC Fee Award* because of the Court's own in-depth knowledge of the case, among other things. 399 F. Supp. 3d at 843–45. Given the guidance of the *HLC Fee Award*, and this Court's ever-increasing familiarity with the facts of this RMBS trust litigation, it is not surprising that ResCap chose not to affirmatively offer an expert opinion in support of its fee petition. But it is also not surprising that after unsuccessfully seeking confirmation from PRMI about its intent to submit an expert opinion in opposition to the fee petition, and after PRMI ultimately disclosed its expert, ResCap obtained Mr. Cambronne's rebuttal opinion. That opinion was limited to the issues that Mr. Remele had raised. Accordingly, the Court finds it reasonable to award Plaintiff the costs incurred in obtaining Mr. Cambronne's opinion— an expense it would not have otherwise borne, but for PRMI's use of an expert.

In sum, the Court finds that ResCap's expert and expert-related costs were reasonably incurred in the amount of $2,623,614.92. (*See* Second Supp'l Horner Decl., Ex. 48.)

### 2.  Document Vendors

Plaintiff seeks to recover $528,642.61 for costs incurred from one of its document vendors.  (*Id*.)  Although it used a number of document vendors during this litigation to process, store, and review over 60 million documents, it seeks reimbursement for costs incurred from only one vendor, NightOwl Discovery, Inc. ("NightOwl"), and only with regard to NightOwl's Wave Two document review.  (Horner Decl. ¶ 61.)  Between November 2017 and April 2018, ResCap used NightOwl to review documents in the Wave Two cases, including those produced by Wave Two defendants, and to make productions.  (*Id*. ¶ 62.)  ResCap hired NightOwl to collect, process, review, search, and maintain over 300,000 documents produced to PRMI.  (*Id*.)  After reviewing the Wave Two NightOwl invoices from November 2017 to April 2018, ResCap calculated $528,642.61 as PRMI's pro rata share.  (*Id*.)  In support of its request for costs, ResCap has submitted summaries of NightOwl's fees, along with the applicable invoices.  (*Id*., Exs. 43-A, 43-B.)

PRMI does not lodge a specific objection to this element of Plaintiff's costs.  Based on the Court's longstanding familiarity with this litigation, and its review of ResCap's supporting documentation, the Court finds ResCap's costs for document vendors were reasonably incurred and awards these costs ($528,642.61) in full.  (*See* Second Supp'l Horner Decl., Ex. 48.)

### 3.  Witnesses and Trial Vendors

ResCap seeks to recover costs totaling $376,121.39 for fact witnesses and trial vendors.  (*Id*.)  With regard to trial witnesses, ResCap paid the expenses, including travel expenses, of Ms. Bangerter and Ms. Farley to attend trial, and also reimbursed them at an

hourly rate based on wages lost as a result of attending and preparing for depositions and trial.  (Horner Decl. ¶ 64.)  Two other witnesses whom PRMI deposed, but who were not called as trial witnesses, Brenda Evans and Lisa Lundsten, were reimbursed at an hourly rate based on their individual wages lost as a result of attending and preparing for depositions.  (*Id.*)

In addition, ResCap incurred costs from four vendors related to the trial:  Hyatt Place, Gamma Lending Omega LLC ("Gamma"), Connect Litigation, and TrialGraphix. (*Id.* ¶ 65.)  Specifically, ResCap incurred lodging fees from Hyatt Place for its witnesses and lawyers during trial, rented office space for trial through Gamma, and rented office equipment and catering for trial through Connect Litigation.  (*Id.* ¶¶ 66–67.)  During trial, ResCap used the services of TrialGraphix for its graphics.  (*Id.* ¶ 68.)  ResCap has provided a summary of its costs from each vendor, along with the related invoices.  (*Id.*, Exs. 44– 47.)

PRMI specifically objects to the amount of costs that ResCap seeks to recover for its fact witnesses Ms. Bangerter and Ms. Farley, noting that Ms. Bangerter billed at a rate of $250 per hour, and Ms. Farley at a rate of $425 per hour.  (Def.'s Opp'n at 40) (citing Johnson Decl. [Doc. No. 55], Exs. 10–11).

The Court finds that the costs incurred for ResCap's fact witnesses (Ms. Farley, Ms. Bangerter, Ms. Lundsten, and Ms. Evans) were reasonable.  (*See* Horner Decl., Ex. 44.) Ms. Farley is an attorney with over 35 years of legal and executive experience, including experience at the Minneapolis law firm of Dorsey & Whitney, and in the RMBS industry in general, and at RFC, in particular, where she served as the co-head of its securitization

group and as a member of its leadership team. (FOF & COL ¶ 29; Feb. 10, 2020 Trial Tr. [Doc. No. 5479] at 97:11-24.) The Court finds that her $425 hourly witness billing rate reasonably reflects the value of her time, and her billed hours were reasonably incurred. Ms. Farley took time away from her work, and refamiliarized herself with events occurring 10 to 20 years ago. (Supp'l Christenson Decl. ¶ 31.) Moreover, in preparation for her testimony, she reviewed many lengthy, technical securitization documents and related information. (*Id.*) She also testified at length at trial over the course of two days, totaling approximately 162 pages of the trial transcript. (Feb. 10, 2020 Trial Tr. at 96–212; Feb. 11, 2020 Trial Tr. [Doc. No. 5480] at 282–328.)

Ms. Bangerter worked at RFC as a sales director, where she was involved in the execution of business contracts. (FOF & COL ¶ 7.) Following her tenure at RFC, Ms. Bangerter went on to work at a number of financial institutions. (Feb. 11, 2020 Trial Tr. at 335:25-337:13.) She later owned and operated an art gallery, and she now provides care for her grandchild, who is in her custody. (*Id.*) Like Ms. Farley, Ms. Bangerter was required to take time away from her other responsibilities, and to refamiliarize herself with events occurring 10 to 20 years ago. (Supp'l Christenson Decl. ¶ 31.) For her deposition, PRMI identified over 100 documents, which necessitated not only attorney review, but Ms. Bangerter's review and preparation as well. (*Id.*) Also like Ms. Farley, Ms. Bangerter testified at length at trial, for a total of approximately 188 pages of the trial transcript. (Feb. 11 Trial Tr. at 333–521.) The Court finds her hourly rate of $250 per hour was reasonable, as were her billed hours.

Having reviewed the fact witnesses invoices, and given the Court's familiarity with this case, the Court finds that the costs incurred by ResCap's fact witnesses were reasonable. Likewise, the Court finds the costs incurred from ResCap's trial vendors were reasonable. Accordingly, the Court grants ResCap's costs in full ($376,121.39) for its fact witnesses and trial vendors. (*See* Second Supp'l Horner Decl., Ex. 48.)

In conclusion, as to costs, the Court finds that Plaintiff's total cost request of $3,528,378.92 is reasonable and it is entitled to an award of costs in this amount.

### C. Post-Award Prejudgment Interest

Earlier, in its discussion of proportionality, the Court addressed pre-award prejudgment interest. Again, ResCap is entitled to pre-award prejudgment interest in the amount of $1,999,180.27. Plaintiff also seeks post-award prejudgment interest on the sum of the award ($5.4 million) and pre-award prejudgment interest ($1,999,180.27), i.e., $7,399,180.27, at the rate of 10% per year, running from the award date to the date on which final judgment is entered. (Pl.'s Mem. at 20) (citing Minn. Stat. § 549.09, subd. 1(a)). Plaintiff argues that the award date is August 14, 2020—the date on which this Court issued its Findings of Fact and Conclusions of Law and awarded $5.4 million in damages. (*See* Pl.'s Reply at 21; Pl.'s Proposed Order [Doc. No. 34].)

As discussed earlier, PRMI disputes ResCap's entitlement to prejudgment interest as a general matter. However, even if ResCap is entitled to prejudgment interest, PRMI argues that Plaintiff is not entitled to interest at the state-proscribed rate of 10% beyond August 17, 2020—the day that the Clerk's Office entered judgment. (Def.'s Opp'n at 41–42.) Beyond August 17, 2020, PRMI contends that federal law governs the rate of

postjudgment interest, which has a much lower floating interest rate (currently, 0.06%), citing http://www.txnd.uscourts.gov /post-judgment-rates.  (*Id*. at 41–42) (arguing that "federal law governs the award of *postjudgment* interest"; "The question here concerns *post-judgment* interest." (emphasis added)).   In other words, PRMI claims that post-judgment interest began accruing (and apparently prejudgment interest stopped accruing) on August 17, 2020 because, it asserts, that is the date this Court entered judgment.  (*See id*. at 41–43.)

While PRMI attempts to invoke the interest rate for postjudgment interest under 18 U.S.C. § 1961, its argument is beside the point with respect to the Court's present undertaking.  Specifically, the Court's task is determining: (1) the prejudgment interest rate that applies; and (2) the prejudgment interest rate accrual period.  PRMI conflates post-award prejudgment interest with postjudgment interest.

"Because ResCap's indemnification claim was asserted under state law, Minnesota law governs Plaintiff's request for prejudgment interest."  *See HLC Prejudgment Int. Order*, 2019 WL 1237166, at *3; *Ewald*, 2015 WL 1746375, at *21 (stating general rule that "prejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court").  Prejudgment interest can be broken down into two sub-categories: pre-award prejudgment interest and post-award prejudgment interest.  *See Hogenson v. Hogenson*, 852 N.W.2d 266, 274 (Minn. Ct. App. 2014).

Pre-award prejudgment interest "should be calculated exclusively under section 549.09" if "damages are not readily ascertainable."  *Hogenson*, 852 N.W.2d at 274.  If "the value of a claim must be determined by litigation, . . . it is not 'readily ascertainable.'"

97

*HLC Prejudgment Int. Order*, 2019 WL 1237166, at *3 (quoting *Hogenson*, 852 N.W.2d at 274). Further, "prejudgment interest, including from the date of the verdict to the date of judgment"—i.e., post-award prejudgment interest—"should be calculated under the appropriate subdivision of section 549.09 in every case." *Hogenson*, 852 N.W.2d at 274.

Here, the value of the claims was litigated at a bench trial, at which the parties strongly contested the calculation of damages. (*See, generally*, FOF & COL ¶¶ 267–371; 441–80.) Thus, the value of the claim here was not "readily ascertainable," which makes Minn. Stat. § 549.09 the exclusive authority for pre-award prejudgment interest. *See Hogenson*, 852 N.W.2d at 274.

Minn. Stat. § 549.09 states that "[f]or a judgment or award over $50,000, . . . the interest rate shall be ten percent per year . . . ." Minn. Stat. § 549.09, subd. 1(c)(2). Such interest (i.e., prejudgment interest) starts accruing "from the time of the commencement of the action" and continues "until judgment is *finally entered*." *Id.,* subd. 1(a) & (b) (emphasis added). The date on which pre-award prejudgment interest ends, marking the beginning of post-award prejudgment interest, is noteworthy because post-award prejudgment interest is calculated by using the total sum of the award and pre-award prejudgment interest. *Hogenson*, 852 N.W.2d at 276 (concluding that pre-award prejudgment interest is "part of compensatory damages"); *see, e.g.*, *HLC Prejudgment Int. Order*, 2019 WL 1237166, at *9.

The Minnesota Court of Appeals has relied on Black's Law Dictionary's definition of "prejudgment interest," which defines the term as "[s]tatutorily prescribed interest accrued either from the date of the loss or from the date when the complaint was filed *up*

*to the date the final judgment is entered.*" *Kinworthy v. Soo Line R.R. Co.*, 841 N.W.2d 363, 367 (Minn. Ct. App. 2013) (emphasis added) (quoting *Prejudgment Interest*, Black's Law Dictionary (9th ed. 2009)), *aff'd*, 860 N.W.2d 355 (Minn. 2015).  Under Minnesota law, prejudgment interest does not stop accruing until "*final* judgment is entered." *Id*. (emphasis added).  In the instant case, and contrary to PRMI's apparent suggestion, final judgment has clearly not yet been entered.

The Court's August 14, 2020 Findings of Fact and Conclusions of Law awarding ResCap $5.4 million, plus to-be-determined fees, costs, and prejudgment interest, did not constitute entry of final judgment.  (*See* FOF & COL, 2020 WL 4728109, at *91) ("Defendant shall pay Plaintiff $5.4 million in damages; and . . . [w]ithin 10 days, the parties shall meet and confer regarding a briefing schedule on Plaintiff's motion for an award of attorney's fees, costs, and pre-judgment interest, and shall inform the Court of the schedule forthwith.").

Nor was the August 17, 2020 judgment from the Clerk of Court a final decision, as it contained the very same language as the Findings of Fact and Conclusions of Law, reserving the Court's determination of the amount of attorney's fees, costs, and prejudgment interest owed by PRMI.  (13-cv-3451, Aug. 17, 2020 Order [Doc. No. 5528]); *Parke v. First Reliance Standard Life Ins.*, 368 F.3d 999, 1002 n.2 (8th Cir. 2004) ("The Order for Judgment dated September 25, 2002, was *not a final decision because the district court explicitly reserved its determination of the amount of attorney's fees and interest owed by [Defendant]*." (emphasis added)); *Minn. v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1023 (8th Cir. 1998) ("[W]hat is required [to constitute final judgment] is 'some

99

clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as the court is concerned, is the end of the case.'" (quoting *Goodwin v. United States*, 67 F.3d 149, 151 (8th Cir.1995))); *Reinholdson v. Minn.*, 346 F.3d 847, 849 (8th Cir. 2003) (same).  In cases in which the judgment contains no such reservation for a determination of attorney's fees or costs, *see Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, No. 10-cv-14 (DWF/SER), Judgment in a Civil Case [Doc. No. 110] (D. Minn. May 20, 2011), and the prevailing parties belatedly move to amend the judgment for attorney's fees, costs, and prejudgment interest, courts have considered the motion to be an untimely postjudgment motion for prejudgment interest.  *Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, 767 F.3d 744, 752–53 (8th Cir. 2014).

The Eighth Circuit held in *Dieser v. Continental Cas. Co.*,  440 F.3d 920, 923–24 (8th Cir. 2006), that orders "indicat[ing] that the amounts of additional statutory penalties, pre-judgment interest[,] and attorney's fees and costs remain[] unresolved," as well as orders "indicat[ing] that the amount of pre-judgment interest [is] yet to be determined," are not "final."  This Court expressly stated in its Findings of Fact and Conclusions of Law that the amounts of attorney's fees, costs, and prejudgment interest remained unresolved, as it ordered the parties to propose a briefing schedule, "on Plaintiff's motion for an award of attorney's fees, costs, and pre-judgment interest."   (FOF & COL, 2020 WL 4728109, at *91.)  This language plainly indicated the Court's job was not done and it remained tasked with resolving substantial issues, including the potential award of attorney's fees, costs, and prejudgment interest. *See Dieser*, 440 F.3d at 923–24; *cf. Knowlton v. Anheuser-Busch Cos. Pension Plan*, 849 F.3d 422, 427 (8th Cir. 2017) (finding that "the district court

100

issued final relief because it purported to address and resolve *all* of the issues in the case." (emphasis added)).  PRMI's legal authority fails to support the proposition that the Court has already entered final judgment.  *See Weitz v. Mo-Kan Carpet*, 723 F.2d 1382, 1385–86 (8th Cir. 1983) (stating that federal law governs the award of postjudgment interest, and state law governs award of prejudgment interest), and *Maddox v. American Airlines*, 298 F.3d 694, 699–700 (8th Cir. 2002) (addressing conflicts of law issue regarding availability of prejudgment interest under Arkansas and Oklahoma law).

This action commenced on December 2, 2016, when service was effective. (Summons Returned [Doc. No. 6] at 3.)  The court issued its Findings of Fact and Conclusions of Law on August 14, 2020, awarding $5.4 million to ResCap, and left open for consideration an award of attorney's fees, costs, and prejudgment interest that are still not yet determined.  (*See* FOF & COL, 2020 WL 4728109, at *91.)  Therefore, pre-award prejudgment interest runs from December 2, 2016 to August 14, 2020, at a rate of 10% per year.  *See* Minn. Stat. § 549.09 subd. 1(a), (b), & (c)(2); *Hogenson*, 852 N.W.2d at 274.

As for post-award prejudgment interest, Section 549.09 likewise controls, running from the date of the award through the date of final judgment.  *See Hogenson*, 852 N.W.2d at 274.  *See Kinworthy*, 841 N.W.2d at 367.  "[I]nterest from the time of the verdict . . . until judgment is *finally* entered shall be . . . added to the judgment or award. . . . [T]he interest rate shall be ten percent per year . . . ."  Minn. Stat. § 549.09, subd. 1(a) & (c)(2) (emphasis added).  Furthermore, "when awarding post[-award] prejudgment interest, courts may 'includ[e] the pre[-award] [prejudgment] interest in the total sum of the award upon which

101

post[-award] prejudgment interest [is] calculated.'" *HLC Prejudgment Int. Order*, 2019 WL 1237166, at *9 (quoting *Hogenson*, 852 N.W.2d at 276).

So that the Court may enter final judgment in this matter, Plaintiff shall promptly file its calculation of the appropriate award of postverdict prejudgment interest on the total award of damages, inclusive of pre-award prejudgment interest, but not on the award of attorney's fees and costs. The Court directs Plaintiff to provide a calculation over a range of four days, to give the Court time to review the submission and direct entry of judgment with the correct calculation.

## III.  CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Plaintiff's Motion for Attorney's fees, costs, and Prejudgment Interest [Doc. No. 22] is **GRANTED in part and DENIED in part**;

2. Plaintiff is awarded $14,081,616.31 in attorney's fees and costs ($10,553,237.39 in attorney's fees + $3,528,378.92 in costs);

3. Plaintiff is awarded $1,999,180.27 in prejudgment interest on the Court's damages award from the commencement of this litigation on December 2, 2016, to the award date of August 14, 2020;

4. Plaintiff is awarded post-award prejudgment interest on the sum of the award and pre-award interest, from the award date through the date the Court enters final judgment in this matter;

5.  Within seven (7) days of this Order, Plaintiff shall file a calculation of the appropriate award of post-award prejudgment interest over a range of four days so that the Court can enter final judgment in this matter; and

6.  This Order is temporarily filed under seal.  Within seven (7) days of the date of this Order, the parties are **ORDERED to show cause** as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long.  To that end, the parties must file (under seal) a joint brief, no longer than five (5) pages, and/or a proposed Redacted Order, if they would like portions to remain under seal.


Dated:  April 28, 2021                               s/Susan Richard Nelson
                                                     SUSAN RICHARD NELSON
                                                     United States District Judge

103